AO 241   (Rev. 5/85)

## PETITION UNDER 28 USC § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District EASTERN DISTRICT OF SACRAMENTO | |
|---|---|---|
| Name MARQUIS M. DAVIS | Prisoner No. F-79213 | Case No. 09CW3510EFB |

Place of Confinement

CSP-CORCORAN   PO. BOX 3461   CORCORAN   CA. 93212

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| MARQUIS M. DAVIS                   V. | MAURICE JUNIOUS   ET.,AL., |

The Attorney General of the State of: CALIFORNIA

### PETITION

1.  Name and location of court which entered the judgment of conviction under attack SUPERIOR COURT OF

    CALIFORNIA SOLANO COUNTY 600 UNION AVENUE FAIRFIELD CA. 94533

2.  Date of judgment of conviction  MAY 24, 2007

3.  Length of sentence  25 YEARS

4.  Nature of offense involved (all counts)  ON NOVEMBER 6, 2006, PETITIONER MARQUIS DAVIS

    ENTERED A PLEA OF GUILTY IN SOLANO COUNTY SUPERIOR COURT TO 1 COUNT

    OF ATTEMPTED MURDER IN VIOLATION OF PENAL CODE SEC. 664/187,SUBD

    (A) HE ALSO ADMITTED ALLEGATIONS TO PENAL CODE SEC. 12022.53,SUBD

    THAT HE PERSONALLY AND INTENTIONALLY, DISCHARGED A FIREARM

5.  What was your plea? (Check one)
    (a) Not guilty           ☐
    (b) Guilty               ☒
    (c) Nolo contendere      ☐

    If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

6.  If you pleaded not guilty, what kind of trial did you have? (Check one)
    (a) Jury             ☐
    (b) Judge only       ☐

7.  Did you testify at the trial?
    Yes  ☐   No  ☐

8.  Did you appeal from the judgment of conviction?
    Yes  ☒   No  ☐

**FILED**

DEC 2 1 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

(2)

AO 241    (Rev. 5/85)

9.    If you did appeal, answer the following:

(a) Name of court ___IN THE COURT OF APPEAL FIRST APPELLATE DIST. DIV. TWO___

(b) Result ___DENIED___

(c) Date of result and citation, if known ___10/31/09    CASE NO. A118622___

(d) Grounds raised ___TRIAL COURT ERRED DENYING PETITIONER'S WITHDRAWAL PLEA___
       ___MOTION    (2) PETITIONER'S SENTENCE MUST BE MODIFIED___

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court ___SUPERIOR COURT OF CALIFORNIA___

(2) Result ___DENIED___

(3) Date of result and citation, if known ___1/28/09    CASE NO. S-169163___

(4) Grounds raised ___THE TRIAL COURT DENIED PETITIONER'S STATE AND FEDERAL___
       ___CONSTITUTIONAL RIGHTS BY DENYING WITHDRAWAL OF PLEA MOTION___

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court _____

(2) Result _____

(3) Date of result and citation, if known _____

(4) Grounds raised _____

10.    Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
       Yes ☒    No  ☐

11.    If your answer to 10 was "yes," give the following information:

(a) (1) Name of court ___SUPERIOR COURT OF CALIFORNIA   SOLANO COUNTY___

(2) Nature of proceeding ___COLLATERAL ATTACK   AND EXHAUSTING STATE REMEDIES___

(3) Grounds raised ___(1)I.A.C. ON APPELLATE COUNSEL   (2) I.A.C. ON TRIAL___
       ___COUNSEL    (3) ABUSE OF DISCRETION ON TRIAL JUDGE___

(3)

(4)  ON MAY 24, 2007 AN EVIDENTIARY HEARING WAS HELD AFTER NEW

EVIDENCE WAS PROCURED BY PETITIONER DAVIS'S TRIAL ATTORNEY

DONALD BERGERSON, WHO DEPOSED A WITNESS SEAN WYDERMYER, WHO WAS

THE PROSECUTION'S STAR WITNESS, AND THEREFORE, RECANTED HIS STATEMENTS

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes  ☒    No  ☐

(5) Result  DENIED

(6) Date of result  MAY 24, 2007

(b) As to any second petition, application or motion give the same information:

(1) Name of court

(2) Name of proceeding

(3) Grounds raised

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes  ☐    No  ☐

(5) Result

(6) Date of result

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
(1) First petition, etc.    Yes  ☐    No  ☐
(2) Second petition, etc.   Yes  ☐    No  ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

12.  State *concisely* every ground on which you claim that you are being held unlawfully.  Summarize *briefly* the *facts* supporting each ground.  If necessary, you may attach pages stating additional grounds and *facts* supporting same.
CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

(4)

AO 241    (Rev. 5/85)

   For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

   Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

   (a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
   (b) Conviction obtained by use of coerced confession.
   (c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
   (d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
   (e) Conviction obtained by a violation of the privilege against self-incrimination.
   (f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
   (g) Conviction obtained by a violation of the protection against double jeopardy.
   (h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
   (i) Denial of effective assistance of counsel.
   (j) Denial of right of appeal.

                         (SEE ATTACHMENT)

   A.  Ground one: _____

   _____

       Supporting FACTS (state *briefly* without citing cases or law):  (SEE ATTACHMENT)

   _____

   _____

   _____

   _____

   _____

   _____

   B.  Ground two: _____

   _____

                                                      (SEE ATTACHMENT)
       Supporting FACTS (state *briefly* without citing cases or law): _____

   _____

   _____

   _____

   _____

   _____

   _____

AO 241    (Rev. 5/85)

C.  Ground three: (SEE ATTACHMENT)

Supporting FACTS (state *briefly* without citing cases or law):    (SEE ATTACHMENT)

D.  Ground four:

Supporting FACTS (state *briefly* without citing cases or law):    (SEE ATTACHMENT)

13.  If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

(1) I.A.C. ON APPELLATE COUNSEL    (2) I.A.C. ON TRIAL COUNSEL

(3) ABUSE OF DISCRETION ON PRESIDING JUSTICE ALLAN P. CARTER

14.  Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
    Yes  ☒    No  ☐

15.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
    (a)  At preliminary hearing    DONALD THOMAS BERGERSON    ATTORNEY AT LAW 34
    BOARDMAN PLACE SAN FRANCISCO    CA. 94103

    (b)  At arraignment and plea    DONALD THOMAS BERSON

AO 241    (Rev. 5/85)

(c)  At trial     DONALD THOMAS BERGERSON

(d)  At sentencing     DONALD THOMAS BERGERSON

(e)  On appeal     ROSS THOMAS ATTORNEY AT LAW 4104 24th STREET NO.411
SAN FRANCISCO    CA. 94114

(f)  In any post-conviction proceeding

(g)  On appeal from any adverse ruling in a post-conviction proceeding

16.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes  ☐  No  ☒

17.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes  ☐  No  ☒
(a)  If so, give name and location of court which imposed sentence to be served in the future:

(b)  Give date and length of the above sentence:  25 YEARS

(c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes  ☒  No  ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on
12/ 8 /09
_____
Date

_____
Signature of Petitioner

(7)

MARQUIS M. DAVIS F-79213

CORCORAN      CA. 93212

1

IMPROPRIA PERSONA

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11                          SACRAMENTO

12

13

14     MARQUIS M. DAVIS    )        CASE NO.
                           )
15              PETITIONER )
                           )        PETITION FOR FEDERAL WRIT OF
16        vs.              )        HABEAS CORPUS PURSUANT TO 28 USC
                           )        § 2254
17     MAURICE JUNIOUS     )
       ET.,AL.,            )
18              RESPONDENT )

19                                  US MAGISTRATE

20

21

22          To; Respondents, Maurice Junious, Et. Al., and the

23     United States Magistrate. Petitioner Marquis M. Davis, here by

24     motions this court he be heard on the following federal claims

25     pursuant to the Petition For

26                      Federal Writ of Habeas corpus pursuant to

27     28 USC § 2254: Please Take Notice! that on December 18, 2009

28     or soon thereafter, petitioner Davis, may be heard, before the

                                    1.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV 8-72)

85 34768

1  United States District Court For the Eastern District Of

2  California Sacramento Office 501 "I" Street,Suite 4-200

3  Sacramento  CA. 95814; Petitioner <u>Davis</u> will not <u>submit</u> any

4  <u>Memorandum of Law</u> with regard to the <u>Federal claims</u> now brought

5  before this court. Only an <u>argument</u> of <u>legal authority</u>, for the

6  Request of"<u>Stay in Abeyance</u>" Petitioner, <u>Davis</u> now request this

7  court <u>grant</u> so that the court will acknowledge <u>Collateral</u>

8  Federal claims are now "<u>Pending</u>" before the lower state courts

9  Petitioner <u>Davis</u>, would ask the court take "<u>judicial notice</u>"

10  of the "<u>Table of Contents</u>" and the Federal claims now <u>pending</u>

11  before the lower state court, inefforts that this court will

12 honor Petitioner <u>Davis's</u> request for "<u>Stay in Abeyance</u>" for the

13 Federal claims now "<u>pending</u>" before the lower state court.

14 Petitioner <u>Davis</u>, would ask the court take <u>judicial notice</u> of

15 the "<u>unexhausted</u> Federal claims now "<u>pending</u>" before the lower

16 state courts, in the"<u>table of contents</u>"

17

18      III. <u>INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL</u>
             <u>ON ROSS THOMAS SBN: 96184 IGNORING FEDERAL CLAIMS</u>
19  .        <u>CLEARLY STRONGER THAN THOSE ISSUES PRESENTED ON</u>
             <u>PETITIONER DAVIS'S DIRECT APPEAL AS WELL AS HIS</u>
20           <u>FAILURE TO ADVISE PETITIONER DAVIS TO FILE</u>
             <u>SUPPLEMENTAL BRIEF TO RESERVE THOSE ISSUES FOR A</u>
21           <u>FEDERAL COURT JURISDICTION</u>.

22       IV. <u>INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ON DONALD</u>
             <u>THOMAS BERGERSON VIOLATION OF SIXTH AMENDMENT</u>
23
          V. <u>ABUSE OF DISCRETION BY PRESIDING JUSTICE ALLAN P.</u>
24           <u>CARTER</u>

25

26 These claims are currently "<u>pending</u>" before the lower state

27 court. Petitioner <u>Davis</u> would ask the court "<u>Stay in Abeyance</u>"

28 the Federal claims raised on Direct Appeal, until these Three

                                    2.

1  aforementioned have been fully exhausted. Petitioner Davis,

2  would ask the court take "judicial notice of the Exhbits

3  attached to this petiton. For they substantiate disputed facts

4  as to the "pending" claims before the lower state court.

5

6  Affiant further sayeth naught!

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                  Respectfully, Submitted

23

24  Dated:  12/9 /09                              pro se

25

26

27

28                          3.

PETITION FOR WRIT OF HABEAS CORPUS . . . . . . . . . . . . . . . 1-6
VERIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . 7
TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . 8-9

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . 10-11
STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . 12-14
MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . 15

ARGUMENT

   I. AEDPA'S CLEAR PURPOSE TO ENCORAGE LITIGANTS TO
      PURSUE CLAIMS IN STATE COURT PRIOR TO SEEKING
      FEDERAL COLLATERAL REVIEW.(SEE 28 USCA 2254 (b)
      ALSO 2254 (e) (2) ALSO 2264 (A),ALSO 28 USCA
      2244 (d) (1) LIMITATIONS PERIOD AND 28 2254 (b)
      'S EXHAUSTION REQUIREMENT ENCOURAGES LITIGANTS
      FIRST TO EXHAUST ALL STATE REMEDIES AND THEN TO
      FILE THEIR FEDERAL HABEAS PETITION A.S.A.P.! . . . . . 16-23


  II. AN APPLICATION FOR STATE COLLATERAL REVIEW IS
      " PENDING " IN THE STATE COURTS, SO AS TO TOLL
      TIME PERIOD FOR SEEKING FEDERAL HABEAS CORPUS
      REMEDY DURING TIME BETWEEN A LOWER STATE COURT'S
      DECISION AND THE FILING OF A 'NOTICE OF APPEAL'
      TO A HIGHER STATE COURT 28 USCA § 2244 (d) (2) . . . . 24-25

 III. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ON
      ROSS THOMAS SBN: 96184 IGNORING FEDERAL CLAIMS
      CLEARLY STRONGER THAN THOSE ISSUES PRESENTED ON
      PETITIONER DAVIS'S DIRECT APPEAL AS WELL AS HIS
      FAILURE TO ADVISE PETITIONER DAVIS TO FILE
      SUPPLEMENTAL BRIEF TO RESERVE THOSE ISSUES FOR
      A FEDERAL COURT JURISDICTION. . . . . . . . . . . . . . 26-44


  IV. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ON DONALD
      THOMAS BERGERSON VIOLATION OF SIXTH AMENDMENT

      A. PETITIONER HAS A RIGHT TO EFFECTIVE ASSISTANCE
         OF COUNSEL AT PRETRIAL PLEADING STAGES UNDER
         BOTH STATE AND FEDERAL CONSTITUTION. . . . . . . . 45-50


      B. FACTS AND CIRCUMSTANCES OF IMPROPER INVESTIGATION
         ADVICE AND NEGOTIATION
                                . . . . . . . . . . . . . . 51-58


      C. HENDERSON/BIGMAN ERROR FAILURE OF COUNSEL TO
         INFORM PETITIONER DAVIS OF THE APPLICABLE
         SPECIFIC INTENT ELEMENTS RELATED TO HIS
         PROSPECTIVE DEFENSES. . . . . . . . . . . . . . . . 59-60

                                 4.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

D. PETITIONER DAVIS'S PLEA WAS INVOLUNTARY AS
   COUNSEL USED IMPROPER MEANS TO CONVINCE
   PETITIONER DAVIS TO ACCEPT THE PLEA BARGAIN.......61-62

E. PETITIONER DAVIS'S PLEA OF GUILTY SHOULD BE
   VITIATED PURSUANT TO PEOPLE V. JOHNSON,
   BECAUSE PETITIONER DAVIS DID NOT UNDERSTAND
   THE POSSIBLE PENAL CONSEQUENCES OF THE PLEA........63-64

F. PETITIONER DAVIS RECEIVED INEFFECTIVE ASSISTANCE
   OF COUNSEL,BECAUSE DEFENSE COUNSEL DID NOT ADVISE
   PETITIONER DAVIS TO WITHDRAW THE GUILTY PLEA WHEN
   THE TRIAL COURT DID NOT APPROVE THE PLEA.........65-66

G. PETITIONER DAVIS UNDER CONSTITUTIONAL STANDARDS
   HAS BEEN PREJUDICED BY DEFENSE COUNSEL'S ERRORS....67-68

V. ABUSE OF DISCRETION BY PRESIDING JUSTICE ALLAN P..... 69-75
   CARTER

   A. DENYING DEFENSE COUNSEL'S MOTION FOR CONTINUANCE

   B. DENYING THE DEFENSE A KELLY-FRYE HEARING

   C. ABUSE OF DISCRETION AND JUDICIAL MISCONDUCT
      DENYING PETITIONER DAVIS'S P.C. 1018 MOTION
      WHEN SEAN WYDERMYER RECANTED HIS TESTIMONY

CONCLUSION . . . . . . . . . . . . . . . . . . . . . .76-77

EXHIBITS (A) CALIFORNIA SUPREME COURT DECISION ON 1/28/09
             DENYING PETITIONER DAVIS'S DIRECT APPEAL ISSUES

         (B) APPELLATE COUNSEL ROSS THOMAS ATTORNEY AT LAW
             SBN: 96184 ASSIGNED TO DAVIS'S DIRECT APPEAL
             CASE NO. A118622

         (C) REPORTER'S TRANSCRIPTS OF PRETRIAL PROCEEDINGS
             BEFORE PLEA COLLOQUY TOOK PLACE

         (D) DECLARATION OF SEAN WYDERMYER EXECUTED ON 5/14/07

PROOF OF SERVICE . . . . . . . . . . . . . . . . . . 78.

COURT PAPER
TATE OF CALIFORNIA

## STATEMENT OF CASE

On November 6, 2006, appellant, Marquis Matthew Davis, entered a plea of guilty in Solano County Superior Court, to one count of attempted murder, a violation of Penal Code section 664/187, subdivision (a). He also admitted the allegation made pursuant to Penal Code section 12022.53, subdivision (c) that he personally and intentionally discharged a firearm during the commission of the offense. (CT 206-209, 211-212; RT 120.)[1]

On May 14, 2007, appellant moved to withdraw his guilty plea. (CT

---

[1]

"CT" refers to the clerk's transcript and "RT" refers to the reporter's transcript. "PXRT" refers to the reporter's transcript of the April 15, 2005, preliminary examination. Any number preceding these notations refers to the volume cited.

229-238.) This motion was heard and denied on May 24, 2007. (CT 272-277.)

Immediately upon the denial of the motion to withdraw the guilty plea, the court sentenced appellant to prison for an aggregate term of 25 years. (CT 277, 279.) Specifically, the midterm of five years was imposed for the attempted murder. (CT 279.) A 20-year enhancement was imposed in accordance with Penal Code section 12022.53, subdivision (c) and ordered to run consecutive to the five-year term. (*Ibid.*) This term of imprisonment was credited with the 1022 days (890 actual days plus 132 days good time/work time) appellant was in custody prior to sentencing. (CT 277, 280.) Additionally, appellant was ordered to pay a $3000 restitution fine pursuant to Penal Code section 1202.4, subdivision (b) and a parole restitution fine in the same amount pursuant to Penal Code section 1202.45. (CT 280.) The latter fine was stayed by the court pending appellant's successful completion of parole. (CT 274.)

Appellant filed a timely notice of appeal on July 11, 2007. (CT 281-282.) He also requested a certificate of probable cause in accordance with Penal Code section 1237.5. (CT 283-284.) This request was granted by the court on July 16, 2007. (CT 284.)

### STATEMENT OF FACTS

Sean Widermyer received a cell phone call from appellant while driving with his girlfriend to Vallejo shortly after noon on December 13, 2004. (PXRT 5-6.)[2] Appellant, who Widermyer knew as "Pluck," was interested in buying a quarter ounce of cocaine but was a "a few dollars short." (PXRT 8.) Widermyer assured him that his lack of funds would be no problem. (*Ibid.*)[3] They agreed to meet at a park in Vallejo later that day. (*Ibid.*)

Shortly after reaching the park, Widermyer received another call from appellant. (PXRT 9.) This time he told Widermyer to meet him at "Chinese Mike's" house which was nearby. (PXRT 9, 50.) Widermyer drove there and met appellant at the front door. (PXRT 12.) Appellant, who was on his cell phone at the time, walked into the bathroom after Widermyer stepped inside the residence. (*Ibid.*) A young man, who Widermyer knew as "Tyree," was in the livingroom. (*Ibid.*)

Widermyer became concerned after noticing that the house was devoid of furnishings. (PXRT 13.) As Widermyer started walking back toward the front door, appellant stepped out of the bathroom and shot him six times with

---

[2]

This rendition of the facts is based on testimony given by several witnesses at the April 15, 2005, preliminary examination.

[3]

Widermyer testified he agreed to sell the drugs to appellant because he was a friend. (PXRT 29.)

a small caliber handgun. (PXRT 13, 17.) Appellant and Tyree ran from the house after the shots were fired. (PXRT 15.)

Widermyer, who was unarmed, made no threatening moves toward appellant prior to the shooting. (PXRT 14.) According to Widermyer at the at the preliminary examination, the shooting came as a complete surprise to him. (*Ibid.*)

Although seriously wounded, Widermyer made his way out of the house and back to his car. (PXRT 15, 52.) He was immediately taken to a nearby hospital by his girlfriend, Regina Teasley. (PXRT 16, 52.) Widermyer testified that he told Teasley on the way to the hospital that Pluck had shot him. (PXRT 42.) Teasley, who testified as well, could only recall him saying the word "Pluck" as he slipped in and out of consciousness. (PXRT 54.)

Widermyer underwent surgery. (PXRT 17.) His injuries included a lacerated liver, damage to his brachial artery, arm, and hip, and removal of one of his kidneys. (PXRT 17, 18, 74.)

Shortly after his arrival at the hospital, Widermyer was interviewed by Vallejo Police Detective Jason Wentz. (PXRT 70.) While on the verge of unconsciousness, he told the detective that Pluck had shot him. (PXRT 70, 72.) Wentz returned to the hospital two days later and showed Widermyer a photo lineup which included appellant's picture. (PXRT 72-73.) He selected

that photograph and said appellant was the man who shot him. (PXRT 73.)

At some point, Wentz searched "Chinese Mike's" house. (PXRT 74-76.) He found several expended bullet cartridges and blood on the carpet and walls. (PXRT 75-76.)

At the preliminary examination, Widermyer revealed that he had learned from appellant about a week prior to the shooting that he was the target of a assassination hit. (PXRT 32-33.) A man named Daniel had offered $30,000 to anyone who killed Widermyer. (PXRT 32.) Daniel was apparently unhappy with Widermyer over a drug deal involving Ecstasy pills. (PXRT 31.) Widermyer testified did not take the threat very seriously at the time. (PXRT 33.)

/ /

/ /

n   n  10.

I.
A FEDERAL DISTRICT COURT HAS DISCRETION TO
STAY A MIXED HABEAS PETITION CONTAINING
EXHAUSTED AND UNEXHAUSTED CLAIMS TO THE STATE
COURT IN THE FIRST INSTANCE AND THEN TO RETURN
TO FEDERAL COURT FOR REVIEW OF HIS PERFECTED
PETITION 28 USCA § 2254(b)(1)(A)

Standard of Review

A federal district court has discretion to stay a mixed habeas petition containing exhausted and unexhausted claims to allow the petitioner to present his unexhausted claims to the state court in the first instance and then to return to federal court for review of his perfected petition 28 USCA § 2254(b)(1)(A) Rhines v Weber (US 2005) 544 US 269, 125 S.Ct. 1528

Comity in General

Under the "doctirn of Comity" one court should defer action on causes properly within it's jurisdiction, until the courts of another sovereignty with concurrent powers, and already cogni-zant of the litigation, have had an opportunity to pass upon the the matter.

The United States Supreme Court

Has reasoned that the interest of "comity" and federalism, dictate that state courts must have the first oppor-tunity to decide a petitioner's claims. Rose v Lundy, 455 US 509 102 S.Ct.1198, 71 L.Ed.2d 379 (1982) Id. at 518-519, 102 S.Ct. 1198. The court further noted, it would be unseemly, in our dual system of government for a federal district court to upset a

11.

1 state cout conviction without an opportunity to the state court

2 to _correct_ a _constitutional_ violation. Federal courts apply the

3 "doctrine of comity" Rose v Lundy (1982) supra, Id., at 518, 102

4 S.Ct. 1198 (quoting Darr v Burford, 339 US 200, 204, 70 S.Ct.587

5 94 L.Ed.761 (1950) This doctrine teaches that one _court_ should

6 _defer_ action on causes properly within it's _jurisdiction_ until

7 the _courts_ of another _sovereignty_, with concurrent powers and

8 already cognizant of the _litigation_, have an opportunity to _pass_

9 upon the matter' Rose v. Lundy, supra Id. at 522, 102 S.Ct. 1198

10 The court further, determined that a requirement of "total _ex-_

11 _haustion"_ be completed by the petitioner, there by, directing the

12 federal courts to effectuate that requirement by dismissing

13 "mixed" petitions without prejudice and allowing _petitioner_ to

14 to _return_ to the state court

15                     to _present_ the _unexhausted_ claims to that

16 Court in the first instance. Rose v Lundy, supra, Id.at 522,102

17 S.Ct.1198. When the court decided Lundy, there was no _statute_

18 of _limitations_ on the filing of _federal_ habeas corpus petitions.

19 As a result, petitioners, who _returned_ to _state_ court to _exhaust_

20 their previously, _unexhausted_ claims, could come _back_ to _federal_

21 court to present their _perfected_ petitions with relative ease.

22 (See Slack v McDaniel, 529 US 473,486, 120 S.Ct.1595, 146 L.Ed.

23 2d 542 (2000)

24

25 THE FILING OF A PETITION FOR HABEAS CORPUS
IN FEDERAL COURT DOES NOT TOLL THE STATUTE

26 ON LIMITATIONS FOR FEDERAL HABEAS RELIEF
28 USC 2244(d)

27

28 The enactment of the Antiterrorism and Effective Death Penalty

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV 8-72)

115 34389

12.

1  Act of 1996 (AEDPA) dramatically, altered the landscape for

2  federal habeas corpus petitions. AEDPA preserved, Lundy's total

3  exhaustion requirement. (See 28 USC § 2254(b)(1)(A) ("An appli-

4  cation for writ of habeas corpus...shall not be granted unless

5  it appears that...the applicant has exhausted the remedies avai-

6  lable in the courts of the state") But it also imposed a 1-year

7  statute of limitations on the filing of federal petitions § 2244

8  (d) Although, the limitations period is tolled during the penden

9  cy of a properly filed application for the state post conviction

10  or other collateral review" 2244(d)(2). The filing of a petiton

11  for habeas corpus in federal court does not toll the statute of

12  limitations, Duncan v Walker 533 US 167, 181-182, 121 S.Ct.2120

13  150 L.Ed.2d 251 (2001) As a result of the interplay between

14  AEDPA's 1-year statute of limitations and Lundy's dismissal

15  requirement, petitioner's who

16                    come to federal court with "mixed" petition

17  run the risk of forever losing their opportunity for any federal

18  review of their unexhausted claims. If a petitioner files a

19  timely, but mixed petition in federal district court and the

20  district court dismisses it under Lundy, after the limitations

21  period has expired, this will likely mean the termination of any

22  federal review. If a district court dismisses a "mixed" petition

23  close to the end of the 1-year period, has petitioner's chances

24  of exhausting his claims in state court, and refiling the peti-

25  tion in federal court before the limitations period runs are slim

26  The problem is not limited to petitioners who file close to the

27  AEDPA deadline. Even a petitioner who files early will have no

28  way of controlling when the district court will resolve the

1 question of <u>exhaustion</u>. Thus, whether a petitioner ever receives
2 federal review of his <u>claims</u> may turn on which district court
3 happens to <u>hear</u> his case <u>Rhines v Weber</u> (US 2005) 544 US 269, 12
4 125 S.Ct. 1528

5

6 The Supreme Court of the United States

7        Has recognized the gravity of this problem and
8 the difficulty it has posed for petitioners around federal dis-
9 trict courts alike. In an attempt to solve the problem, some
10 <u>district courts</u> have adopted a <u>version</u> of the "<u>Stay and Abeyance</u>
11 procedure employed by the <u>district court</u> below. Under this
12 procedure, rather then <u>dismiss</u> the "<u>mixed</u>" petition pursuant to
13 <u>Rose v Lundy</u> 455 US 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) A
14 <u>district court</u> might <u>stay</u> the <u>petition</u> and <u>hold</u> it in <u>abeyance</u>,
15 while the petitioner <u>returns</u> to <u>state</u> court to <u>exhaust</u> his pre-
16 viously, <u>unexhausted</u> claims. Once the petitioner <u>exhaust</u> his
17 state <u>remedies</u>, the <u>district court</u> will <u>lift</u> the "<u>stay</u>" and
18 allow the <u>petitioner</u> to <u>proceed</u> in federal court.

19

20 THE DISTRICT COURTS ORDINARILY HAVE AUTHORITY
   TO ISSUE STAYS,WHERE SUCH A STAY WOULD BE A
21 PROPER EXERCISE OF DISCRETION.AEDPA DOES NOT
   DEPRIVE DISTRICT COURTS OF THEIR AUTHORITY TO
22 ISSUES STAYS 28 USCA § 2254(b)(1)(A)

23

24        District Courts, do ordinarily have <u>authority</u>
25 to issue "<u>stays</u>", (See <u>Landis v North American</u> Co. 299 US 248,
26 254, 57 S.Ct.163, 81 L.Ed.153 (1936) Where such a "<u>stay</u>" would
27 be a proper <u>exercise</u> of <u>discretion</u>, (See <u>Clinton v Jones</u>, 520 US
28 681, 706, 117 S.Ct.1636, 137 L.Ed.2d945 (1997) <u>AEDPA</u> does not

14.
9.

1 | deprive the district court of that authority,cf. 28 USC § 2244
2 | (b)(1)(A) An application for a writ of habeas corpus...shall not
3 | be granted unless it appears that...the appellant has exhausted
4 | the remedies available in the courts of the state, but it does
5 | circumscibe their discretion. Any solution to this problem must
6 | therefore, be compatible with AEDPA'S purposes.

7

8 | A DISTRICT COURT SHOULD STAY RATHER THAN DISMISS
A MIXED HABEAS PETITION CONTAINING EXHAUSTED AND
9 | UNEXHAUSTED CLAIMS,IF THE PETITIONER HAS GOOD CAUSE
FOR HIS FAILURE TO EXHAUST, HIS UNEXHAUSTED CLAIMS
10 | ARE POTENTIALLY MERITORIOUS AND THERE IS NO INDI-
CATION THAT PETITIONER ENGAGED IN INTENTIONALLY
11 | DILATORY LITIGATION TACTICS 28 USCA § 2254(b)(1)(A)

12

13 | The Supreme Court of the United States
14 | has determined, it would be an "abuse of discretion" for a dis-
15 | trict court to deny a "stay" and to dismisss a "mixed" petition
16 | if the petitioner had "good cause" for his failure to exhaust his
17 | unexhausted claims, are potentially, "meritorious" and there is
18 | no indication that the petitioner engaged intentionally, dilatory
19 | litigation tactics should stay, rather than dismiss the "mixed"
20 | petition.(See Rose v Lundy 455 US 509, 102 S.Ct. 1198, 71 L.Ed.
21 | 2d 379 (1982) The total exhaustion requirement was not intended
22 | to "unreasonably" impair the

23 | petitioner's right to obtain federal relief.(See
24 | Rose v Lundy, supra, Id. at 520, 102 S.Ct.1198 ("A petitioner can
25 | always amend the petition to delete the "unexhausted" claims,
26 | rather than returning to state court to exhaust all of his claims
27 | Therefore this court should grant petitioner  Davis` "stay" to
28 | exhaust unexhausted federal claims now raised before this court.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

115 34769

15.
10.

1    For the above stated reasons, Petitioner Davis, prays this

2    court grant "Stay in Abeyance" for the Three federal claims now

3    "pending" before the lower states courts

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                              Respectfully, Submitted

26

27    Dated: 12/08/09                                              pro se

28                              16.

# EXHIBIT COVER PAGE

A

EXHIBIT

Description of this Exhibit:   SUPREME COURT OF CALIFORNIA   OPINION

Number of pages to this Exhibit: _____ 1 _____ pages.

JURISDICTION:   (Check only one)

☐   Municipal Court

☐   Superior Court

☐   Applellate Court

☐   State Supreme Court

☒ X   United States District Court

☐   State Circuit Court

☐   United States Supreme Court

☐   Grand Jury

Court of Appeal, First Appellate District, Div. 2 - No. A118622
**S169163**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

MARQUIS MATTHEW DAVIS, Defendant and Appellant.

The petition for review is denied.

George, C.J., was absent and did not participate.

SUPREME COURT
**FILED**

JAN 2 8 2009

Frederick K. Ohlrich Clerk

Deputy

**CORRIGAN**

Acting Chief Justice

EXHIBIT (F)(1)

# EXHIBIT COVER PAGE

B

EXHIBIT

Description of this Exhibit: LETTER OF APPELLATE COUNSEL

ROSS THOMAS, ON OF 6/13/08

Number of pages to this Exhibit: 1. pages.

JURISDICTION: (Check only one)

☐ Municipal Court

☒ Superior Court

☐ Appellate Court

☒ State Supreme Court

☒ United States District Court

☐ State Circuit Court

☐ United States Supreme Court

☐ Grand Jury

JANICE WELLBORN
Attorney at Law
4104 24th Street, No. 411
San Francisco, California 94114
(415) 627-4052

June 13, 2008

Marquis M. Davis
F-79213
Corcoran State Prison
Post Office Box 3461
3A04-114L
Corcoran, California 93212

Dear Mr. Davis,

Enclosed are copies of the Attorney General's respondent's brief and our reply brief. I believe
both are self-explanatory.

With the filing of these documents, the briefing phase of the appellate process comes to an end.
Now we wait for the issuance of the Court of Appeal's decision. Unfortunately, there is no way
of knowing when that will occur. However, I suspect it will issue in about 4 to 6 months from
now. I will inform you of any developments.

If you have any question, please contact me.

Very truly yours,

ROSS THOMAS
Attorney at Law

EXHIBIT (A)(1)

# EXHIBIT COVER PAGE

| C |
|---|

EXHIBIT

Description of this Exhibit: PRETRIAL HEARING OF 11/6/06 CASE NO. VCR176744

Number of pages to this Exhibit: _____55.____ pages.

JURISDICTION: (Check only one)

| | |
|---|---|
| [ ] | Municipal Court |
| [X] | Superior Court |
| [ ] | Appellate Court |
| [X] | State Supreme Court |
| [X] | United States District Court |
| [ ] | State Circuit Court |
| [ ] | United States Supreme Court |
| [ ] | Grand Jury |

1          THURSDAY, NOVEMBER 2, 2006

2                        -oOo-

3          The before-entitled matter came on regularly

4     this day for JURY TRIAL MOTIONS in the Superior Court

5     of California, County of Solano, before HONORABLE ALLAN

6     P. CARTER, Judge Presiding.

7          The PEOPLE OF THE STATE OF CALIFORNIA were

8     represented by JAMES HIGHSMITH, Deputy District

9     Attorney.

10         The Defendant, MARQUIS DAVIS, was present

11    and represented by DONALD BERGERSON, Attorney at

12    Law.

13         JANICE DEL RIO, Official Court Reporter, was

14    present and acting.

15         The following proceedings were had and taken,

16    to wit:

17                        -oOo-

18         (Defendant entered courtroom.)

19         MR. BERGERSON:  Your Honor, in this case, I

20    need to be asking for a continuance.

21         THE COURT:  Hang on a minute.

22         MR. BERGERSON:  I have a declaration, and I

23    can --

24         THE COURT:  You want to file something?

25         MR. BERGERSON:  Yes, I would, but you know,

26    it's two days in advance of the trial here, so it's

27    timely, but I'll tell you why, so you don't have to

28    read all six pages.

```
1              MR. HIGHSMITH:  Can I have one?
2              THE COURT:  So that's what you want to deal
3    with at this time; is that it?  Is that the first order
4    of business you want to deal with?
5              MR. BERGERSON:  I think that would be
6    appropriate.
7              THE COURT:  Notice of motion and motion to
8    continue trial, and trial is set in about three days.
9              MR. BERGERSON:  Correct.  And the gist of
10   what I'm saying in there that really matters is that
11   I've tried as hard as I can to get this thing together,
12   but I had a disaster happen to me professionally in
13   September, which I intimated to the Court, but I don't
14   think the Court is fully cognizant of what happened.
15              I have a live/work space, and I was just
16   evicted summarily with no notice by the county of San
17   Francisco for a code violation.  And, you know, it was
18   marketed to me by a real estate company.  I didn't see
19   it coming, and they basically said, "You get out now,
20   you can get out in a month," or something like that.
21   And I just spent the whole of September essentially
22   relocating my office.  I have described it to people as
23   the movie "Apollo 13," but in my scenario both the
24   space capsule and the LEM blow up at the same time.  It
25   was just awful.  And I'm just -- you know, I've been
26   doing a lot of things, including the Gilbreth appeal
27   that we just discussed, and I'm not quite ready on this
28   one.
```

```
 1              THE COURT:  Okay.  I'm looking at page 3.
 2   "This leaves the Davis case.  Although it is not an
 3   unusually complicated one, it's a serious one, and it
 4   entails investigation of several street sources to
 5   support the anticipated defense.  I had intended to
 6   conduct this investigation in September and October,
 7   but for the foregoing reasons, I've not been able to do
 8   so.  Although I do not anticipate that I will need more
 9   than two weeks to do the investigation, a November 6th
10   trial date is simply incompatible with my undertaking
11   it.  Even without the investigation, the case still
12   requires me to master these materials.  I had earlier
13   prepared for trial in the matter, and it will not take
14   long for me to get back up to speed.  However, I have
15   been working literally nonstop on other cases.
16              "With respect to the in limine hearings, I
17   must confess that my recent request for a 402 hearing
18   on cell phone technology only occurred to me recently.
19   My research indicates that my motion is a good one, but
20   I will need more time to litigate it.
21              "I am aware that in the past few days
22   Mr. Highsmith has responded to that request by citing
23   transcripts in two cases in which the Courts, in
24   essence, said that such a hearing was not required
25   under the Kelly rule because it was not a new
26   technology."
27              This would be the two, one out of Moelk's
28   court and one out of Garrett's court?
```

1           "This is of key importance in this case

2      because Davis, the defendant, has claimed in the past

3      not to have been at the house in Vallejo which this

4      shooting occurred, but instead claims he was in

5      Fairfield.  A glance at tower locations in the Solano

6      County area on a web site shows that there are a number

7      of towers between Vallejo and Fairfield, each with

8      overlapping footprints or else the network would drop

9      calls as one drives along Highway 80, so they have to

10     overlap" -- that's probably true -- "and, hence, each

11     of which might have been the real tower in this case.

12     Assuming that the real tower in this case had a

13     footprint that covered, for example, American Canyon

14     and parts of Vallejo and Fairfield, Davis's, the

15     defendant's, cell phone carrier could document him as

16     being in Vallejo when, in fact, he was in Fairfield

17     because his tower was in American Canyon."

18          "Mr. Casey has informed me that he probably

19     could be available to testify within the next few

20     weeks.  He's already been making inquiries of local

21     cell carriers as to their geotopographic mapping

22     abilities."

23          MR. BERGERSON:  That's a word I made up, by

24     the way.

25          THE COURT:  "As the Court knows, I am

26     diligent and thorough, but this whole issue just

27     occurred to me.  I do not wish to deny Mr. Davis

28     effective assistance merely because a good idea arrived

1    in my mind at a late date.  Accordingly, I'm requesting

2    a continuance for further investigation."

3              Okay.  So you want a continuance, but you

4    don't want a continuance for more than a couple of

5    weeks; is that it?

6              MR. BERGERSON:  Well, I talked to Mr. Davis

7    and I can probably amend that to, you know, I'd rather

8    not, but if the Court can't accommodate us, then we'll

9    accommodate the Court.

10             THE COURT:  Okay.  So you want a continuance?

11             MR. BERGERSON:  Yeah.

12             THE COURT:  Okay.  What is the D.A.'s view?

13             MR. HIGHSMITH:  I'm opposed.

14             THE COURT:  Tell me why.

15             MR. HIGHSMITH:  I'm opposed because, number

16   one, the number of times this case has been continued.

17   It's two years old.  The second reason I'm opposed is

18   because the cell phone records we've all known about

19   that this was going to be evidence for a long, long

20   time, but primarily because if this case gets

21   continued, it's not going to be able to be continued to

22   next week, because I've got witnesses that are

23   unavailable next week, and that's one of the main

24   reasons why --

25             THE COURT:  Well, one second, sir.  I just --

26   I'm looking for your trial management packet here, if I

27   can find it, because I'm interested in which witnesses

28   you are going to have a problem with if I grant this

```
 1    residue analysis?
 2              MS. KAUFFMAN:  I'm not prepared to represent
 3    to the Court one way or the other.
 4              THE COURT:  You don't remember?
 5              MS. KAUFFMAN:  No, I don't.
 6              THE COURT:  You probably weren't prepared to
 7    be asked questions about this case, were you?
 8              MS. KAUFFMAN:  No.
 9              THE COURT:  Would you like me to stop?
10              MS. KAUFFMAN:  Yes.
11              MR. BERGERSON:  Judge, I don't want --
12              MR. HIGHSMITH:  I wasn't actually finished
13    with my presentation.
14              THE COURT:  You go ahead, Mr. Highsmith.
15              MR. HIGHSMITH:  I basically had received this
16    motion to continue, although Mr. Bergerson did tell me
17    he was going to be filing this motion.  He told me this
18    morning or I think it was this morning.  He also hinted
19    that he might be doing it earlier.
20              I don't agree with his analysis on cell
21    phones, and I've already filed a brief, and I've also
22    filed several transcripts or portions of transcripts in
23    which in two -- at least in two departments, it has
24    been ruled that pursuant to Kelly-Frye, this is not new
25    technology, nor do we need to have a 402 hearing.
26              Actually, in the transcript presented by
27    Ms. Jensen, who happens to be the daughter of Judge
28    Jensen, retired, she says something I think is -- just
```

```
 1    a second -- I want to quote her.  In any case, this is
 2    not like the DNA hearings that we used to have where
 3    there was a raging dispute as to --
 4              THE COURT:  We are not asking -- we are not
 5    talking about Kelly-Frye here.  Right now, he's asking
 6    for a continuance basically --
 7              MR. HIGHSMITH:  But that's one of the
 8    reasons.
 9              THE COURT:  For a number of reasons, not the
10    least of which he's got some expert that may provide
11    impeaching, exculpatory and, with all due respect,
12    confusing testimony that could assist the defense.
13              In any event, when is that fellow available?
14              MR. BERGERSON:  Judge, he said he was going
15    to call me yesterday with his availability and with his
16    research into the local carriers, and he didn't, and I
17    called today and I've not received a call back, so --
18              THE COURT:  Here is one reason I'm asking.
19              MR. BERGERSON:  Yeah.
20              THE COURT:  Is that I'm looking at next
21    week's calendar, and if we -- if I deny this motion and
22    we proceed on Monday, we'll start picking a jury.
23    We're only going to be here two days next week because
24    it's a short week because Veteran's Day is a holiday.
25    So we are only going to be here Monday and Tuesday.
26    Then we are coming back the following week, in which
27    case, I can give you three full days and probably wrap
28    up then, but, see, that's two weeks off.  That gives
```

EXHIBIT (B)(7)

17

 1   determine whether something is long distance or not.
 2   We use it in determining bills that are sent out.  It's
 3   not new technology.  It's something that's been used
 4   since the '80s, and it's not a raging -- there's no
 5   raging dispute here among people.  It's only a raging
 6   dispute when a defense attorney in a criminal case
 7   makes it one or tries to make it one.
 8             MR. BERGERSON:  Judge --
 9             THE COURT:  Yes, sir, Mr. Bergerson, go
10   ahead.
11             MR. BERGERSON:  If I may.  See, the problem I
12   have is that I know they say the Fairgrounds tower,
13   because that's what cellular phone records tend to say,
14   and I don't have a statement from this expert.  I got a
15   fax yesterday with the name of this expert.  I don't
16   know who he is.  There's no 1054.1 discovery to me as
17   to who the expert is and really what he's going to say
18   or his vitae or his qualifications or anything.  And I
19   actually thought he was a custodian of records for the
20   cell phone carrier.
21             This just more underscores what I was saying
22   which is, again, with all due respect to Mr. Highsmith,
23   I'm just not ready because there are a couple of things
24   now being thrown at me.  Obviously, they will inspire
25   major tactical choices in this case depending on how
26   the outcome comes out, all of this is nobody's fault
27   except for whoever marketed me that unit and caused me
28   to lose a month of time.  I mean, this could probably

 1   all have been accommodated if we had been doing this
 2   two or three weeks ago, and we are just not, and it's
 3   nobody's fault.  And I just think Mr. Davis deserves a
 4   better defense than a lawyer who is harried at having
 5   done this.  I haven't even finished that Gilbreth
 6   brief, and that's due tomorrow.  And I got the
 7   ultimate, you know, red notice from the Court that it
 8   better be in, and I'm going to be up all night doing
 9   it.
10              MR. HIGHSMITH:  There are two issues then.
11   One is that we still have the issue of the Kelly-Frye
12   hearing, and, secondly, whether or not there is going
13   to be a motion granted for a continuance, and if so, to
14   what date?
15              As the Court knows, I'm retiring in the
16   middle of December and if it goes to a certain date,
17   this case is going to have to be reassigned.  I mean,
18   I'm not going to, frankly, come back for this case, and
19   if there's a Kelly-Frye hearing, that really makes a
20   huge difference, because then we can forget about
21   having a trial next week, and also the defendant has
22   not waived time.
23              MR. BERGERSON:  Well, he'll waive time.
24              MR. HIGHSMITH:  I'm just suggesting that --
25              THE COURT:  Yeah, I show -- I think he
26   withdrew his time waiver.
27              MR. HIGHSMITH:  He's got a pro rata.
28              THE COURT:  Up to the 13th.



```
 1              MR. HIGHSMITH:  Right.
 2              THE COURT:  Okay.  Anything else, Mr.
 3    Bergerson, you want to say on your request for a
 4    continuance?
 5              MR. BERGERSON:  No.
 6              THE COURT:  How about you, sir?
 7              MR. HIGHSMITH:  No.
 8              THE COURT:  You want to submit it?
 9              MR. BERGERSON:  Yes.
10              MR. HIGHSMITH:  Yes.
11              THE COURT:  Okay.  Well, Mr. Bergerson, I
12    think, number one, your request is legally timely, but
13    I don't think it shows good cause for requested
14    continuance.  Obviously, your client is entitled to
15    effective assistance of counsel, and I'm convinced that
16    based on my experience with you in this case and some
17    other cases that you have had in this court, that
18    you've had ample opportunity to prepare in spite of the
19    unfortunate circumstances you have listed that has made
20    it difficult for you to maintain a practice in an
21    orderly fashion because of this disruption in
22    apparently your personal, as well as your professional
23    life.
24              I point out this case is coming up on two
25    years old.  It's been continued a number of times.  I
26    think your reason for the requested continuance, number
27    one, could be completely irrelevant.  It could be, and
28    it's speculative at best.  So I'm going to deny your
```

EXHIBIT (B)(10)

```
 1    request for continuance.
 2              I'm going to confirm the trial date of
 3    November 6th at 8:30.
 4              Now, with reference to the Kelly-Frye issue,
 5    I'm going to take five minutes, and we'll come back and
 6    we'll have your hearing.  Okay.
 7              MR. HIGHSMITH:  Thank you.
 8              MR. BERGERSON:  What are we having a hearing
 9    on?
10              THE COURT:  To determine whether or not I'm
11    going to allow you a Kelly-Frye hearing.
12              MR. HIGHSMITH:  Thank you, your Honor.
13              THE COURT:  Be right back.
14              (Recess.)
15              THE COURT:  All right.  We are back on the
16    record.  We'll get Mr. Davis back out here.
17              (Defendant entered courtroom.)
18              THE COURT:  Okay.  I'm just looking for your
19    motion.
20              MR. BERGERSON:  You know what is going to
21    happen is that over the weekend, Judge -- I hate to do
22    this to you and I'm hoping we can schedule around it --
23    I'm going to have to be coming in with a couple of
24    other in limine motions now that I got this stuff on
25    the GSR, because I just talked to Detective Mustard,
26    and it's my understanding that the arrest of Mr. Davis
27    occurred with respect to a call of shots fired.
28              THE COURT:  Okay.
```

```
 1              MR. BERGERSON:  And that, you know, that's
 2    probably the source of the GSR, because we've all been
 3    around this stuff.  And my feeling is that I want to
 4    move in limine to exclude the GSR on relevancy and 352
 5    and 1101(b) grounds.
 6              THE COURT:  Yeah?
 7              MR. BERGERSON:  And, you know, I have to --
 8    but now I have to write it up because I didn't know
 9    about it.
10              THE COURT:  Okay.
11              MR. BERGERSON:  And I think that we have to
12    have a hearing on that.
13              THE COURT:  Okay.
14              MR. HIGHSMITH:  That's fine.
15              MR. BERGERSON:  Or we can get a stipulation
16    that it just isn't relevant to this case.
17              THE COURT:  He's not going to stipulate to
18    that.
19              Okay.  Here is what I want to deal with now.
20    Here is the motion I was looking for, and this is Mr.
21    Bergerson has filed a motion in limine to bar expert
22    testimony on cell tower positioning and objection to
23    business records purporting to show cell tower
24    locations.  So the issue is whether or not a Kelly-Frye
25    hearing is necessary, and that's why we're here today
26    to determine whether or not I'm going to grant the
27    request for the hearing.
28              And then Mr. Highsmith has filed opposition
```

1　associated with those records was proximate to that

2　particular tower as opposed to other towers when he

3　made a cellular telephone call.

4　　　I mean, yeah, of course, cell calls go into

5　towers, but my expert says that the tower that's

6　selected is selected simply because there is evidence

7　that the cell phone may be within the overlapping

8　footprint area of one of several towers, and that

9　essentially the company would select, for example, its

10　own tower, rather than a tower that's used by another

11　company or owned by another company that conveys into

12　the system, or that it will select the tower that's

13　emitting the strongest signal in the general area, even

14　though there might be a tower emitting a weaker signal

15　that actually is the tower used because the individual

16　is closer to the other tower.  That's what my expert in

17　Texas was trying to explain to me, and I don't purport

18　to be an expert, but I think there is controversy about

19　this.

20　　　In other words, you don't have -- what you

21　have is a very superficial layering in these bills, and

22　you are essentially having a guy reading hearsay into

23　the record without any showing that the hearsay means

24　anything, other than that the phone company has decided

25　to go and put these alphanumeric listings on some sort

26　of records it keeps.

27　　　THE COURT:  Okay.  Is the matter going to be

28　submitted?

38

```
 1              MR. BERGERSON:  I guess, because I don't have

 2    anything more at this time because the Court has denied

 3    me my motion to continue to get the expert.

 4              THE COURT:  Okay.  So is it submitted, Mr.

 5    Bergerson?

 6              MR. BERGERSON:  Yes.

 7              THE COURT:  Is it submitted?

 8              MR. HIGHSMITH:  Yes.

 9              THE COURT:  Based on your comments most

10    recently made, Mr. Bergerson, I just don't think they

11    support having a Kelly-Frye hearing.  They certainly

12    would go to the relevance of evidence.  It would go to

13    the admissibility of the evidence, and it may go to the

14    impeachment of the evidence.  But let me just read a

15    couple of things into the record, the matter having

16    been submitted.

17              "In applying the Kelly standard, it's

18    important to distinguish between expert testimony and

19    scientific evidence.  The former is not subject to the

20    special admissibility of Kelly, which applies to cases

21    involving novel devices or procedures.  The Kelly test

22    is intended to forestall the jury's uncritical

23    acceptance of scientific evidence or technology that is

24    so foreign to everyday experience as to be unusually

25    difficult for a layperson to evaluate.  In most other

26    instances, the jurors are permitted to rely on their

27    own common sense and good judgment in evaluating the

28    weight of the evidence presented to them."
```

 1  established to have gained general acceptance in the
 2  particular field in which it belongs.  In determining
 3  whether there has been general acceptance, the goal is
 4  not to decide the actual reliability of this technique,
 5  this new technique, but simply to determine whether the
 6  technique is generally accepted in the relative --
 7  relevant, excuse me, scientific community.
 8          And I don't think you have sufficient legal
 9  basis for the hearing, so I'm going to deny the request
10  for the Kelly-Frye hearing.
11          MR. BERGERSON:  I appreciate the Court's
12  reasoning.
13          THE COURT:  You are interrupting me because
14  I'm not finished, Mr. Bergerson.
15          MR. BERGERSON:  I apologize.
16          THE COURT:  So with reference to the 402
17  hearing, which sort of follows on its heels, I am not
18  going to make a ruling on that now.  I'm not going to
19  deny it.  I may deny it, but you may be entitled to a
20  402 hearing regarding, you know, foundational
21  requirements regarding somebody coming in and
22  testifying, but I'm denying the Kelly hearing.
23          MR. BERGERSON:  I understand where the Court
24  is going.  I appreciate the Court's reasoning.  Just to
25  correct my part of the record, I kept referring to the
26  second prong of Kelly.  I really meant the third prong,
27  and the Court is right.  And that is what I'm asking
28  for.  The Court hasn't addressed that in its ruling.

```
 1              What I question is how we know that this
 2    information is in any way accurate without him having
 3    somebody explain that it's accurate, and it's not the
 4    person that says --
 5              THE COURT:  Isn't that why you are bringing
 6    somebody in from Texas?
 7              MR. HIGHSMITH:  Exactly.  Not from Texas, but
 8    from San Francisco.
 9              THE COURT:  He's got somebody from Texas.
10              MR. HIGHSMITH:  Texas is the custodian from
11    Dallas, and the RF engineer is from San Francisco, and
12    he's going to testify exactly to answer his questions
13    before the jury would be to explain how this works.
14              THE COURT:  Okay.
15              MR. BERGERSON:  I'd have fewer questions if I
16    had a statement from this expert.
17              THE COURT:  Well, you know, your client is
18    entitled to a fair trial and not a perfect one, and
19    basically what you are asking is that we have two
20    trials on this issue, you know, sort of two shots at
21    the person.  And that's one reason, you know, a
22    preliminary hearing is not supposed to be a discovery
23    hearing.
24              MR. BERGERSON:  Right.
25              THE COURT:  Oftentimes, it turns into one,
26    but it's not supposed to be, and I don't recall any of
27    this, but if I picked up a transcript from the prelim
28    right now, I'm sure there's probably no testimony
```

EXHIBIT (B)(16)                                            47

1  regarding cell phone use, anybody from Texas, none of
2  that stuff.

3          MR. HIGHSMITH:  Actually, there was.

4          THE COURT:  So this isn't a civil matter, you
5  are not entitled to a deposition.

6          MR. BERGERSON:  I got that.  I mean, the last
7  time we had Detective Mustard, I think it was also
8  testified in the Hughes trial, I mean, he was just
9  doing time stamping, and that I accept.  That's a whole
10 different issue.

11         THE COURT:  He has a certain amount of
12 expertise in a limited area.

13         MR. BERGERSON:  No, I don't -- Judge, any
14 person who is, you know, in the third grade -- and I'm
15 not demeaning Detective Mustard -- but anybody who is
16 in the third grade can read these numbers.  They are
17 not hard to read.  They are Arabic numbers.

18         MR. HIGHSMITH:  Well, it does require some
19 knowledge as to what these numbers mean.

20         MR. BERGERSON:  But what I'm saying is the
21 knowledge of what the numbers mean is correlate to some
22 sort of key, a crib sheet, you know -- what is the word
23 that I'm looking for -- but it just correlates to some
24 sort of gliff that's been generated by the cell phone
25 company.  But why is that being generated?  How do we
26 know that this stuff actually means anything?  And to
27 say that people use radios all the time is begging not
28 answering the question.  That's what my problem is.

1    And I think that before the jury is prejudiced by

2    having this stuff come in and then being stricken on so

3    crucial an issue as to where the defendant was at the

4    time of the shooting, I think we have to have a hearing

5    outside the jury's presence.  I mean, if it's not on

6    the morning, fine, but it should be before this guy

7    testifies and we have to unring a bell.

8            MR. HIGHSMITH:  There's not going to be any

9    bells unrung until I've laid a foundation.  That's why

10   we have experienced lawyers like Mr. Bergerson and I.

11   He will object, and the objection will either be

12   sustained or denied, if I haven't laid a proper

13   foundation.  That's why I have these witnesses lined

14   up.

15           MR. BERGERSON:  I don't have a vitae on the

16   guy.  I don't have any statements from him.  I don't

17   know who he is.

18           MR. HIGHSMITH:  I haven't talked to him in

19   detail yet.  I intend to talk to him tomorrow

20   afternoon.

21           MR. BERGERSON:  I at least did my best to try

22   and explain what it is that I knew from a telephone

23   conversation with my expert.

24           MR. HIGHSMITH:  One thing I did do is I had

25   Officer Mustard and he, in a timely fashion, provided

26   us with this incredible report, and it explains

27   everything that Mr. Bergerson wanted to know and what

28   it is that we are going to elicit at trial.

1        THE COURT:  I'm sorry, you have provided Mr.
2    Bergerson with this information?

3        MR. HIGHSMITH:  A report as to what all these
4    things mean in these records.

5        THE COURT:  When did you give that to Mr.
6    Bergerson?

7        MR. HIGHSMITH:  I gave it to him today,
8    because I wanted -- it was mostly for my use.  It's
9    nothing new in here, but it's for my use, so I'll
10   understand what it means, because I've never been
11   through a hearing like this.  But I know what's
12   involved now, after having somewhat prepared for it
13   this week in what little time I've had.

14       MR. BERGERSON:  This is a list of antennas.
15   And as I say, my question is, how do you know that this
16   antenna, which I don't deny exists -- I mean, I
17   probably could drive out to them.

18       THE COURT:  Here is what I'm going to do.
19   I'm not going to rule on the 402 request, because it
20   may be appropriate and, you know, I don't want to --
21   the easiest thing for me to do would be to deny it,
22   frankly, but I want to do the right thing, of course,
23   and I want to make sure both sides get a fair trial.
24   And I may deny it.  I don't know.  But I'm not going to
25   force Mr. Highsmith to bring in his people early on
26   Monday morning to accommodate, I guess, Mr. Bergerson.

27       So what I will say is that prior to these
28   people testifying, whether it's Mustard or the fellow

EXHIBIT (B)(19)                                    50

```
 1   we get there, but we might not get there, because I
 2   might 1118 him because he can't prove my client was at
 3   the scene because he doesn't get his cell phone stuff
 4   in.  And, see, that -- because we have to prove that
 5   beyond a reasonable doubt, that's the test of an 1118.
 6            THE COURT:  That's fine.  I'll deal with that
 7   when it occurs, but the trial is set to begin on
 8   Monday, and we are going to start picking a jury on
 9   Monday.
10            Now, there's a motion here by the defense.
11   Motion to require the prosecution to refer to itself as
12   the State or the Government rather than the People.
13            MR. BERGERSON:  Mr. Russo and I attend the
14   same seminars.
15            THE COURT:  I understand.
16            MR. HIGHSMITH:  I think it says on the
17   caption, People of the State of California versus
18   Marquis Davis.  That's who we are.  That's who I
19   represent, and I think I should be able to refer to
20   myself and --
21            THE COURT:  Okay.  Do you have anything other
22   than what is in your pleadings to support your
23   position?
24            MR. BERGERSON:  Constitution of the United
25   States, by George.  No, nothing.
26            MR. HIGHSMITH:  It says, "We the People."
27            MR. BERGERSON:  Nothing, Judge.
28            THE COURT:  Submitted?
```

```
 1                    MR. BERGERSON:  Yes.
 2                    THE COURT:  Okay.  Your request is denied.
 3                    Now, here is a notice of motion to amend the
 4      Information.  What is that all about, Mr. Highsmith?
 5                    MR. HIGHSMITH:  I filed that because, in my
 6      research, I realized -- I should have known this and I
 7      did know at one time and I forgot -- that assault with
 8      a firearm is not a lesser included of attempted murder.
 9      So I thought that it would be prudent of me to add a
10      count to allege assault with a firearm along with the
11      other --
12                    THE COURT:  In the alternative, is that it?
13                    MR. HIGHSMITH:  Well, no, it's not -- it's
14      just --
15                    THE COURT:  Well, it is in the alternative.
16                    MR. HIGHSMITH:  It's not.
17                    THE COURT:  It's not?
18                    MR. HIGHSMITH:  No.  You can't punish him for
19      both, but they can certainly find him guilty of both.
20      This is a lesser related offense, and therefore, as you
21      know, it's not going to be part of -- it's not going to
22      be a lesser included of attempted murder.  So I thought
23      I would want to have the jury to have that option in
24      case for some reason they didn't feel that the
25      defendant is guilty of attempted murder.
26                    MR. BERGERSON:  Gee, Judge, you know, see
27      here I am in this difficult position because, see, I
28      can kind of like the same outcome, if I were to ask for
```

```
 1              THE COURT:  Well, is it relevant to whether
 2    this defendant fired the gun on the 16th, or is it
 3    relevant that he fired the gun on the 13th?
 4              MR. HIGHSMITH:  On the 13th.  And I'm not
 5    offering any evidence that he was arrested regarding
 6    shots fired.  I'm not offering that.  I'm not even
 7    having any evidence of that.  I'm just going to have
 8    evidence that he was in custody on such and such a day.
 9              THE COURT:  So Mr. Bergerson, you want me to
10    exclude any reference to the results of the gunshot
11    residue test that was done shortly after your client's
12    arrest on the 16th?
13              MR. BERGERSON:  I do, Your Honor.  And unless
14    the Court is prepared to do it, I had two other reasons
15    that I wanted to articulate for the record.
16              THE COURT:  Why don't you start over.  Give
17    me one, two, three.
18              MR. BERGERSON:  Okay.  One, I'm now just
19    becoming aware of the circumstances of Mr. Davis'
20    arrest, and I as yet actually have no discovery on the
21    gunshot residue evidence.
22              I received from Mr. Highsmith when we first
23    heard about this on Thursday, the summary GSR report, a
24    one-paragraph report that says that GSR evidence was
25    found on the defendant.  I went through my file, and
26    what I found in my file is evidence that there was a
27    gunshot residue swab collected.  I was aware of that,
28    but I assumed it wasn't tested because why would it
```

EXHIBIT (C)(1)                                                      74



```
 1   have been tested?  There was no material connection
 2   between Mr. Davis's arrest and the --
 3           THE COURT:  Is there some expert's report
 4   floating around out there that would have been
 5   generated at or near the time of your client's arrest?
 6           MR. BERGERSON:  Well, that's the second
 7   problem in the discovery.
 8           THE COURT:  Let me ask Mr. Highsmith.  Do you
 9   have -- forget the summary that Mr. Bergerson just
10   referred to.  Do you have a report that says "I'm a GSR
11   expert, and on January 5th of '05 at the request of the
12   Vallejo Police Department, I examined a couple of bags
13   that had been placed on the hands of Mr. Davis"?
14           MR. HIGHSMITH:  Yes.
15           THE COURT:  You have a report like that?
16           MR. HIGHSMITH:  Yes, I do.
17           THE COURT:  When did you provide that to the
18   defense, whether it was Mr. Bergerson or the other
19   lawyer, Ms. Kauffman?  Do you know?
20           Are you saying you never got that report?
21           MR. BERGERSON:  I'm -- I'm now actually in a
22   state of wonderment, because I've asked Mr. Highsmith
23   if he had the report.  And by that, I mean, what I
24   ordinarily get in GSR cases, you know, the pictures of
25   the things that look like cannon balls that they take
26   off the people.  And Mr. Highsmith told me not five
27   minutes ago that no, he didn't have that.
28           THE COURT:  Well, he just says he has it, and
```

EXHIBIT (C)(2)                                    75

1    is relevance. There is no relevance to the charge at
2    bar that is derived from the fact that three calendar
3    days later, exactly 72 hours minus an hour, Mr. Davis
4    is found to be having handled a gun within, depending
5    on the checks that you use, the last 20 minutes or the
6    last hour. That's just irrelevant to the charge at
7    bar. I mean, unless the prosecution wants to speculate
8    that the shooting --

9           THE COURT: You know, I tend to sort of agree
10   with both of you on this, because it is relevant,
11   because it sends to show that he has handled a fired
12   firearm within three days after somebody is shot and
13   says your client shot him. So the fact that he's got
14   GSR residue, gunshot residue, on his hands is some
15   evidence that he may have handled a fired gun within
16   three days.

17          MR. BERGERSON: Yes. But that is not
18   relevant to the charge at bar. It's relevant to the
19   explanation which is implicit in this report which,
20   again, I am now belatedly receiving, although I have to
21   say that I did have oral reference to it last Thursday.

22          THE COURT: What explanation?

23          MR. BERGERSON: Which is that the defendant
24   was arrested at a shots fired scene. So now we are
25   stuck with the following. I have a cure that is worse
26   than the disease, in that in order to explain why the
27   defendant has gunshot residue on his hands, I have to
28   either admit that he was carrying around the gun that

EXHIBIT (C)(3)                                          80

1    from opposing, because it does give the jury, in a case
2    where I think we all agree the evidence is substantial
3    against my client, an option of finding a lesser
4    offense that carries no possibility of life
5    imprisonment, whereas the principle charge carries a
6    possibility of life imprisonment, both in the charge
7    itself and in the enhancement, which will necessarily
8    follow from it.

9             So, therefore, I almost cannot, as a
10   competent lawyer, object to the amendment to the
11   Information.  However, the fact that the Information is
12   being amended substantially increases the likelihood
13   that the prosecution is going to obtain a conviction of
14   some sort in this case.  And since 245 is not a
15   lightweight crime, it's a conviction for something
16   that's serious.  With the great bodily injury, ten year
17   weapons enhancement and the four years for 245, that's
18   a total of -- I'm terrible at math -- 17 years.

19             MR. HIGHSMITH:  I didn't figure it out.

20             MR. BERGERSON:  -- 17 years I think that
21   Mr. Davis could be serving as a result of a compromised
22   verdict which is more likely to be reached as a result
23   of this Amended Information.  And I think the sole and
24   exclusive remedy that the Court has is to grant the
25   motion to amend the Information, because number one, I
26   can't oppose it and, number two, I think that there
27   really is a compromise verdict possibility here.  But
28   because the compromise verdict substantially increases

83

EXHIBIT (C)(4)

1   the prosecution's chances of victory, and because I was

2   not preparing my case around the calculation of those

3   chances, that the Court follow the United States

4   Supreme Court decision in Holloway versus Arkansas,

5   Chandler verse Freytag and a number of other cases that

6   are directly on point, and grant me my continuance, so

7   I can think about what is now happening to Mr. Davis.

8   And that is clear U.S. Supreme Court law, when the

9   prosecution amends at the last minute to increase its

10   chances of victory, the defense is allowed a

11   continuance.

12         MR. HIGHSMITH:  If he's objecting, I'll

13   withdraw this thing.  We'll just go on the attempted

14   murder.  I feel really confident about this case.  I'll

15   withdraw it.

16         THE COURT:  Okay.

17         MR. HIGHSMITH:  That's fine.

18         THE COURT:  It's been withdrawn.  Very good.

19         MR. HIGHSMITH:  Thank you.

20         MR. BERGERSON:  Well, see, now, that puts me

21   in a difficult position, whereby just going and

22   articulating Mr. Davis's constitutional right to have a

23   prepared lawyer --

24         THE COURT:  Sir, with all due respect, you

25   are beginning to talk out of both sides of your mouth.

26         MR. BERGERSON:  No, no --

27         THE COURT:  Yes, you are.

28         MR. BERGERSON:  But that's what happens when

EXHIBIT (C)(5)

84

1   the prosecution gives you a sandbagging motion at the

2   last minute.

3           THE COURT:  He's withdrawn his request.

4           MR. BERGERSON:  I'm not opposed to the

5   amendment.  We are going to get the attempted voluntary

6   manslaughter instructions anyway.

7           THE COURT:  Well, let me ask Mr. Highsmith.

8   Let's assume that you have withdrawn your request to

9   amend the Information, and you proceed on Count 1,

10   which is an attempted willful, deliberate, premeditated

11   murder as an attempt.  What lessers do you think that

12   the Court is going to have to give?

13           MR. HIGHSMITH:  At this point, nothing.  I've

14   heard nothing about self-defense.  I've heard no

15   opening statement.  I've heard nothing about

16   self-defense.  Until I hear the defendant take the

17   stand or Tyree Covin take the stand and stay that the

18   victim pulled a gun out and this guy acted in

19   self-defense or thought --

20           THE COURT:  Let's assume there's some

21   evidence that the defendant here was placed in a

22   position where he had an honest, but unreasonable

23   belief in the need to exercise his right to

24   self-defense.  Wouldn't he be entitled to an attempted

25   voluntary manslaughter instruction?

26           MR. HIGHSMITH:  Yes, he would, but not until

27   I hear some evidence of it.

28           THE COURT:  Okay.  And if there's some

EXHIBIT (C)(6)



1  evidence of self-defense, that could be a complete
2  defense.

3          MR. HIGHSMITH:  And, of course, if that
4  happens, all of this discussion we are having now is
5  kind of moot, irrelevant.

6          THE COURT:  Are there any necessarily lesser
7  includeds, like a 245?

8          MR. HIGHSMITH:  No.  These are lesser
9  relateds.  And that's why I filed this thing, because I
10 thought, you know, I really ought to have something
11 besides attempted murder, because maybe for some odd
12 reason, the jury is going to think that the defendant
13 accidentally fired off six rounds or maybe they are
14 going to think that he didn't really intend to kill him
15 when he shot him multiple times in the stomach.  And
16 that's why I wanted this.  And I think Mr. Bergerson,
17 if I were in his shoes, and I'm not, I would certainly
18 want it, because it is a compromise verdict, and like
19 he says, it's better serving 15 years than it is 40 to
20 life.

21         MR. BERGERSON:  I do want it.  I do want it.
22         MR. HIGHSMITH:  Fine.  Then I'll file it.
23         THE COURT:  Well, I'm glad we had this
24 conversation.

25         MR. BERGERSON:  I'm just raising a
26 constitutional issue.

27         MR. HIGHSMITH:  Why don't I just file it?
28         MR. BERGERSON:  That's fine.  I was just

EXHIBIT (C)(7)

86



```
 1   raising a constitutional issue.
 2           THE COURT:  You would prefer it; is that
 3   true?
 4           MR. BERGERSON:  Yes.  But I would have
 5   preferred it to have been timely filed, and that I get
 6   to present --
 7           THE COURT:  I'm denying your continuance.  If
 8   you want it filed, then bring it on up here.
 9           (Document handed to the Court.)
10           MR. HIGHSMITH:  I think I gave you a copy,
11   right?
12           MR. BERGERSON:  Well, it's a 245, right?
13           MR. HIGHSMITH:  Yeah.
14           THE COURT:  Let's take a look at our -- well,
15   first of all, Mr. Bergerson, do you have a copy of the
16   Amended Information?
17           MR. BERGERSON:  I believe I do.  Hold on.
18           MR. HIGHSMITH:  I think I gave you mine.
19           MR. BERGERSON:  I mean, I know I do.
20           MR. HIGHSMITH:  I gave you the pink one.
21           MR. BERGERSON:  No, I have a fax.
22           MR. HIGHSMITH:  Here.  This is yours.
23           MR. BERGERSON:  Now I have two copies of it.
24           THE COURT:  Would you please enter a plea to
25   Count 2 and perhaps the enhancements?
26           MR. BERGERSON:  Okay.  With respect to the
27   Amended Information, formal instruction, arraignments
28   are waived.  The irregularities already objected to are
```

EXHIBIT (C)(8)                                          87

1  not, but otherwise all other irregularities are waived,

2  and the plea would be not guilty as to both counts.

3          THE COURT:  And deny all the enhancements?

4          MR. BERGERSON:  Yes.

5          THE COURT:  Mr. Highsmith, would you please

6  look at your Amended Information, because I want to see

7  if this is the language you want me to give this jury.

8  So it's alleged December 13th of '04, the defendant

9  committed a felony, attempted, willful, deliberate

10  premeditated murder, attempted 664/187.  The defendant

11  did unlawfully with malice aforethought attempt to

12  murder a human being.  You want that, right?

13          MR. HIGHSMITH:  Yes.

14          THE COURT:  Okay.  Lines 20 and 21 should not

15  be given, true?

16          MR. HIGHSMITH:  That's right.

17          MR. BERGERSON:  This is on page 1?

18          THE COURT:  I'm still looking at page 1.

19          MR. HIGHSMITH:  Yes.  That should not be

20  given.

21          THE COURT:  Okay.

22          MR. HIGHSMITH:  22 and --

23          THE COURT:  You wanted 22 and 23, though,

24  right?

25          MR. HIGHSMITH:  Yes.

26          THE COURT:  And --

27          MR. BERGERSON:  Isn't there a case, by the

28  way, that says that you are not supposed to have a jury

88

EXHIBIT (C)(9)

```
 1                      AFTERNOON SESSION
 2                          -oOo-
 3             (Continuing proceedings re Jury Voir
 4             Dire held and reported, but not
 5             transcribed.)
 6             (PROSPECTIVE JURY PANEL NOT PRESENT.)
 7             MR. HIGHSMITH:  Your Honor --
 8             THE COURT:  Yes.
 9             MR. HIGHSMITH:  -- can I say one thing?
10             THE COURT:  Yeah.
11             MR. HIGHSMITH:  This offer is not on the
12    table at five o'clock tonight.  And, in fact, it's not
13    on the table when the jury is sworn in.  Once the jury
14    is sworn in, it's not on the table.
15             THE COURT:  Whoa, whoa, whoa, whoa, whoa.
16    What is the problem?  Wait a minute.
17             MR. BERGERSON:  Maybe we should --
18             MR. HIGHSMITH:  As soon as the jury is sworn
19    in, the offer is off the table.
20             MR. BERGERSON:  Here's the situation.
21    There's an offer in the case.  I'll just be candid with
22    this, what the hell, on the record.  There has never
23    been an offer previous to today in this case that's in
24    any way reasonable.  When I spoke with Mr. Highsmith,
25    we were talking 35 to 40 year kind of offers.  The
26    mandatory minimum penalty in this case if Mr. Davis
27    falls on all allegations is, I guess, 40 years to life.
28             THE COURT:  Okay.
```

EXHIBIT (C)(10)                                            113

# EXHIBIT COVER PAGE

| D |
|---|

EXHIBIT

Description of this Exhibit: PETITIONER DAVIS'S MOTION TO

WITHDRAW PLEA OF GUILTY PURSUANT TO P.C. 1018 DUE TO
SEAN WYDERMYER "RECANTED" TESTIMONY ON 5/24/07

Number of pages to this Exhibit:  52  pages.

JURISDICTION:  (Check only one)

|   | Municipal Court |
|---|---|
| X | Superior Court |
|   | Appellate Court |
| X | State Supreme Court |
| X | United States District Court |
|   | State Circuit Court |
|   | United States Supreme Court |
|   | Grand Jury |



1   we are here today because Mr. Bergerson has filed a

2   motion to withdraw a previously entered plea of guilty,

3   and I have read that and then there's a response from

4   the D.A. which was prepared by Mr. Mullins and

5   basically in opposition, right?  Okay.  So that's why

6   we are here.

7              MR. BERGERSON:  You didn't get the other two

8   documents?

9              THE COURT:  What?  No.

10             MR. BERGERSON:  Okay.

11             THE COURT:  I got your motion, and there's a

12  couple of exhibits.

13             MR. KAUFFMAN:  There were two motions.  I

14  received them May 24th.

15             THE COURT:  Today is May 24th.

16             MR. BERGERSON:  Yeah.  No, I mailed them.  I

17  got the response on Friday, and then I mailed out on

18  Monday or whenever it was, Tuesday, a reply which you

19  might want to glance it.

20             THE COURT:  Never seen it.

21             MR. KAUFFMAN:  There was a response and there

22  was a motion to continue.

23             MR. BERGERSON:  There was a motion to

24  continue, but that's been taken care of, I think,

25  because my -- there was an allegation that I probably

26  shouldn't have any future contact with this victim

27  witness.  And that's not a problem anymore.  It would

28  have presented a problem my serving him, but Officer

```
 1              MR. BERGERSON:  Yes.
 2              THE COURT:  Really?
 3              MR. BERGERSON:  Yes.
 4              MR. KAUFFMAN:  Mr. Mullins cited Watts.
 5              MR. BERGERSON:  And I considered it.
 6   Obviously, I didn't cite it in my initial memorandum.
 7              MR. KAUFFMAN:  In fact, if I may interrupt,
 8   Mr. Bergerson at page 2, line 19, actually says "Watts"
 9   and he means "Davis."
10              THE COURT:  Oh.
11              MR. KAUFFMAN:  Because it was referred to a
12   number of times.
13              THE COURT:  Well, I found it on something on
14   my computer, and it's a withdrawal of a previously
15   entered plea of guilty or no contest --
16              MR. KAUFFMAN:  Right.
17              THE COURT:  -- under a situation where the
18   defendant allegedly over-estimated the D.A.'s case.
19              MR. KAUFFMAN:  Right.
20              THE COURT:  And Watts stands for the
21   proposition that a mistake of fact regarding the
22   strength of the prosecution's case is not good cause
23   for withdrawing a guilty plea.
24              MR. BERGERSON:  Yeah, yeah.  And here is what
25   I said in my reply memorandum.  This is at page 2 --
26   I'm sorry, the document, the response memorandum, page
27   2 starting at line 10.  I need to get new bifocals,
28   Judge.
```



```
1         Watts' claim is very different from that at
2    bar.  Here the State's case consisted primarily of
3    Wydermyer's statements that Davis shot him, but
4    Mr. Wydermyer has now recanted.  This is not,
5    therefore, a motion in which the defendant seeks to
6    withdraw his plea because the defendant was
7    subjectively mistaken about the strength of the State's
8    evidence.  It is, rather, a case in which the chief
9    statement, the victim has recanted, a case in which the
10   evidence has objectively shifted in Mr. Davis's favor.
11   And they really are different.  Watts goes and doesn't
12   realize that at some future point the person he thought
13   was going to testify against him, he actually doesn't
14   mention it at the trial of a co-defendant.  That means
15   that he subjectively misvalued his own case.  This is a
16   case in which there's essentially new evidence that
17   could not have been discovered in the exercise of
18   diligence.  Specifically, that on reflection, Mr.
19   Wydermyer has decided that Mr. Davis may very well not
20   be the person who shot him.
21         And this is fortunate that this has developed
22   during a period of time where it's not too late for a
23   fair trial to be had for a possibly innocent man.  What
24   I was going to say in connection with the Court's
25   observation, this probably is not a typical
26   circumstance.  Usually, a person is sentenced about 30
27   days from date of their plea, and you have to imagine
28   that a prosecution witness would objectively recant and
```

1     then come forward during that period for the issue we

2     have here even to arise. And I think that's actually a

3     fairly unlikely scenario.

4           Second of all, in order to get an appellate

5     decision that says that the person has a right to

6     withdraw his plea at that juncture, you'd have to

7     assume that the judge who heard that claim decided it

8     wrongly, because it would only be the defendant who

9     would appeal. For all I know, this has happened before

10     but it was resolved favorably to the defendant in the

11     trial court.

12           So it seems to me that the absence of

13     specific case authority shouldn't be a bar to our

14     prevailing on the motion here in that this is both a

15     rare set of circumstances, and that judicial error is

16     probably even rarer.

17           THE COURT: Okay.

18           MR. BERGERSON: And I did site these federal

19     cases.

20           THE COURT: I saw them, yeah.

21           Now, I'm looking at two cases, the

22     Cal.App.2nd case is People versus Langlois,

23     L-a-n-g-l-o-i-s, 1963. It's at 220 Cal.App.2d 831,

24     page 834; People versus McGaughran,

25     M-c-G-a-u-g-h-r-a-n, 1961 case, 197 Cal.App.2d 6 at

26     page 17. I sort of agree with Mr. Bergerson that there

27     doesn't appear to be a lot of law in this area. But

28     these two cases stand for the proposition, which I

1              MR. BERGERSON:  Your Honor, if I can say it

2     fairly, I pretty much clubbed him over the head with

3     the 43 year to life top, and I think the Court kind of,

4     you know, said, "Listen to Mr. Bergerson, he's a good

5     lawyer."  There was very nice other things that you

6     said.

7              THE COURT:  Why didn't you enter the plea

8     pursuant to People versus West?

9              MR. BERGERSON:  Pardon me?  It was -- a West

10    plea is a plea bargain.  You mean an offered plea?

11             THE COURT:  A West plea is you are not

12    admitting guilt.  What you are doing is you are

13    accepting a plea bargain to avoid a more serious

14    consequence.

15             MR. BERGERSON:  I think that that was

16    relatively clear from the discussions we had that are

17    not necessarily important.  I could characterize it

18    fairly as an offered plea.  Mr. Davis was saying at all

19    times that he was --

20             THE COURT:  What do you want to do today?

21             MR. BERGERSON:  Well, if the Court wants to

22    hear from Mr. Wydermyer, that may be appropriate.

23             THE COURT:  Okay.  That's fine.  I'd be happy

24    to hear from him.  Why not?

25             MR. KAUFFMAN:  Can I just say a couple of

26    things --

27             THE COURT:  Yes.

28             MR. KAUFFMAN:  -- along the lines of what

1   your pleading here and you say that a well-recognized

2   ground for permitting a defendant to withdraw a guilty

3   plea is the recantation of the prosecution's

4   complaining witness.  There is absolutely no support

5   for this position.

6           MR. BERGERSON:  You know, I think that -- I

7   would imagine that based on what he says, if the Court

8   feels that there is -- you know, it's good cause, fair

9   and just, whatever the standard is.

10          THE COURT:  Well, the standard is by clear

11  and convincing evidence.  So let's get him in here.

12  Let's get him in here.

13          MR. BERGERSON:  Can I show him my copy of it?

14          THE COURT:  I don't want you to do anything

15  right now.

16          Okay.  Mr. Wydermyer?

17          THE WITNESS:  Yes.

18          THE COURT:  Thank you for waiting, sir.  Head

19  over this way.  We are going to get you sworn.

20          Raise your right hand, please face our clerk.

21          THE CLERK:  Do you swear the testimony you

22  are about to give will be the truth, the whole truth

23  and nothing but the truth, so help you God?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  Come on up here, please.

26  Have a seat.

27                      SEAN WYDERMYER

28  called as a witness on behalf of the defense, having

```
 1    been duly sworn, was examined and testified as follows:
 2              THE COURT:  Sir, would you please state your
 3    name for the record and spell your last name.
 4              THE WITNESS:  Sean Wydermyer,
 5    W-y-d-e-r-m-y-e-r.
 6              THE COURT:  Okay.  I'm Judge Carter.  I don't
 7    know if we met before.  Remember testifying -- it would
 8    be about two years ago at a preliminary hearing in
 9    front of a different judge, probably same room?
10              THE WITNESS:  Um-hmm.
11              THE COURT:  Do you remember that?
12              THE WITNESS:  Um-hmm.
13              THE COURT:  Have you since that time read a
14    transcript of your comments or testimony at that
15    hearing?
16              THE WITNESS:  Yes.
17              THE COURT:  Who gave you a copy of that?
18              THE WITNESS:  Detective Wentz or Mustard.
19              THE COURT:  Okay.  Mustard or Wentz, one of
20    those --
21              THE WITNESS:  Yeah.
22              THE COURT:  -- Vallejo police officers.
23              Okay.  Now, I'm looking at what is called,
24    can you see this, it says declaration of Sean
25    Wydermyer?
26              THE WITNESS:  Um-hmm.
27              THE COURT:  I, Sean Wydermyer, declare as
28    follows, and there's a page full of stuff there and
```

1  | then a second page and then a signature, right?

2  |       THE WITNESS:  Yep.

3  |       THE COURT:  Is that you?

4  |       THE WITNESS:  Yeah.

5  |       THE COURT:  Did you read this document before

6  | you signed it?

7  |       THE WITNESS:  Yes, sir.

8  |       THE COURT:  Okay.  And did you ever get a

9  | copy of it?  Anybody give you a copy of it?

10 |       THE WITNESS:  Yeah.  I have a copy.

11 |       THE COURT:  Okay.  All right.  These lawyers

12 | are going to ask you a few questions about this, okay?

13 |       THE WITNESS:  Okay.

14 |       THE COURT:  So we know what we are taking

15 | about, right?

16 |       THE WITNESS:  Yes.

17 |       THE COURT:  Very well.

18 |       Mr. Bergerson, go ahead.

19 |             DIRECT EXAMINATION

20 |    Q   MR. BERGERSON:  Good afternoon,

21 | Mr. Wydermyer.

22 |    A   Good afternoon.

23 |    Q   Do you recognize me?

24 |    A   Yes.

25 |    Q   We met and talked one time; is that correct?

26 |    A   (Nods head.)

27 |    Q   14th of May, remember that?

28 |    A   Yes.

1        Q     And where was that?

2        A     At -- it was a -- it was a Starbucks.

3              THE COURT:  Was it here in town?

4              MR. BERGERSON:  It starts with Jack.

5              THE WITNESS:  Oh, Jack in the Box.  That was

6     the first location we were supposed to meet at.

7              THE COURT:  Was it in Vallejo?

8              THE WITNESS:  No.  It was in Richmond.

9              THE COURT:  So you are in Richmond at Jack in

10    the Box somewhere?

11             THE WITNESS:  Yeah.

12             THE COURT:  Nighttime?  Daytime?

13             THE WITNESS:  Daytime.

14       Q     MR. BERGERSON:  Now, before I met you there,

15    I had talked to you a couple times on the phone?

16       A     Yeah.

17       Q     Some of those conversations, is it fair to

18    say, were just for me to arrange the circumstances of

19    our meeting, correct?

20       A     Yes.

21       Q     Okay.  And in that respect, do you remember I

22    was late for the meeting?

23       A     Yes.

24       Q     And as a result of that, I gave you $20 and

25    told you to buy lunch?

26       A     Lunch.

27       Q     You didn't sign the declaration because I

28    gave you $20, did you?

1      A    No.

2      Q    Nobody threatened you in any way to get you

3  to sign the declaration, did they?

4      A    No.

5      Q    Anybody make you any promises of money or any

6  other kind of benefit?

7      A    Nope.

8      Q    Did you sign the declaration because it was

9  true?

10     A    Yes.

11     Q    Okay.  Was it you who first contacted me

12  about this case or was it I who contacted you?

13     A    I contacted you.

14     Q    What made you contact me about this case?

15     A    Just having time to think stuff over, you

16  know.  I can't assume, you know, just because one

17  person went in, there wasn't another person there,

18  especially when I didn't go in for a thorough search.

19  I didn't look through the tub or nothing, you know.  I

20  can't assume, I can't even say that he did it when I

21  didn't look at his face, you know, clothes, you know.

22     Q    We are talking about December 4th, 2004,

23  correct?

24     A    Yeah.

25     Q    You were shot and very badly wounded; is that

26  fair?

27     A    Yeah.

28     Q    You had previously that day arranged to do a

EXHIBIT (D)(10)

1   transaction with a person you know by the nickname of
2   "Pluck"; is that correct?
3          A    Yes.
4          Q    And that person "Pluck" is this person here,
5   Mr. Davis, correct?
6          A    Yeah.
7          Q    But when you got to the location, something
8   happened?  You got shot?
9          A    Yeah.
10         Q    Okay.
11              THE COURT:  Sir, I'm looking at your
12   declaration.  Among other things, you say that "I have
13   determined that I may have been mistaken in saying and
14   later testifying that Mr. Davis shot me."
15              Is that how you feel?
16              THE WITNESS:  Yeah, because you know --
17              THE COURT:  You don't know if you were
18   mistaken, but you may have been mistaken; is that it?
19              THE WITNESS:  Yeah.
20              THE COURT:  Did you want to ask any more
21   questions?
22              MR. BERGERSON:  Sure.
23         Q    Let's assume that you were testifying at a
24   hearing before a finder of fact, like a judge at a
25   preliminary hearing or a jury, okay?
26         A    Yeah.
27         Q    And I'm going to pretend to be the prosecutor
28   and I'm going to ask you after you have described how

1    you got shot, you see this man over here, and I'm

2    pointing to Mr. Davis.  Do you see him?

3         A    Yes.

4         Q    Is this the man who shot you?

5         A    I can't -- I can't say that because I was

6    looking down a barrel, not at a face or any clothes.

7         Q    This man was in the house; is that correct?

8         A    Yeah, but I can't say he's the one who did

9    it.

10             MR. BERGERSON:  Well, I have no questions at

11   this time, Judge.

12             THE COURT:  Okay.  Mr. Kauffman, questions?

13             MR. KAUFFMAN:  Thank you.

14                  CROSS-EXAMINATION

15        Q    MR. KAUFFMAN:  Good afternoon, sir.

16        A    How you doing?

17        Q    We've never met, right?

18        A    No.

19        Q    I've never talked to you?

20        A    (Shakes head.)

21        Q    Looking at your transcript of what happened

22   at the prelim, do you remember testifying that the

23   person who shot you just before that maybe just walked

24   into a bathroom?

25        A    Yeah.

26        Q    Okay.  And the person who walked into the

27   bathroom just before you got shot was the defendant,

28   right, Mr. Davis, right?

1          A     Yes.

2          Q     So you know that and you are sure of that,

3     right?

4          A     Yes.

5          Q     Did you ever see anybody in the house go into

6     that bathroom?

7          A     No, but I can't say there wasn't no one

8     already in there.  I didn't thoroughly search anything.

9          Q     Right.  Because you didn't go in there and,

10    like, as you said, look in the tub and that sort of

11    thing?

12         A     Right.

13         Q     And there was another person in the house

14    other than the defendant, Mr. Davis, right?

15         A     Yeah.

16         Q     What was his name?

17         A     I can't remember his name.

18         Q     Where was that person when you are getting

19    shot at?

20         A     Sitting in the front.

21         Q     So it definitely wasn't that person who shot

22    you, right?

23         A     No.

24         Q     And you, a number of times, did identify the

25    defendant as the person who shot you, right?  I think

26    the day this happened, you identified him?

27         A     Yeah.

28         Q     To Detective Wentz here; is that right?

```
 1          A    Yeah.
 2          Q    And, again, maybe a day or two later,
 3    Detective Wentz showed you a photo lineup, and you
 4    identified the defendant then, right?
 5          A    Yeah.
 6          Q    And there was some kind of dying declaration
 7    done --
 8               MR. BERGERSON:  Excuse me --
 9          Q    MR. KAUFFMAN:  -- by the defendant at that
10    point, right?
11               MR. BERGERSON:  Your Honor, it's not a dying
12    declaration, whatever it is.
13               MR. KAUFFMAN:  Well, that's what they called
14    it.
15               THE COURT:  Well, yeah.  That's what they
16    called it.  It sort of calls for a legal conclusion.
17               You were hospitalized, and you knew you were
18    in pretty bad shape, right?
19               THE WITNESS:  Yeah.
20               THE COURT:  And you made a couple of
21    statements, maybe to the doctors and certainly to the
22    police officers.
23               THE WITNESS:  Yeah, that's how all the names
24    and stuff popped up.
25               THE COURT:  Right.
26          Q    MR. KAUFFMAN:  And just to be clear, you
27    identified the defendant by a nickname called Pluck,
28    right?
```

1        A    Yes.

2        Q    And you don't know anybody else you call that

3    name, right?

4        A    No.

5        Q    And you testified at a preliminary hearing a

6    number of months after this, and at that point you

7    identified the defendant as the person who shot you,

8    right?

9        A    Yeah.

10       Q    But now two years later you are saying you

11   are not sure, right?

12       A    Yeah, because I look -- I'm looking at the

13   big picture. I can't --

14       Q    Sure.

15       A    I can't say that it was him or not. I really

16   didn't look at his face. I just went by who I seen

17   went in the bathroom.

18       Q    But you're not saying that it wasn't the

19   defendant, right?

20       A    I'm not saying that it is either.

21       Q    And nobody threatened you --

22       A    No.

23       Q    -- to say this, right?

24       A    Nope.

25       Q    And after you got shot, did the two people

26   you saw in the house, the defendant and somebody else,

27   actually run out?

28       A    I know that the people ran out the house, but

1    all I seen was a couple of heads go by the window when
2    I got up.
3        Q    And the person -- Tyree, is that it? -- he
4    was gone after these people fled, right?
5        A    Yeah.  I heard the footsteps go out the door,
6    and then when I looked, when I tried to make my way
7    outside, I seen a couple of heads run by the window.
8        Q    A couple.  You mean two by a couple?
9        A    Yeah, but I only looked in one direction.
10   There was two windows I could have looked out of, and I
11   chose to look to my right.
12       Q    So you only saw two people leaving, right?
13       A    I only seen two people pass the window.
14       Q    Okay.  Pass the window.  Two heads pass the
15   window?
16       A    Yeah.
17       Q    There was never like a third person you saw
18   leave the house?
19       A    I didn't look for a third person.  I just saw
20   the two heads.
21            THE COURT:  He's just asking, did you see a
22   third person?
23            THE WITNESS:  No.
24            THE COURT:  Did you hear a third person?
25            THE WITNESS:  I don't recall.
26       Q    MR. KAUFFMAN:  You got shot and that made a
27   pretty loud noise, right?
28       A    Yeah.  It wasn't -- it wasn't really all that

1          A    I'm terrible with days.

2               THE COURT:  About three weeks ago?

3               THE WITNESS:  Yeah.

4          Q    MR. KAUFFMAN:  So sometime between then and

5    now, you've now signed this declaration and that's

6    different from what you told Detective Wentz, right?

7          A    It's not different.  It's actually giving a

8    different perspective on it.

9               MR. KAUFFMAN:  Thank you.  Nothing further.

10              THE COURT:  Mr. Bergerson, any questions?

11              MR. BERGERSON:  Sure.

12                   REDIRECT EXAMINATION

13         Q    MR. BERGERSON:  Let me just get the sequence

14   of what you saw at that house on the 4th of December.

15   Is it your testimony that you saw Pluck for the last

16   time, knowing him to be Pluck, when he went into the

17   bathroom?  Is that what you are saying?

18         A    Yes.

19         Q    And then you just saw a gun being fired?

20         A    Yes.

21         Q    That's all you focused on?

22         A    Yes.

23         Q    With respect to the conversation you had on

24   the phone with Detective Wentz, do you remember that

25   line for line, or do you just --

26         A    No.  I don't remember it line for line.

27         Q    Okay.

28         A    I have a terrible memory especially after the

```
 1              THE COURT:  Go ahead.  Take your time.
 2         Q    MR. BERGERSON:  Do you have an explanation,
 3    yes or no, as to --
 4              THE COURT:  You can't limit his answer to yes
 5    or no.
 6         Q    MR. BERGERSON:  Do you --
 7              THE COURT:  He can expand on his answer if he
 8    wants.
 9         Q    MR. BERGERSON:  Do you have an explanation as
10    to what it is that you were thinking at the time you
11    told Detective Wentz "No, I don't want to change
12    anything in my statement"?
13         A    Yeah, I do.  I'm not going to change what I
14    was saying as far as what I seen and as far as when I
15    got there, but it's a different point of view.  I can't
16    say that someone did something when I didn't see him,
17    see his face, clothes, nothing.  I was just looking at
18    a weapon.  That's all I was looking at, and it was
19    close enough for it to be the only thing.  It was
20    closer than this mike in my face right now for me to be
21    looking at, so --
22              MR. BERGERSON:  Okay.  I have no further
23    questions.
24              THE COURT:  Anything else, Mr. Kauffman?
25              MR. KAUFFMAN:  Just to clarify.
26                      RECROSS-EXAMINATION
27         Q    MR. KAUFFMAN:  You knew the defendant, what,
28    eight months to a year prior to when the shooting
```

EXHIBIT (D)(18)

160

1    happened?

2         A    Yeah.

3         Q    You had known him for a while?

4         A    Maybe longer, yeah.

5         Q    You knew him well enough to arrange this deal

6    with him, right?

7         A    Yeah.

8         MR. KAUFFMAN:  Thank you.  Nothing further.

9         THE COURT:  Mr. Bergerson, anything else?

10                FURTHER REDIRECT EXAMINATION

11        Q    MR. BERGERSON:  Was it your belief at the

12   time that the shooting took place that there was a

13   person who had targeted you for some sort of

14   retaliatory hit over a drug deal?

15        MR. KAUFFMAN:  Objection, leading.

16        THE COURT:  Sustained.

17        Q    MR. BERGERSON:  Okay.  Did you believe that

18   you were in danger from somebody even before you got

19   shot?

20        A    I've heard a few things, but it was from more

21   than one character, just over some jealousy stuff.

22        Q    Did any of those things involve Mr. Davis?

23        A    No.

24        Q    Mr. Davis had a good relationship with you

25   until that time?

26        A    Yeah.  That was -- that's another reason that

27   had me thinking, no motive, no reason.

28        MR. KAUFFMAN:  Okay.  All right.  Well, I

1    have no further questions.

2              THE COURT:  Anything else, sir?

3              MR. KAUFFMAN:  No thank you.

4              THE COURT:  Okay.  Thank you for coming down.

5    Step down.  You are free to go.  All right?

6              THE WITNESS:  All right.

7              THE COURT:  Thank you.

8              Did you want to call another witness?

9              MR. BERGERSON:  I don't want to call another

10   witness.

11             THE COURT:  Do you want to call any witness?

12             MR. KAUFFMAN:  I don't think it's necessary.

13             THE COURT:  Okay.  I think I'll hear from Mr.

14   Bergerson.  He has the burden of proof here.

15             MR. BERGERSON:  Well, a couple of things.

16   First of all, I think when the Court considers this

17   motion, it should expand the scope of it in two small

18   respects.  One is that unanticipated by me, there was a

19   statement by Mr. Wydermyer that basically his general

20   memory is bad, and I think that that may be

21   significant, because, you know, in general,

22   Mr. Wydermyer seems to be a person who might not have

23   been that impressive as a prosection witness in the

24   first place, given the manner in which he claims to

25   have identified Mr. Davis in the first place.

26             I say all this because I want to make sure

27   that the Court understands what we are dealing with is

28   a real person's life and the implications of granting

1  | or not granting this motion. I tend to think that
2  | Mr. Davis got a fairly good disposition in this case,
3  | if the evidence against him --
4  | THE COURT:  Go ahead.
5  | MR. BERGERSON:  -- if the evidence against
6  | him is regarded as objectively strong. I must say as a
7  | practitioner of some years of experience, I don't
8  | regard the evidence at this point as being nearly as
9  | strong as I would have believed it objectively to be,
10 | based on Mr. Wydermyer's previous statements as
11 | unexplained by his objective new statement today.
12 | We have here, fortunately, an opportunity to
13 | correct something that could have been an injustice,
14 | which is the conviction by plea under the face -- in
15 | the face of potentially catastrophic consequences of
16 | Mr. Davis simply because he had reason to believe that
17 | he could be convicted of a certain testimony of
18 | Mr. Wydermyer. We now know that testimony is not
19 | certain.
20 | This is not the same thing as Watts, where
21 | the defendant just over-estimated the strength of the
22 | prosecution case. This is an objective new development
23 | that could not have been foreseeable or discovered in
24 | due diligence at the time of the trial.
25 | Apparently Mr. Wydermyer decided, having
26 | heard that Mr. Davis pleaded guilty, that having
27 | thought about it, he couldn't abide in his own
28 | conscious Mr. Davis going to prison for however long

1    and however comparatively less it would have been than
2    had he been convicted and decided to come forward and
3    prevent the prison term from happening at all.  And I
4    think the Court should respect this victim's testimony
5    and give the defendant a shot at a fair trial.

6            THE COURT:  Mr. Kauffman, what is the D.A.'s
7    view?

8            MR. KAUFFMAN:  I think even if you do believe
9    what Mr. Wydermyer says here today, it's still an
10   extremely strong circumstantial case.  You know, the
11   defendant goes into this bathroom, and moments later,
12   someone returns out and starts firing.  Mr. Bergerson,
13   before that hearing, tried to suggest it was this other
14   person in the house, but as the victim clearly said,
15   there's another person sitting on the couch and never
16   had anything do with this.

17           THE COURT:  I have a question for you.  Was
18   the cigarette butt with this other person's DNA on it
19   located inside the house, and if so, where?

20           MR. KAUFFMAN:  It was located inside the
21   house, but I don't --

22           THE COURT:  Was it in the bathroom?

23           MR. BERGERSON:  I think it was.

24           MR. KAUFFMAN:  I know the defendant's
25   cigarette butt was in the bathroom, but I think it's
26   clear from what the witness said today --

27           THE COURT:  At the time somebody went in
28   there and came out shooting --

```
 1              MR. KAUFFMAN:  Right.

 2              THE COURT:  -- the second person --

 3              MR. KAUFFMAN:  -- is somewhere on the couch,

 4    luxuriating, had nothing to do with it.  So that hasn't

 5    changed.  So what we have to believe is there is some

 6    hidden third person there who no one ever sees leave

 7    because the victim sees only these two people leaving

 8    from this house.

 9              So I think this is exactly like Watts.  You

10    know, this objective/subjective distinction that

11    Mr. Bergerson tries to make, I think is one that makes

12    no difference in this situation, even if it's true,

13    which I don't think it is.  I think it's remarkably

14    close to Watts, if not on all fours with it.

15              I think what you have is just a person who

16    has known the defendant for a long time, reflected on

17    this and is sort of regretting the situation.  He

18    thinks he was responsible.  I think that the abundance

19    of his statement implicating the defendant would be

20    fatal to the defendant at any trial, and I don't think

21    this is a situation where the defendant should be

22    allowed to withdraw his plea simply because this may

23    have changed.

24              THE COURT:  Okay.

25              MR. BERGERSON:  Judge, first of all, on the

26    legal standard, I don't have to prove by clear and

27    convincing evidence that this testimony establishes the

28    right of Mr. Davis during a trial.  I just have to
```

1     prove that it establishes good cause for withdrawing

2     the plea and that the evidence is substantial. In

3     other words, that there's a sufficient quantity of it

4     to allow the Court to make whatever inferences we seek

5     to draw from it.

6             I think that there's a hundred percent

7     certainty from this evidence that Mr. Wydermyer has

8     changed the key aspect of his story, and that's the

9     identification of Mr. Davis. In that respect, this is

10     a hundred percent opposite from the circumstance we saw

11     presented in Watts. In Watts, there was a failure on

12     the part of the testifying witness to even mention

13     Mr. Watts, which led -- in the trial of the

14     co-defendant, which led Mr. Watts to allege that he

15     over-estimated the strength of the State's case.

16             Here, there's an explicit denial by

17     Mr. Wydermyer that he can identify Mr. Davis as the

18     person who shot him. It's just a different set of

19     circumstances. The Court can rule according to its own

20     interpretation of the law, but that law should not be

21     dictated by Watts, which really involves different

22     circumstances than those presented at bar.

23             I don't have with me, by the way, the DNA

24     report on the case. My recollection is that there were

25     three cigarettes butts found in the bathroom: One from

26     Mr. Davis, one from Mr. Covin and one unidentified, but

27     I don't want to say that as a court officer, because

28     it's been almost a year -- well, six months at least

 1 | since I've looked at the police report.  If Detective
 2 | Wentz, who is looking through it has the report, that
 3 | might help me refresh my recollection, and I would make
 4 | an offer of proof to the Court, because I think that
 5 | that may be -- it could be important.  It might not.
 6 |         MR. KAUFFMAN:  I just want to point out one
 7 | thing.
 8 |         THE COURT:  What?
 9 |         MR. KAUFFMAN:  Mr. Wydermyer didn't get up
10 | there and say it wasn't the defendant who shot him.  He
11 | says he's now not sure.  Mr. Bergerson is making it
12 | sound like that's what he did.
13 |         THE COURT:  Well, he's arguing his case.
14 |         MR. BERGERSON:  I don't think I said that.  I
15 | said that he couldn't identify him with a hundred
16 | percent certainty.  He basically said "I was looking at
17 | a gun," which probably is true.
18 |         THE COURT:  We are all familiar with the
19 | concept of weapon focus, and the identification experts
20 | will say identification is questionable because of the
21 | cross-racial nature, which doesn't apply here, or
22 | weapon focus, and that apparently has been shown, that
23 | people that get guns or knives pointed at them will
24 | look at that gun or knife and not the height, weight,
25 | appearance of the perpetrator.
26 |         In any event, do the two of you want to
27 | submit it?
28 |         MR. BERGERSON:  I just want to make one more

1    comment.

2          THE COURT:  Okay.

3          MR. BERGERSON:  I agree with Mr. Kauffman

4    that this is a highly plausible circumstantial case.  I

5    think that's the reason that Mr. Wydermyer made the

6    identification of Mr. Davis, which he now thinks may be

7    mistaken, and because Mr. Davis was in the house,

8    because he was dealing with him, because there was a

9    drug deal that was going on, so he assumed it was

10   Mr. Davis.  But now we have explicit testimony that he

11   was focusing on the weapon, he can't say with a hundred

12   percent certainty that it was Mr. Davis.  I think that

13   any competent lawyer capable of fogging a mirror could

14   go and argue to a reasonable doubt to a jury that this

15   identification that was made at the preliminary hearing

16   was not accurate and could argue that the individual

17   before the jury, Mr. Davis, is not guilty.

18         So I think that there is good and sufficient

19   cause for Mr. Davis to proceed to trial if he so

20   chooses to do.  I cannot irrigate to myself the task of

21   dictating to him that he must avoid a trial, simply

22   because the odds of him losing are significant, which

23   they still would be, but I think there might be a very

24   good claim for reasonable doubt, and because the

25   punishment would be drastic if he were convicted.

26         I think that in the interest of justice,

27   which is, after all, what Section 1018 is about, the

28   Court should allow him to proceed to trial and let him

168

```
 1   withdraw his plea, and I would submit.
 2            THE COURT:  Submitted?
 3            MR. BERGERSON:  Submitted.
 4            THE COURT:  Okay.  Well, Penal Code Section
 5   1058 authorizes motions to withdraw guilty pleas,
 6   provides basically that a trial court may grant such a
 7   motion for a good cause shown, and as a general rule, a
 8   plea of guilty may be withdrawn for mistake, ignorance
 9   or inadvertence or any other factor overreaching the
10   defendant's free and clear judgment, meaning at the
11   time he entered the plea.  The defendant has the burden
12   of proving grounds for withdrawal of the guilty plea by
13   clear and convincing evidence, and I agree with
14   Mr. Bergerson that he's got to show good cause.  And
15   he, of course, thinks he has.
16            I think the general rule, as I articulated in
17   these two cases from the '60s, is that cases involving
18   a victim's recantation, our appellate courts have
19   cautioned repeatedly that a witness's offer to retract
20   sworn testimony should be viewed with suspicion and
21   given little credence.
22            And I listened to this gentleman, and I think
23   that Mr. Wydermyer basically has a little bit of
24   buyer's remorse.  After all, what he says is the same
25   in the declaration that Mr. Bergerson prepared and he
26   signed, he basically said the same thing here ten
27   minutes ago, that is, that he may have been mistaken in
28   saying and later testifying that the defendant, Mr.
```

169

1   Davis, shot me.

2            I don't think you've carried your burden of

3   proof.  I think this defendant got what he asked for.

4   He got the benefit of his bargain.  He got a case,

5   which could have resulted in over 40 years to life,

6   reduced to a case where he was going to receive 25

7   years.

8            So your motion to withdraw his previously

9   entered plea is denied.

10           MR. BERGERSON:  Thank you very much for

11   considering it.

12           THE COURT:  You're welcome.  Is he ready to

13   be sentenced?

14           MR. BERGERSON:  Yes.  No legal cause.  I've

15   looked at the probation report a long time ago.  I

16   don't remember anything particularly egregious about it

17   that I would object to.

18           THE COURT:  Do you want to submit it, Mr.

19   Kauffman?

20           MR. KAUFFMAN:  Yes.

21           THE COURT:  Okay.  Arraignment having been

22   waived, no legal cause, it appears to me the interest

23   of justice would not be served by granting the

24   defendant probation, so I'm going to deny him

25   probation.

26           The Court having denied probation, it's the

27   judgment of this Court that the defendant be committed

28   to the California Department of Corrections for the

# EXHIBIT COVER PAGE

E

EXHIBIT

Description of this Exhibit: DECLARATION OF SEAN WYDERMEYER

EXECUTED ON 5/14/07

Number of pages to this Exhibit: ___2.___ pages.

JURISDICTION: (Check only one)

| | |
|---|---|
| [ ] | Municipal Court |
| [X] | Superior Court |
| [ ] | Appellate Court |
| [X] | State Supreme Court |
| [X] | United States District Court |
| [ ] | State Circuit Court |
| [ ] | United States Supreme Court |
| [ ] | Grand Jury |

C 00236

1

2          DECLARATION OF SEAN WYDERMEYER

3

4          I, SEAN WYDERMEYER, declare as follows:

5          I was the complaining witness against Marquis Davis. I recall having

6    testified at his preliminary hearing that he shot me. I recall having made

7    previous statements consistent with my said testimony.

8          Several months ago, I learned that Davis had pleaded guilty to the charge

9    of having shot me. In thinking about the case both before and after I learned of

10   Davis' said plea, I have determined that I may have been mistaken in saying,

11   and later in testifying, that Davis shot me. I am now uncertain of the truth of

12   my statements in this regard. I myself have a doubt as to whether Davis shot

13   me. I would be prepared to testify to this doubt to any Court or any jury should

14   Davis be permitted to withdraw his plea and go to trial.

15         I am aware that if I sign this declaration, I will have to testify regarding

16   its contents at a hearing. I am further aware that if Davis is permitted to

17   withdraw his plea, I will have to testify at trial. I am aware that my statement

18   here is not consistent with my prior testimony at Davis' preliminary hearing

19   and that the prosecution might decide to say that I perjured myself either at

20   that hearing, or in making this statement and in testifying consistently with it

21   any any of the above-referenced prospective hearings. I nevertheless make this

22   statement of my own free will. No one has offered me any inducements to make

EXHIBIT (E)(1)                    8

L00237

1    this statement, or to testify in any fashion hereafter. I make this statement,

2    and proffer my future testimony exclusively because it is true.

3         I declare under penalty of perjury that this is true.

4         EXECUTED: Richmond, county of Contra Costa, state of California, this

5    May 14, 2007.

6

7                         SEAN WYDERMEYER

8

9                     PROOF OF SERVICE BY MAIL

10

11        I, DONALD THOMAS BERGERSON, declare that I am over 18 years old

12    and not a party hereto and that I mailed a true copy hereof to DISTRICT

13    ATTORNEY, attn. GEORGE WILLIAMSON, Chief Deputy, c/o branch office at

14    321 Tuolomne Ave., Vallejo, CA., 94590, on May 14, 2007.

15        EXECUTED: City and County of San Francisco, California, this May 14,

16    2007.

17

18                     DONALD THOMAS BERGERSON

EXHIBIT (E)(2)              9

DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare the following:

I am over 18 years of age, and a party to the within action.

My address is:     MARQUIS M. DAVIS D-18498

CSP-CORCORAN   PO. BOX 3461

CORCORAN          CA. 93212

On  12 / 16 /09            , I served a copy of the attached

PETITION FOR FEDERAL WRIT OF HABEAS CORPUS

PURSUANT TO 28 USC § 2254

On the below-named persons by placing a true copy thereof
in envelope addressed as follows, with first class postage
thereon fully prepaid, and delivering the sealed envelopes,
according to the procedures prescribed for sending legal
mail, to the proper institutional official for deposit
in the United States mail at Corcoran, in the County of
Kings, California.

| UNITED STATES DISTRICT COURT | ATTORNEY GENERAL'S OFFICE |
| --- | --- |
| FOR THE EASTERN DISTRICT OF | EDMUND G. BROWN JR. |
| CALIFORNIA SACRAMENTO OFFICE | ATTN: DEPUTY AG. JAIME M. GANSON |
| 501 "I" STREET,SUITE 4-200 | 1300 I STREET, SUITE 125 |
| SACRAMENTO      CA. 95814 | PO. BOX 94442-2550 |
|  | SACRAMENTO        CA. 94442-2550 |

Executed under penalty of perjury this  16  day of
DECEMBER      , 200 9 , at Corcoran, California.

DECLARANT