AMENDED HABEAS PETITION



AO 241 (Rev. 5/85)

**PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

# United States District Court

| District | of California Eastern District |

| Name | Marquis M. Davis | Prisoner No. F-79213 | Case No. 2:09-cv-3510 EFB |

Place of Confinement

Corcoran State Prison Po. Box 3461
Corcoran CA. 93212

Name of Petitioner (include name under which convicted)          Name of Respondent (authorized person having custody of petitioner)

**FILED**

Marquis M. Davis V. R.Lopez, Warden          FEB 1 - 2010

The Attorney General of the State of: California

CLERK, U S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

## PETITION

1. Name and location of court which entered the judgment of conviction under attack Superior Court of California Solano County 600 Union Avenue Fairfield CA. 94533

2. Date of judgment of conviction May 24, 2007

3. Length of sentence 25 Years

4. Nature of offense involved (all counts) On November 6, 2006, Petitioner Marquis Davis entered a plea of guilty in Solano County Superior Court to 1 Count of Attempted Muder in violation of Penal Code Sec. 664/187,Subd.(A) He also admitted allegations to Penal Code sec. 12022.53

5. What was your plea? (Check one)
(a) Not guilty ☐
(b) Guilty ☒
(c) Nolo contendere ☐
If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

_____

_____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
(a) Jury ☐
(b) Judge only ☐

7. Did you testify at the trial?
Yes ☐ No ☐

8. Did you appeal from the judgment of conviction?
Yes ☒ No ☐

(2)

AO 241 (Rev. 5/85)

9. If you did appeal, answer the following:

(a) Name of court    In the Court of Appeal First Appellate Dist. Div.Two

(b) Result    Denied

(c) Date of result and citation, if known    10/31/09    Case No. A118622

(d) Grounds raised    Trial Court erred denying petitioner's withdrawal

plea motion (2) Petitioner's sentence must be modified

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court    California Supreme Court

(2) Result    Denied

(3) Date of result and citation, if known    1/28/09    S169163

(4) Grounds raised    The Judgment of conviction   must be reversed

because the Trial court erred when it denied Appellant's
motion to withdraw  his guilty plea violating state & federal rigts

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each
direct appeal:

(1) Name of court

(2) Result

(3) Date of result and citation, if known

(4) Grounds raised

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions,
applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒  No ☐

11. If your answer to 10 was "yes," give the following
information:
(a) (1) Name of court    Superior Court of California Solano County

(2) Nature of proceeding    Collateral Relief   Exausting State remedies.

(3) Grounds raised    (1) I.A.C. on Appellate counsel (2) I.A.C. on Trial
Counsel (3) Abuse of Discretion on Trial Judge (4) Withdrawal of plea

(3)

AO 241 (Rev. 5/85)

pursuant to p.c. 1018

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☒

(5) Result

(6) Date of result

(b) As to any second petition, application or motion give the same information:

(1) Name of court   Superior Court of California Solano County

(2) Nature of proceeding Collateral Attack

(3) Grounds raised   (I.A.C. on Appellate Counsel (2) I.A.C. on Trial
Counsel (3) Abuse of Discretion on Trial Judge (4) withdrawal of
plea pursuant to p.c. 1018

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☒
(5) Result

(6) Date of result

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
(1) First petition, etc.      Yes ☒   No ☐
(2) Second petition,         Yes ☒   No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.
CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

(4)

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one:  (SEE ATTACHMENT)

Supporting FACTS (state *briefly* without citing cases or law)   (SEE ATTACHMENT)

B. Ground two: 

Supporting FACTS (state *briefly* without citing cases or law):  (SEE ATTACHMENT)

AO 241 (Rev. 5/85)

---

C. Ground three:   (SEE ATTACHMENT)

_____

Supporting FACTS (state *briefly* without citing cases or law):   (SEE ATTACHMENT

_____

_____

_____

_____

D. Ground four: _____

_____

Supporting FACTS (state *briefly* without citing cases or law):   (SEE ATTACHMENT

_____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

(1) I.A.C. ON APPELLATE COUNSEL (2) I.A.C. ON TRIAL COUNSEL

(3) ABUSE OF DISCRETION ON PRESIDING JUSTICE ALLAN P. CARTER

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☒ No ☐

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing  DONALD THOMAS BERGERSON ATTORNEY AT LAW

34 BOARDMAN PLACE SAN FRANCISCO          CA. 94103

(b) At arraignment and plea   DONALD THOMAS BERGERSON

_____

(6)

AO 241 (Rev. 5/85)

(c) At trial  DONALD THOMAS BERGERSON

(d) At sentencing  DONALD THOMAS BERGERSON

(e) On appeal  ROSS THOMAS ATTORNEY AT LAW 4104 24th STREET NO. 411

SAN FRANCISCO          CA. 94114

(f) In any post-conviction proceeding

(g) On appeal from any adverse ruling in a post-conviction proceeding

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☐ No ☒

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☐
   (a) If so, give name and location of court which imposed sentence to be served in the future:

   (b) Give date and length of the above sentence:     25 YEARS

   (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
   Yes ☒ No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed

1/26/10
_____
(date)

_____
Signature of Petitioner

(7)

MARQUIS M. DAVIS F-79213
CSP-CORCORAN  PO. BOX 3461
CORCORAN      CA. 93212

IMPROPRIA PERSONA

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO

MARQUIS M. DAVIS          )        CASE NO.
                          )
          PETITIONER)
                          )        PETITION FOR FEDERAL WRIT OF
    vs.                   )        HABEAS CORPUS PURSUANT TO 28 USC
                          )        § 2254 FIRST AMENDED PETITION
R. LOPEZ,WARDEN           )        PURSUANT TO Fed R.Civ P Rule 15
ET.,AL.,                  )
          RESPONDENT)

                                   US MAGISTRATE

          To; Respondents,  R. LOPEZ          Et. Al., and the

United States Magistrate. Petitioner Marquis M. Davis, here by

motions this court he be heard on the following federal claims

pursuant to the Petition For

                    Federal Writ of Habeas corpus pursuant to

28 USC § 2254; Please Take Notice! that on   JANUARY   2010

or soon thereafter, petitioner Davis, may be heard before the

                                1.

1   United States District Court For the Eastern District Of

2   California Sacramento Office 501 "I" Street,Suite 4-200

3   Sacramento  CA. 95814; Petitioner Davis, will not submit any

4   Memorandum of Law with regard to the Federal claims now brought

5   before this court. Only an argument of legal authority, for the

6   Request of"Stay in Abeyance" Petitioner, Davis now request this

7   court grant so that the court will acknowledge Collateral

8   Federal claims are now "Pending" before the lower state courts

9   Petitioner Davis, would ask the court, take "judicial notice"

10  of the "Table of Contents" and the Federal claims now pending

11  before the lower state court, inefforts that this court will

12  honor Petitioner Davis's request for "Stay in Abeyance" for the

13  Federal claims now "pending" before the lower state court.

14  Petitioner Davis, would ask the court take judicial notice of

15  the "unexhausted Federal claims now "pending" before the lower

16  state courts, in the"table of contents"

17

18          III. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
                ON ROSS THOMAS SBN: 96184 IGNORING FEDERAL CLAIMS
19              CLEARLY STRONGER THAN THOSE·ISSUES PRESENTED ON
                PETITIONER DAVIS'S DIRECT APPEAL AS WELL AS HIS
20              FAILURE TO ADVISE PETITIONER DAVIS TO FILE
                SUPPLEMENTAL BRIEF TO RESERVE THOSE ISSUES FOR A
21              FEDERAL COURT JURISDICTION.

22          IV. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ON DONALD
                THOMAS BERGERSON VIOLATION OF SIXTH AMENDMENT
23
            V. ABUSE OF DISCRETION BY PRESIDING JUSTICE ALLAN P.
24             CARTER

25

26  These claims are currently "pending" before the lower state

27  court. Petitioner Davis would ask the court "Stay in Abeyance"

28  the Federal claims raised on Direct Appeal, until these Three

                                2.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34 969

1  aforementioned have been fully exhausted. Petitioner Davis,

2  would ask the court take "judicial notice of the Exhbits

3  attached to this petiton. For they substantiate disputed facts

4  as to the "pending" claims before the lower state court.

5

6  Affiant further sayeth naught!

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                          Respectfully, Submitted

23                                          Marques Harto

24  Dated: 1/2/10                                      pro se

25

26

27

28                          3.

1   PETITION FOR WRIT OF HABEAS CORPUS . . . . . . . . . . . . . . . . . .1-6

   VERIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2   TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . .8-9

3

   STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . .10-11

4   STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . .12-14

   MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . .15

5

   ARGUMENT

6

     I. AEDPA'S CLEAR PURPOSE TO ENCORAGE LITIGANTS TO

7       PURSUE CLAIMS IN STATE COURT PRIOR TO SEEKING

      FEDERAL COLLATERAL REVIEW.(SEE 28 USCA 2254 (b)

      ALSO 2254 (e) (2) ALSO 2264 (A),ALSO 28 USCA

8       2244 (d) (1) LIMITATIONS PERIOD AND 28 2254 (b)

      'S EXHAUSTION REQUIREMENT ENCOURAGES LITIGANTS

9       FIRST TO EXHAUST ALL STATE REMEDIES AND THEN TO

      FILE THEIR FEDERAL HABEAS PETITION A.S.A.P.! . . . . .16-23

10

11

     II. AN APPLICATION FOR STATE COLLATERAL REVIEW IS

      " PENDING " IN THE STATE COURTS, SO AS TO TOLL

12       TIME PERIOD FOR SEEKING FEDERAL HABEAS CORPUS

      REMEDY DURING TIME BETWEEN A LOWER STATE COURT'S

13       DECISION AND THE FILING OF A 'NOTICE OF APPEAL'

      TO A HIGHER STATE COURT 28 USCA § 2244 (d) (2) . . . .24-25

14

15     III. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ON

      ROSS THOMAS SBN: 96184 IGNORING FEDERAL CLAIMS

16       CLEARLY STRONGER THAN THOSE ISSUES PRESENTED ON

      PETITIONER DAVIS'S DIRECT APPEAL AS WELL AS HIS

17       FAILURE TO ADVISE PETITIONER DAVIS TO FILE

      SUPPLEMENTAL BRIEF TO RESERVE THOSE ISSUES FOR

18       A FEDERAL COURT JURISDICTION. . . . . . . . . . . . . . .26-44

19

     IV. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ON DONALD

20       THOMAS BERGERSON VIOLATION OF SIXTH AMENDMENT

21       A. PETITIONER HAS A RIGHT TO EFFECTIVE ASSISTANCE

       OF COUNSEL AT PRETRIAL PLEADING STAGES UNDER

22        BOTH STATE AND FEDERAL CONSTITUTION. . . . . . . . .45-50

23

      B. FACTS AND CIRCUMSTANCES OF IMPROPER INVESTIGATION

24        ADVICE AND NEGOTIATION

       . . . . . . . . . . . . . . . . .51-58

25

      C. HENDERSON/BIGMAN ERROR FAILURE OF COUNSEL TO

26        INFORM PETITIONER DAVIS OF THE APPLICABLE

       SPECIFIC INTENT ELEMENTS RELATED TO HIS

27        PROSPECTIVE DEFENSES. . . . . . . . . . . . . . . . .59-60

28

               4.

1   D. PETITIONER DAVIS'S PLEA WAS INVOLUNTARY AS
2      COUNSEL USED IMPROPER MEANS TO CONVINCE
       PETITIONER DAVIS TO ACCEPT THE PLEA BARGAIN........61-62
3

4

5

6   E. PETITIONER DAVIS'S PLEA OF GUILTY SHOULD BE
       VITIATED PURSUANT TO PEOPLE V. JOHNSON,
7      BECAUSE PETITIONER DAVIS DID NOT UNDERSTAND
       THE POSSIBLE PENAL CONSEQUENCES OF THE PLEA........63-64

8

9   F. PETITIONER DAVIS RECEIVED INEFFECTIVE ASSISTANCE
       OF COUNSEL, BECAUSE DEFENSE COUNSEL DID NOT ADVISE
       PETITIONER DAVIS TO WITHDRAW THE GUILTY PLEA WHEN
10     THE TRIAL COURT DID NOT APPROVE THE PLEA.........65-66

11

12  G. PETITIONER DAVIS UNDER CONSTITUTIONAL STANDARDS
       HAS BEEN PREJUDICED BY DEFENSE COUNSEL'S ERRORS....67-68

13

14  V. ABUSE OF DISCRETION BY PRESIDING JUSTICE ALLAN P.
15     CARTER                                            69-75

16     A. DENYING DEFENSE COUNSEL'S MOTION FOR CONTINUANCE

17     B. DENYING THE DEFENSE A KELLY-FRYE HEARING

18     C. ABUSE OF DISCRETION AND JUDICIAL MISCONDUCT
          DENYING PETITIONER DAVIS'S P.C. 1018 MOTION
19        WHEN SEAN WYDERMYER RECANTED HIS TESTIMONY

20  CONCLUSION........................................76-77

21  EXHIBITS (A) CALIFORNIA SUPREME COURT DECISION ON 1/28/09
                 DENYING PETITIONER DAVIS'S DIRECT APPEAL ISSUES
22
             (B) APPELLATE COUNSEL ROSS THOMAS ATTORNEY AT LAW
23               SBN: 96184 ASSIGNED TO DAVIS'S DIRECT APPEAL
                 CASE NO. A118622
24
             (C) REPORTER'S TRANSCRIPTS OF PRETRIAL PROCEEDINGS
25               BEFORE PLEA COLLOQUY TOOK PLACE

26           (D) DECLARATION OF SEAN WYDERMYER EXECUTED ON 5/14/07

27

28  PROOF OF SERVICE....................................78.

COURT PAPER

## STATEMENT OF CASE

On November 6, 2006, appellant, Marquis Matthew Davis, entered a

plea of guilty in Solano County Superior Court, to one count of attempted

murder, a violation of Penal Code section 664/187, subdivision (a). He also

admitted the allegation made pursuant to Penal Code section 12022.53,

subdivision (c) that he personally and intentionally discharged a firearm during

the commission of the offense. (CT 206-209, 211-212; RT 120.)[1]

On May 14, 2007, appellant moved to withdraw his guilty plea. (CT

---

[1]

"CT" refers to the clerk's transcript and "RT" refers to the reporter's transcript. "PXRT" refers to the reporter's transcript of the April 15, 2005, preliminary examination. Any number preceding these notations refers to the volume cited.

229-238.) This motion was heard and denied on May 24, 2007. (CT 272-277.)

Immediately upon the denial of the motion to withdraw the guilty plea, the court sentenced appellant to prison for an aggregate term of 25 years. (CT 277, 279.) Specifically, the midterm of five years was imposed for the attempted murder. (CT 279.) A 20-year enhancement was imposed in accordance with Penal Code section 12022.53, subdivision (c) and ordered to run consecutive to the five-year term. (*Ibid.*) This term of imprisonment was credited with the 1022 days (890 actual days plus 132 days good time/work time) appellant was in custody prior to sentencing. (CT 277, 280.) Additionally, appellant was ordered to pay a $3000 restitution fine pursuant to Penal Code section 1202.4, subdivision (b) and a parole restitution fine in the same amount pursuant to Penal Code section 1202.45. (CT 280.) The latter fine was stayed by the court pending appellant's successful completion of parole. (CT 274.)

Appellant filed a timely notice of appeal on July 11, 2007. (CT 281-282.) He also requested a certificate of probable cause in accordance with Penal Code section 1237.5. (CT 283-284.) This request was granted by the court on July 16, 2007. (CT 284.)

7.

## STATEMENT OF FACTS

Sean Widermyer received a cell phone call from appellant while driving
with his girlfriend to Vallejo shortly after noon on December 13, 2004.
(PXRT 5-6.)[2] Appellant, who Widermyer knew as "Pluck," was interested in
buying a quarter ounce of cocaine but was a "a few dollars short." (PXRT 8.)
Widermyer assured him that his lack of funds would be no problem. *(Ibid.)*[3]
They agreed to meet at a park in Vallejo later that day. *(Ibid.)*

Shortly after reaching the park, Widermyer received another call from
appellant. (PXRT 9.) This time he told Widermyer to meet him at "Chinese
Mike's" house which was nearby. (PXRT 9, 50.) Widermyer drove there and
met appellant at the front door. (PXRT 12.) Appellant, who was on his cell
phone at the time, walked into the bathroom after Widermyer stepped inside
the residence. *(Ibid.)* A young man, who Widermyer knew as "Tyree," was
in the livingroom. *(Ibid.)*

,Widermyer became concerned after noticing that the house was devoid
of furnishings. (PXRT 13.) As Widermyer started walking back toward the
front door, appellant stepped out of the bathroom and shot him six times with

---

2

This rendition of the facts is based on testimony given by several witnesses
at the April 15, 2005, preliminary examination.

3

Widermyer testified he agreed to sell the drugs to appellant because he was
a friend. (PXRT 29.)

8.

a small caliber handgun. (PXRT 13, 17.) Appellant and Tyree ran from the house after the shots were fired. (PXRT 15.)

Widermyer, who was unarmed, made no threatening moves toward appellant prior to the shooting. (PXRT 14.) According to Widermyer at the at the preliminary examination, the shooting came as a complete surprise to him. *(Ibid.)*

Although seriously wounded, Widermyer made his way out of the house and back to his car. (PXRT 15, 52.) He was immediately taken to a nearby hospital by his girlfriend, Regina Teasley. (PXRT 16, 52.) Widermyer testified that he told Teasley on the way to the hospital that Pluck had shot him. (PXRT 42.) Teasley, who testified as well, could only recall him saying the word "Pluck" as he slipped in and out of consciousness. (PXRT 54.)

Widermyer underwent surgery. (PXRT 17.) His injuries included a lacerated liver, damage to his brachial artery, arm, and hip, and removal of one of his kidneys. (PXRT 17, 18, 74.)

Shortly after his arrival at the hospital, Widermyer was interviewed by Vallejo Police Detective Jason Wentz. (PXRT 70.) While on the verge of unconsciousness, he told the detective that Pluck had shot him. (PXRT 70, 72.) Wentz returned to the hospital two days later and showed Widermyer a photo lineup which included appellant's picture. (PXRT 72-73.) He selected

9.

that photograph and said appellant was the man who shot him. (PXRT 73.)

At some point, Wentz searched "Chinese Mike's" house. (PXRT 74-76.) He found several expended bullet cartridges and blood on the carpet and walls. (PXRT 75-76.)

At the preliminary examination, Widermyer revealed that he had learned from appellant about a week prior to the shooting that he was the target of a assassination hit. (PXRT 32-33.) A man named Daniel had offered $30,000 to anyone who killed Widermyer. (PXRT 32.) Daniel was apparently unhappy with Widermyer over a drug deal involving Ecstasy pills. (PXRT 31.) Widermyer testified did not take the threat very seriously at the time. (PXRT 33.)

//

//

10.

I.
A FEDERAL DISTRICT COURT HAS DISCRETION TO
STAY A MIXED HABEAS PETITION CONTAINING
EXHAUSTED AND UNEXHAUSTED CLAIMS TO THE STATE
COURT IN THE FIRST INSTANCE AND THEN TO RETURN
TO FEDERAL COURT FOR REVIEW OF HIS PERFECTED
PETITION 28 USCA § 2254(b)(1)(A)

## Standard of Review

A federal district court has <u>discretion</u> to <u>stay</u> a <u>mixed</u> habeas petition containing <u>exhausted</u> and <u>unexhausted</u> claims to allow the petitioner to present his <u>unexhausted</u> claims to the <u>state</u> court in the first instance and then to <u>return</u> to <u>federal</u> court for <u>review</u> of his <u>perfected</u> petition <u>28</u> USCA § <u>2254</u>(b)(1) (A) <u>Rhines v Weber</u> (US 2005) 544 US 269, 125 S.Ct. 1528

## Comity in General

Under the "doctirn of Comity" one court should defer action on causes properly within it's jurisdiction, until the courts of another sovereignty with concurrent powers, and already cogni= zant of the litigation, have had an opportunity to pass upon the the matter.

## The United States Supreme Court

Has <u>reasoned</u> that the <u>interest</u> of "comity" and federalism, dictate that state courts must have the first oppor- tunity to decide a petitioner's claims. <u>Rose v Lundy</u>, 455 US 509 102 S.Ct.1198, 71 L.Ed.2d 379 (1982) Id. at 518-519, 102 S.Ct. 1198. The court further noted, it would be unseemly, in our dual system of government for a federal district court to upset a

11.

1  state cout conviction without an opportunity to the state court
2  to correct a constitutional violation. Federal courts apply the
3  "doctrine of comity" Rose v Lundy (1982) supra, Id., at 518, 102
4  S.Ct. 1198 (quoting Darr v Burford, 339 US 200, 204, 70 S.Ct.587
5  94 L.Ed.761 (1950) This doctrine teaches that one court should
6  defer action on causes properly within it's jurisdiction until
7  the courts of another sovereignty, with concurrent powers and
8  already cognizant of the litigation, have an opportunity to pass
9  upon the matter' Rose v. Lundy, supra Id. at 522, 102 S.Ct. 1198
10 The court further, determined that a requirement of "total ex-
11 haustion" be completed by the petitioner, there by, directing the
12 federal courts to effectuate that requirement by dismissing
13 "mixed" petitions without prejudice and allowing petitioner to
14 to return to the state court

15               to present the unexhausted claims to that
16 Court in the first instance. Rose v Lundy, supra, Id.at 522,102
17 S.Ct.1198. When the court decided Lundy, there was no statute
18 of limitations on the filing of federal habeas corpus petitions.
19 As a result, petitioners, who returned to state court to exhaust
20 their previously, unexhausted claims, could come back to federal
21 court to present their perfected petitions with relative ease.
22 (See Slack v McDaniel, 529 US 473,486, 120 S.Ct.1595, 146 L.Ed.
23 2d 542 (2000)

24

25 THE FILING OF A PETITION FOR HABEAS CORPUS
   IN FEDERAL COURT DOES NOT TOLL THE STATUTE
26 ON LIMITATIONS FOR FEDERAL HABEAS RELIEF
   28 USC 2244(d)
27

28 The enactment of the Antiterrorism and Effective Death Penalty

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

1 Act of 1996 (AEDPA) dramatically, altered the landscape for
2 federal habeas corpus petitions. AEDPA preserved, Lundy's total
3 exhaustion requirement. (See 28 USC § 2254(b)(1)(A) ("An appli-
4 cation for writ of habeas corpus...shall not be granted unless
5 it appears that...the applicant has exhausted the remedies avai-
6 lable in the courts of the state") But it also imposed a 1-year
7 statute of limitations on the filing of federal petitions § 2244
8 (d) Although, the limitations period is tolled during the penden
9 cy of a properly filed application for the state post conviction
10 or other collateral review" 2244(d)(2). The filing of a petiton
11 for habeas corpus in federal court does not toll the statute of
12 limitations, Duncan v Walker 533 US 167, 181-182, 121 S.Ct.2120
13 150 L.Ed.2d 251 (2001) As a result of the interplay between
14 AEDPA's 1-year statute of limitations and Lundy's dismissal
15 requirement, petitioner's who

16 come to federal court with "mixed" petition
17 run the risk of forever losing their opportunity for any federal
18 review of their unexhausted claims. If a petitioner files a
19 timely, but mixed petition in federal district court and the
20 district court dismisses it under Lundy, after the limitations
21 period has expired, this will likely mean the termination of any
22 federal review. If a district court dismisses a "mixed" petition
23 close to the end of the 1-year period, has petitioner's chances
24 of exhausting his claims in state court, and refiling the peti-
25 tion in federal court before the limitations period runs are slim
26 The problem is not limited to petitioners who file close to the
27 AEDPA deadline. Even a petitioner who files early will have no
28 way of controlling when the district court will resolve the

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

1 question of exhaustion. Thus, whether a petitioner ever receives
2 federal review of his claims may turn on which district court
3 happens to hear his case Rhines v Weber (US 2005) 544 US 269, 12
4 125 S.Ct. 1528

5

6 The Supreme Court of the United States

7 Has recognized the gravity of this problem and
8 the difficulty it has posed for petitioners around federal dis-
9 trict courts alike. In an attempt to solve the problem, some
10 district courts have adopted a version of the "Stay and Abeyance
11 procedure employed by the district court below. Under this
12 procedure, rather then dismiss the "mixed" petition pursuant to
13 Rose v Lundy 455 US 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) A
14 district court might stay the petition and hold it in abeyance,
15 while the petitioner returns to state court to exhaust his pre-
16 viously, unexhausted claims. Once the petitioner exhaust his
17 state remedies, the district court will lift the "stay" and
18 allow the petitioner to proceed in federal court.

19

20 THE DISTRICT COURTS ORDINARILY HAVE AUTHORITY
   TO ISSUE STAYS,WHERE SUCH A STAY WOULD BE A
21 PROPER EXERCISE OF DISCRETION.AEDPA DOES NOT
   DEPRIVE DISTRICT COURTS OF THEIR AUTHORITY TO
22 ISSUES STAYS 28 USCA § 2254(b)(1)(A)

23

24 District Courts, do ordinarily have authority
25 to issue "stays", (See Landis v North American Co. 299 US 248,
26 254, 57 S.Ct.163, 81 L.Ed.153 (1936) Where such a "stay" would
27 be a proper exercise of discretion, (See Clinton v Jones, 520 US
28 681, 706, 117 S.Ct.1636, 137 L.Ed.2d945 (1997) AEDPA does not

14.

1  deprive the district court of that authority,cf. 28 USC § 2244
2  (b)(1)(A) An application for a writ of habeas corpus...shall not
3  be granted unless it appears that...the appellant has exhausted
4  the remedies available in the courts of the state, but it does
5  circumscibe their discretion. Any solution to this problem must
6  therefore, be compatible with AEDPA'S purposes.

7

8  A DISTRICT COURT SHOULD STAY RATHER THAN DISMISS
   A MIXED HABEAS PETITION CONTAINING EXHAUSTED AND
9  UNEXHAUSTED CLAIMS,IF THE PETITIONER HAS GOOD CAUSE
   FOR HIS FAILURE TO EXHAUST, HIS UNEXHAUSTED CLAIMS
10 ARE POTENTIALLY MERITORIOUS AND THERE IS NO INDI-
   CATION THAT PETITIONER ENGAGED IN INTENTIONALLY
11 DILATORY LITIGATION TACTICS 28 USCA § 2254(b)(1)(A)

12

13                          The Supreme Court of the United States
14 has determined, it would be an "abuse of discretion" for a dis-
15 trict court to deny a "stay" and to dismisss a "mixed" petition
16 if the petitioner had "good cause" for his failure to exhaust his
17 unexhausted claims, are potentially, "meritorious" and there is
18 no indication that the petitioner engaged intentionally, dilatory
19 litigation tactics should stay, rather than dismiss the "mixed"
20 petition.(See Rose v Lundy 455 US 509, 102 S.Ct. 1198, 71 L.Ed.
21 2d 379 (1982) The total exhaustion requirement was not intended
22 to "unreasonably" impair the

23                          petitioner's right to obtain federal relief.(See
24 Rose v Lundy, supra, Id. at 520, 102 S.Ct.1198 ("A petitioner can
25 always amend the petition to delete the "unexhausted" claims,
26 rather than returning to state court to exhaust all of his claims
27 Therefore this court should grant petitioner Davis a "stay" to
28 exhaust unexhausted federal claims now raised before this court.

05 34788

I.

1    AEDPA'S CLEAR PURPOSE TO ENCORAGE LITIGANTS TO PURSUE
   CLAIMS IN STATE COURT PRIOR TO SEEKING FEDERAL COLLATERAL
2    REVIEW.(SEE 28 USCA 2254(b) ALSO 2254 (e) (2) ALSO 2264
   (A),ALSO 28 USCA 2244 (d) (1) LIMITATIONS PERIOD AND 28
3    USC 2244 (d) (2)'S TOLLING PROVISION, TOGETHER WITH 28
   2254 (b)'S EXHAUSTION REQUIREMENT ENCOURAGES LITIGANTS
4    FIRST TO EXHAUST ALL **STATE** REMEDIES AND THEN TO FILE
   THEIR FEDERAL HABEAS PETITON A.S.A.P!
5

6

7 Standard of Review

8

9    ' 28 USC 2244(d)(2) by contrast employs the word "state"

10 but not the word federal as a modifier for review. Duncan v.

11 Walker (2001) 533 US 167, 121 S.Ct.2120, the court determined

12 that it is well settled that where congress includes a particular

13 language in one section of a statute, but omits it in another

14 section of the

15    same ACT, It is generally, presumed that congress, ACTS

16 intentionally, and purposely in the disparate inclusion or

17 exclusion. (SEE Bates v. United States (1997) 522 US 23-29,30,118

18 S.Ct.285, 139 L.Ed.2d.215 (quoting Russello v. United States (1983

19 464 US 16,23, 104 S.Ct.296, 78 L.Ed.2d 17. The court found no '

20 likely, explination for congress 'omission of the word "federal"

21 in 28 USC 2244(d)(2) (See Duncan v. Walker (2001) 533 US 167,121

22 20. The court further held other than that congress did not in-.

23 tend properly, filed applications

24                       for federal review to "tell" the limitation

25 period. That it would be anomolous to say the least, for congress

26 to usher in federal review under the generic rubric of"other co-

27 llateral review" in a statutory provision,that refers expressly

28 to "state" review, while denominating expressly, both "state" and

1 "federal" proceedings in other parts of the same statute.The
2 anomaly is underscored by the fact that the words "state" and
3 "federal" are likely to be of no small import when congress
4 drafts a statute that governs federal collateral review of stated
5 court judgments. Duncan v. Walker(2001) 533 US 167,121 S.Ct.2120
6 28 USC 2244 (d)(1)'s 1-year limitation period applies to an
7 application for a "Writ of Habeas Corpus, by a person in custody
8 pusuant to the judgment
9           of a state court. 28 USC 2244 (d)(2) provides for
10 "tolling" during the pendency of " a properly, filed application
11 for state post conviction or other "collateral" review with
12 respect to the pertinent judgment or claim"nothing in the language
13 of these provisions requires that the state court judgment pur-
14 suant to which a person is in custody be a criminal conviction
15 Nor does 28 USC §2254 by it's terms apply only to those in
16 custody pursuant to the judgment of a state court 28 USC §2254(A
17 A person in custody pursuant to the judgment of a state court 28
18 USC § 2254(b)(1) " A person in custody pursuant to the judgment
19 of a state court 28 USC § 2254 (d) A person in custody pursuant
20 to the judgment of a state court 28 USC § 2254 (e)(1) A person in
21 custody pursuant to the judgment of a state court. incarceration
22 pursuant to a state criminal conviction may be by far
23
24                                   the most common and most familar
25 basis for satisfaction of the "in custody" requirement in 28 USC
26 § 2254 cases. But there are other types of state court judgments
27 pursuant to which a person may be held in custody within the
28 meaning of the federal Habeas Corpus statute. For example, federal

1 | Habeas Corpus review may be available to challenge the legality
2 | of a state court order of civil commitment or state court of civil
3 | contempt. (See Francois v. Henderson (1988) 850 F.2d 231;
4 | Entertaining a challenge brought in a federal Habeas petition
5 | under 28 USC § 2254, to a state court's commitment of a person in
6 | custody.

7 |

8 | AEDPA's provisions, also demonstrate that "other collateral" need
9 | not refer to any form. (See Duncan v. Walker (2001) 533 US 167,
10 | 121 S.Ct.2120; Especially, federal review in order to have
11 | meaning, Title 28 USC § 2263; Establishing the limitations period
12 | for filing a 28 USC § 2254 petition consideration of the competing
13 | constructions in light of AEDPA's purposes reinforces the
14 | conclusion, the court has drawn from the text.
15 | .

16 | AEDPA's

17 | Purpose, is to further the principles of "comity" finalty a
18 | federalism (See Williams v. Taylor (2000) 529 US at, 436, 120 S.c
19 | 1479, specifically, under petitioner's construction 28 USC § 2244
20 | (d) (2) promotes the exhaustion of state remedies, while respect
21 | ing the interest in the finality of state court judgments.

22 |

23 | EXHAUSTION REQUIREMENTS OF 28 USC § 2254(b)

24 |

25 | Ensure that the state courts have the opportunity
26 | fully to consider federal law, challenges to a state custodial
27 | judgment before the lower courts may entertain a "collateral"
28 | attack upon that judgment. (See Duncan v. Walker, (2001) 533 US 1

1   79, 121 S.Ct.2120, also O'Sullivan v. Boerckel, (1999) 526 US 83
2   845, 119 S.Ct.1728, 144 L.Ed.2d 1 ; The exhaustion doctrin is
3   designed to give the state courts a full and fair opportunity to
4   resolve federal constitutional claims before those claims are
5   presented to the federal courts. (See Rose v. Lundy (1982) 455 US
6   509,518,519, 102 S.Ct.1198, 71 L.Ed.2d 379 a rigorously,enforced
7   total exhaustion rule will encourage state prisoners to seek full
8   relief first from the state courts opportunity, to review all
9   claims of "Constitutional error"
10                   This requirement is principally, designed
11  to protect the state court role in the enforcemnt of federal law
12  and prevent disruption of state judicial proceedings.
13
14  THE EXHAUSTION RULE

15              Promotes "Comity" in that it would be unseemy in our
16  dual system of government for a federal District Court to upset a
17  state court conviction without an opportunity to the state courts
18  to correct a constitutional violation
19
20

21  THE UNITED STATES SUPREME COURT

22              Has observed that "strict enforcement of the exhau-
23  stion requirement will encourage habeas petitioner   to exhaust
24  all of their claims in state court and to present the Federal
25  court with a single habeas petition (See Duncan v. Walker (2001)
26  533 US 167 121 S.Ct.2120. The court of Appeals reasoned that it's
27  interpretation of the statute would further congress goal "to
28  spur defendants to file their federal Habeas more quickly" (See

OURT PAPER
TATE OF CALIFORNIA

1 "(See 208 F.3d at 361. But this view fails to account sufficient
2 for AEDPA's clear purpose to encourage litigants to pursue claim
3 in state court prior to seeking federal collateral review. (See
4 28 USC § 2254(b) also 2254 (e)(2) also 2264 (A) also 28 USC 2244
5 (d)(1)'s limitation period and 28 USC § 2244(d)(2)'s tolling
6 provision together with 28 USC 2254 (b)'s exhaustion requirement
7 encourage litigants first to exhaust all state remedies and then
8 to file their federal habeas petitions as soon as possible.
9
10 THE CALIFORNIA SUPREME COURT
11            denied petitioner Davis's"petition for review"on
12 1/28/09 and failed to rule on the "merits" of the petition.(See
13 Exhibit (F) California Supreme Court opinion. On Direct Appeal
14 Petitioner Davis was appointed Appellate Counsel  Ross Thomas
15          SBN:    who only raised one claim, but as to a quest⁻
16 ion, of law of Davis's state and federal constitutional rights.
17
18                    QUESTION PRESENTED
19 Whether, petitioner Davis was denied his federal and state consti-
20 tutional rights due process of law, when the trial court
21 erroneously, refused to permit petitioner Davis, to withdraw his
22 guilty plea?
23
24 CALIFORNIA SUPREME COURT'S OBLIGATION TO
   RULE ON THE MERITS
25
26            When a federal court, is confronted with a state court
27 decision that does not provide the basis of it's decision A
28 Federal Habeas Court must determine, whether in light of an ind

1  ependent review of the record and the relevant federal law. The
2  state court's resolution of a petitioner's claim was "contrary to
3  or involved an unreasonable application of clearly established
4  Federal law, as determined by the Supreme Court of The United
5  States as required by statute 28 USCA § 2254 (d)(1) Delgado v.
6  Lewis (1099) 181 F.3d 1087.

7

8      NINTH CIRCUIT

9

10        Panel has noted that the AEDPA's standard of review
11  provisions "reflect the...general requirement that federal courts
12  not disturb state court determinations, unless the state court has
13  failed to follow the law as explicated by the SUPREME COURT.
14  Davis v. Kramer, (9TH Cir 1999) 167 F.3d 494,500. Under Davis

15

16        " A state court decision amounts to an unreasonable
           application of clearly established federal law,
17        where the state court fails to apply a legal
           principle enunciated in one or more Supreme Court
18        decisions, to a situation, where such application
           is required by the force and logic of the court's
19        decision. (See Delgado v. Lewis (CA.9 CA1.1999)
           181 F.3d 1087;

20

21

22  In Davis v. Kramer (9TH Cir 1999) 167 F.3d 494,500. The court
23  provided a framework for analyzing state court opinions under
24  AEDPA, that when a state court does not articulate the rationale
25  for it's determination of clearly established federal law is not
26  possible. (See Cardwell v. Green, (4TH Cir) 152 F.3d 331,339, Cert
27  denied 525 US 1037, 119 S.Ct.587, 142 L.Ed.2d 491 (1998) and thus
28  when confronted with a state court decision that does not provide

1 the states' collateral review systems, require a prisoner to file
2 a petition in a trial court, then to file a "notice of appeal"
3 within a specified time after entry of the trial court's un-
4 favorable judgment, and if still unsuccessful, to file a further
5 notice of appeal" or request for discretionary review, to the
6 state Supreme Court within a specified time. Because a federal
7 Habeas petitioner, has not exhausted his state remedies, as long
8 as he has "The right under state law...to raise in that state be
9 any available procedure; The question presented (See 28 USC §
10 2254(c) and the court's recognized a state prisoner is entitled
11 to a full round of "collateral" review. (See Carey v. Saffold (
12 2002) 536 US 214, 122 S.Ct.2134;

13

14    " PENDING "

15        Is the rule that applies to California's unique " co-
16 llateral" review system, even through that system involves not a
17 "notice of appeal" but the filling within a "reasonable" time
18 (See Carey v. Saffold (2002) 536 US 214, Also Evans v. Chavis
19 (2006) 546 US 189, 126 S.Ct. 846;

20

21    " The Antiterrorism and Effective Death Penalty Act of 1996
        (AEDPA) gives a state prisoner whose conviction has become
22      final one year to seek federal habeas corpus relief (See
        28 USC § 2244 (d)(1)(A), but tolls, this 1-year limitation
23      period for the time during which a properly filed applica-
        tion for state...collateral review...is "pending" (See 28
24      USC § 2244 (d)(2) under California's Collateral review
        scheme, the equivalent of a "notice of appeal" is timely
25      if filed within a "reasonable time" (SEE Carey v. Saffold
        (2002) 536 US 214, 122 S.Ct.2134, 153 L.Ed.2d 260.
26

27

28 In Evans v. Chavis (2006) 546 US 189, 126 S.Ct.846; The court

1  held ,inter alia, that (1) Only a timely appeal "tolls" AEDPA's

2  limitations period for the time between, the lower court's

3  adverse decision and the filing of a "notice of appeal"

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II.

AN APPLICATION FOR STATE COLLATERAL REVIEW
IS " PENDING " IN THE STATE COURTS, SO AS TO
TOLL THE PERIOD FOR SEEKING FEDERAL HABEAS
CORPUS REMEDY DURING TIME BETWEEN A LOWER STATE
COURT'S DECISION AND THE FILING OF A 'NOTICE OF
APPEAL' TO HIGHER STATE COURT 28 USCA § 2244 (d)(2)

STANDARD OF REVIEW

6      Application for state collateral review is "pending"in

7 the state courts, so as to toll time period for seeking federal

8 habeas corpus remedy during time between a lower court's deter-

9 mination and filing of a further original state habeas petition

10 in a higher court 28 USCA § 2244(d)(2)

11                               Carey v. Saffold (2002) 536 US 214,

12 122 S.Ct.2134; California's reading would also produce a serious

13 statutory anomaly. A federal habeas petitioner must exhaust

14 state remedies before he can obtain federal habeas relief. The

15 statute makes clear that a federal petitioner has not exhausted

16 those remedies as long as he maintians " the right under the law

17 of the state to raise "

18          in that state" by any available procedure the

19 question presented" 28 USC § 2254(c) The court has interpreted

20 the latter provision to require the federal habeas petitioner

21 " invok[e] one complete round of the state's established

22 appellate review process" O'Sullivan v. Boerckel, (1999) 526 US

23 838,845, 119 S.Ct.1728, 144 L.Ed.2d 1. The exhaustion require-

24 ment serves AEDPA's goal of promoting "comity, finality and

25 federalism," Williams v. Taylor (2000) 529 US.529 US. 420,436,

26 120 S.Ct.1479, 146 L.Ed.2d 435

27                               By giving state courts " the first

28 opportunity to review [the] claim" and to"correct" any consti-

1   tutional violation in the first instance" (See Boerckel, supra

2   at 844-845, 119 S.Ct.1728. And AEDPA's limitations period with

3   its accompanying tolling provision-ensures the achievement of

4   this goal because it " promotes the exhaustion of state remedie

5   while respecting the interest in the finality of state court

6   judgments" Duncan v. Walker, 533 US. 167, 178, 121 S.Ct.2120,

7   150 L.Ed.2d 251 (2001); Petitioner Davis, has already submitted

8   a " COLLATERAL " attack, filing a petition before the lower

9   state court of the Superior Court of The State of California

10  Solano County 600 Union Avenue fairfield CA. 94533, on 7/29 09

11  (See Exhibit (G) The court denied the petition. Petitioner

12  Davis there by, sought further relief

13                              raising 5 federal constitutional

14  claims before the California Supreme Court, (See Exhibit (H) on

15  /  /09; Therefore, Petitioner Davis, humbly, "Request Stay and

16  Abeyance" be "Granted" until the California state courts have

17  heard and ruled on all 5 federal constitutional claims.

18

19

20

21

22

23

24

25

26

27

28

III.

INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
ON ROSS THOMAS SBN:96184 IGNORING FEDERAL
CLAIMS CLEARLY STRONGER THAN THOSE ISSUES
PRESENTED ON PETITIONER DAVIS'S DIRECT APPEAL
AS WELL AS HIS FAILURE TO ADVISE PETITIONER
DAVIS TO FILE SUPPLEMENTAL BRIEF TO RESERVE
THOSE ISSUES FOR A FEDERAL COURT JURISDICTION

STANDARD OF REVIEW

Effective Assistance of Appellate counsel is "clearlY establish" law for purposes of habeas review under the Antiterrorism and Effective death Penalty Act (AEDPA). U.S.C.A Constitutional AMENDMENT 6; 28 U.S.C.A.§ 2254(d) (SEE Strickland v. Washington (1984) 466 US. 668, 104 S.Ct.2052, 80 L.Ed.2d 674.

UNITED STATES SUPREME

Under clearly, established federal law as determined by the Supreme Court, all criminal defendants have a right to an advocate in mandatory appeals. (See Douglas v. California,(1963) 372 US. 353,358, 83 S.Ct.814, 9 L.Ed.2d 811; In this case peti-tioner Davis, was represented by Appellate Counsel Ross Thomas SBN: 96184, (See Exhibit (A) Letter from Ross Thomas of 6/13/08 On 3/19/08 Mr.Thomas,

filed petitioner Davis's "Opening Brief" raising the following two issues. (1) THE JUDGMENT OF CONVICTION MUST BE REVERSED BECAUSE THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO WITHDRAW HIS GUILTY PLEA THUS DENYING APPELLANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO TRIAL BY JURY ABD DUE PROCESS OF LAW.

(2) APPELLANT'S SENTENCE MUST BE MODI-FIED TO REFLECT ONE ADDITIONAL DAY OF PRESENTENCE CONDUCT CREDIT

1 (See Exhibit (A) Appellate counsel has an ethical responsibility,
2 of constitutional dimension to argue zealously those issues that
3 counsel finds not wholly frivolous.(SEE Anders v. California (196
4 386 US. 738, 87 S.Ct.1396, 18 L.Ed.2d 493; Appellate counsel who
5 files a merits brief need not, and should not, raise every nonfri-
6 volous claim,but rather may select from among them in order to
7 maximize the likelihood of success on appeal; Smith v. Robbins
8 (2000) 528 US.259, 120 S.Ct.746; Nonetheless, it is possible to
9 bring a Strickland claim based on counsel's failure to raise a
10 particular claim, though it

11                      is difficult to demonstrate that counsel was
12 incompetant, and generally, only when ignored issues are clearly,
13 stronger than those presented, will the presumtion of effective
14 assistance of counsel be overcome. Smith v. Robbins (2000) 528 US
15 259, 120 S.Ct.746. It is no harder for a court to apply Strickland
16 in this area than it is when a defendant claims that he received
17 ineffective assistance of appellate counsel because his counsel,
18 although filing a merits brief,

19        failed to raise a particular claim. It will likely be
20 easier to do so. (See Jones v. Barnes (1983) 463 US.745, 103 S.Ct
21 3308, 77 L.Ed.2d 987;

22

23 UNITED STATES SUPREME COURT

24

25        . Held that where an appellate counsel who files a
26 merits brief need not and should not raise every nonfrivolous
27 claim, but rather may select from among them in order to maximize
28 the likelihood of success on appeal.Notwithstanding Jones v. ....

1  Barnes, supra, it is still possible to bring a Strickland claim
2  based on counsel's failure to raise a particular claim, but it is
3  difficult to demonstrate that counsel was incompetant. (See e.g.
4  Gray v. Greer (1986) 800 F.2d 644,646. Generally, only when ignored
5  issues are clearly stronger than those presented, will the presu-
6  mption of effective assistance of counsel be overcome") With a
7  claim that counsel erroneously, failed to file a merits brief, It
8  will be easier for a defendant-appellant to satisfy the first part
9  of the Strickland test, for it is only necessary for him to show
10 that a reasonably competant attorney would have found one frivo-
11 lous issue warranting a merits brief, rather than showing that a
12 particular nonfrivolous issue was clearly stronger than issues
13 that counsel did present. The court further determined that the
14 prejudice analysis will be the same.

15                          Smith v. Robbins (2000) 528 US. 259,
16 120 S.Ct.746; In this case ,Appellate Counsel Ross Thomas,raised
17 two issues,one of which petitioner Davis,presents before this
18 court today; However, the state and federal claim mentioned, were
19 not correctly, argued; Therefore, as to the first claim initially
20 raised by appellate counsel (See Exhibit (A)
21

22     petitioner Davis, will amend the caption of the claim to it's
23 appropriate title of the claim (1) Abuse of discretion by presi-
24 ding Justice Allan p. Carter.

25

26                 (2) Appellant's sentence must be modified to reflect
27 one additional day of presentence conduct credit. This argument
28 raised by appellate counsel is frivolous, (SEE Exhibit (F)

1    The <u>record</u> is apparent, that <u>appellate counsel</u> should have

2    additionally, <u>raised</u>, the <u>state</u> and <u>federal</u> claim of <u>Ineffective</u>

3    <u>Assistance of counsel</u> on <u>Donald Thomas Bergerson</u>. (See <u>Exhibit</u> (B)

4    Also " <u>Abuse of Discretion</u>" on presiding justice <u>ALLAN P.Carter</u>

5    not just <u>trial</u> error. Because the <u>facts</u> and <u>evidence</u> demonstrate

6    " <u>Abuse of Discretion</u> " which there by substantiates a "<u>structural</u>

7    error (<u>Exhibit</u> (B)

8         Because petitioner <u>Davis</u>, has filed these <u>state</u> and <u>federal</u>

9    claims after <u>April 1, 1996</u>, the Anti-Terrorism and Effective

10   Death Penalty Act ("<u>AEDPA</u>") applies to his petition. (See <u>Lindh v</u>

11   <u>Murphy</u> (1997) 521 US. 320,336, 117 S.Ct.2059, 138 L.Ed.2d 481;

12   <u>Jeffries v. Wood</u>, 114 F.3d 1448,1499 (9TH Cir.) (En banc) Cert.

13   denied, 522 US 1008, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). Under

14   <u>AEDPA</u>, a <u>federal</u> court may <u>grant</u> habeas <u>relief</u> if a <u>state</u> court

15   adjudication:

16

17       (1) <u>resulted in a decision that was contrary to, or</u>
             <u>involved an unreasonable application of, clearly</u>
18           <u>established Federal law, as determined by the</u>
             <u>Supreme Court of the United States; or</u>
19

20       (2) <u>resulted in a decision that was based on an</u>
             <u>unreasonable determination of the facts in light</u>
21           <u>of the evidence presented in the state court</u>
             <u>proceeding.</u>
22

23   (See <u>28</u> USCA § <u>2254</u>(d) <u>Delgado v. Lewis</u> (1999) 181 F.3d 1087;

24

25   <u>NINTH CIRCUIT</u>

26

27        Defendants have a right to an advocate in mandatory appeals

28   and <u>appellate counsel</u> has an <u>ethical</u> responsibility of constitu-

1 tional dimension to argue zealously those issues that counsel
2 finds not wholly frivolous. (See Anders, 386 US. at 744, 87 S.Ct
3 1396. When an attorney believes an appeal would violate his or
4 her ethical duty to refrain from making frivolous arguments,
5 Anders, requires counsel to "advise the court and request permi-
6 ssion to withdraw" Id. A request to withdraw, "must, however, be
7 accompanied by a brief referring to anything in the record that
8 might arguably support the appeal" Id. The attorney must send the
9 brief to the defendant and the defendant must be informed of his
10 or her right to file a "supplemental brief" In this case
11 Appellate counsel Ross Thomas filed a " merit brief raising two
12 issues for petitioner Davis; However, those issues were frivolous
13 and argued in the wrong
14                         context. It was incumbent upon appellate
15 counsel to raise nonfrivolous issues, (See Exhibit (A)
16
17        de novo Standard of Review
18
19              When the Federal court conducts an independent
20 review of the record and applicable federal law when the state
21 has not articulated it's reasoning is not the equivalent of
22 applying a de novo standard of review, to state court decisions
23 under these circumstances; rather it provides the method for
24 ascertaining whether the state court's resolution of the case was
25 " contrary to, or involved an unreasonable application of,
26 clearly established Federal law" under AEDPA. 28 USCA § 2254(d)(1)
27 This approach is in consonance with the deference, which the court
28 has accorded state findings of fact on habeas review.The court

1 further held that although, AEDPA ordinarily, requires federal
2 courts to defer to state court factual findings of fact, granted
3 less deference to the state court decision. (See Jones v. Woood,
4 114 F.3d 1002, 1013 (9TH Cir. 1997) (Holding that when a state
5 court has made no findings of fact, "the district court's duty to
6 ascertain the sufficiency of the evidence by angaging in a
7 thorough review of the complete state court record is unaffected
8 by the AEDPA"); Baylor v. ESTELLE, ($ F.3d 1321, 1325 (9TH Cir
9 1996); (Stating that the district court's evidentiary hearing was
10 the first chance that the petitioner had to develope the factual
11 basis of his claim and therefore finding that it would be in-
12 appropriate to disregard

13                the facts developed in the district court even in
14 the light of AEDPA), (See Baylor v. Estelle (1997) 520°OS. 1151,
15 117 S.Ct. 1329, 137 L.Ed.2d 489;The courts however, have deter-
16 mined,that as a practical

17

18 THE FOURTEENTH AMENDMENT OF THE
   UNITED STATES CONSTITUTION
19

20                Provides the equal protection and due process clauses
21 largely, that converge to require that a state's procedure
22 affords adequate and effective appellate review to indigent
23 defendants, and a state's procedure provides such review so long
24 as it reasonably ensures that an indigent's appeal will be re-
25 solved in a way that is related to the merit of that appeal. The
26 court has held that a " criminal appellant pursuing a first appeal
27 as of right [the]minimum safegaurds, necessary to make that appeal

28
OURT PAPER

1  'adequate and effective' Evitts v. Lucey, 469 US 387,392, 105
2  S.Ct. 830, 83 L.Ed.2d 821 (1985) (quoting Griffin v. Illinois 35
3  US 12, 76 S.Ct.585, 100 L.Ed. 891, and continuing with Douglas v
4  California 372 US 353, 83 S.Ct. 814, 9 L.Ed.2d 811; As the court
5  has admitted on numerous occassions, "'[t]he precise rationale
6  for the Griffin and Douglas lines of cases has never been
7  explicitly stated, some support being derived from the Equal
8  Protection Clause of the Fourteenth Amendment and some from the
9  Due Process Clause of that Amendment'" Evitts v. Lucey, (1985) at
10 supra, at 403, 105 S.Ct. 830 (quoting Ross v. Moffitt, (1974) 417
11 US 600,608-609, 94 S.Ct.2437, 41 L.Ed.2d 341. But the court's
12 case law reveals that

13         as a practical matter, the two clauses largely
14 converge to require that a state's procedure "affor[d] adequate
15 and effective appellate review to indigent defendants," Griffin
16 v.Illinois 35 US 12, 76 S.Ct.585, 100 L.Ed. 891; In the court's
17 plurality opinion) A STATE's PROCEDURE provides such review, so
18 long as it reasonably ensures that an indigent's appeal will be
19 resolved in a' way that is related to the merit of that appeal.
20 (SEE Griffin, supra. at 22, 76 S.Ct.585.

21                         Justice Frankfurter, concurring in
22 the judgment. The law that imposed differentiations...that have
23 no relation to a rationale policy of criminal appeal" (See
24 Douglas, 372 US.,at 357, 83 S.Ct. 814. A decision of first appeal
25 "without benefit of counsel,...no matter how meriotrious [an
26 indigent's] case may turn out to be discriminates between rich
27 and poor rather than between "possibly good and obviously bad
28 cases" Rinaldi v. Yeager, (1966) 384 US 305, 310, 86 S.Ct.1497,

1 16 L.ED.@d 577 (1966) (State appellate system must be "free of
2 unreasoned distinctions"); (See Evitts v. Lucey, supra, at 404,
3 105 S.Ct.830. The law in Griffin, decided the appeal in a way
4 that was arbitrary with respect to the issues involved")As
5 compared to Pennsylvania v. Finely, 481 US 551, 107 S.Ct.1990,
6 95 L.Ed.2d 539;The equal protection guarantee only...assure[s]
7 the indigent defendant an adequate opportunity to present his
8 claims fairly in the context of the state's appellate process"
9 (quoting Ross, supra, at 616, 94 S.Ct. 2437; with Evitts, supra
10 at 405, 105 S.Ct. 830 (" [D]ue process...[requires] States...to
11 offer each defendant a fair opportunity to obtain an adjudicaticn
12 on the merits of his appeal" (Griffin v. Illinois 35 US 12, 76
13 S.Ct.585, 100 L.Ed.891;

14         ALSO Douglas v. California 372 US 353, 83 S.Ct.
15 814, 9 L.Ed.2d 811; The court has determined as a practical matter
16 the equal protection and due process clauses of the Fourteenth
17 Amendment largely converge to require that a state's procedure
18 affords adequate and effective appellate
19                              review to indigent defendants
20 and a state's procedure provides such review so long as it rea-
21 sonably ensures that an indigent's appeal will be resolved in a
22 way that is related to the merit of that appeal

23

24 STATE APPELLATE SYSTEM

25         Must be free of unreasoned distinctions" (See Evitts v
26 Lucey (1985) 469 us 387,392, 105 S.Ct.830, 83 L.Ed.2d 821;also
27 Griffin v. Illinois 35 US 12, 76 S.Ct.585, 100 L.Ed.891; which
28 decided the appeal in a way that was arbitrary with respect to

1 the issues involved") comparing _Finely_, supra, at 556, 107 S.Ct.
2 1990(" The equal protection guarantee only...assure[s] the indi-
3 gent defendent an adequate opportunity to present his claims
4 fairly in the context of the state's appellate process" (quoting
5 _Ross,_ 405, 105 S.Ct.830; ("[D]ue process...[requires] States...to
6 offer each defendant a fair opportunity to obtain an adjudication
7 on the merits of his appeal"_Griffin v. Illinois_ 35 US 12, 76 S.Ct
8 585, 100 L.Ed.891; Also _Douglas v. California_ 372 US 353, 83 S.Ct
9 814, 9 L.Ed.2d 811;

10          Where the defendant has received appellate counsel who
11 has complied with a valid state procedure for determining whether
12 the defendent's appeal is frivolous, and the state has not at any.
13 time left the defendant without counsel on appeal,there is no
14 reason to presume that the _defendant_ has been _prejudiced;_ rather
15 the Supreme court presumes that the result of the proceedings on
16 appeal was reliable,

17          and requires a habeas petitioner claiming ineffective
18 assistance of appellate counsel to prove the presumption incorrect
19 in his particular case;

20

21          Despite the fact that petitioner _Davis,_ received
22 Mr. _Ross Thomas,_ as his _appellate counsel,_ who complied with the
23 valid state procedure for determining whether the defendant's
24 appeal was _frivolous,_ and the state did not at any time leave
25 petitioner _Davis_ without counsel on _appeal,_ prejudicial circum-
26 stances resulted .Presumption of prejudice, has been shown, thus
27 far. (See _Strickland v. Washington_ (1984) 466 US at 694, 104,S.
28 2052. (quoting _Smith v.Robbins_ (2000) 528 US 259 120 S.Ct.746;

1 (See Exhibit (A)

2

3 Under Strickland v. Washington (1984) 466 US 668, 104 S.Ct.2052
4 The court has determined that there are three categories of case
5 in which The United States Supreme court presumes prejudice
6 rather than requiring a defendant to demonstrate it: (1) in a
7 case of denial of counsel; (2) cases involving various kinds of
8 state interference with counsel's assistance and (3) cases when
9 counsel is burdened by an actual conflict of interest, although,
10 in such a case court does require the defendant to show that the
11 conflict adversely, affected his counsel's performance. (See
12 United Statesv. Cronic, (1984) 466 US 648, 656, 104 S.Ct.2039, 8
13 L.Ed.2d 657;

14    Appellate counsel's duties, are to examine the trial record
15 with an advocate's eye, identifying and weighing potential issue
16 for appeal. This is review not by a dispassionate legal mind but
17 by a committed representative, pledged to his client's interest
18 primed to attack the conviction on any ground the record may
19 reveal. If counsel's review reveals arguable trial error, he
20 prepares and submits a brief

21                    on the merits and argues the appeal. The right
22 to the first of these services, a partisan scrutiny of the record
23 and assessment of potential issues, goed to the irreducible core
24 of the lawyer's obligation to a litigant in an adversary system,
25 and this. . consistently held it essential to substantial equality
26 of representation follows from the nature of our adversarial
27 system of justice. Penson v. Ohio (1988) 488 US 75, 109 S.Ct.346,
28 102 L.Ed.2d 300.(Ellis v. United States (1958) 356 US 674,675, 78

1 S.Ct.974, 2 L.Ed.2d 1060. (per curiam); Douglas, supra, at 357-
2 358, 83 S.Ct.814;(See McCoy v. Court of Ppeals of Wis.,Dist.1,
3 (1988) 486 US 429, 108 S.Ct.1895, 100 L.Ed.2d 440; The right is
4 unqualified when a defendant has retained counsel,and one can
5 imagine no reason that it should not be so when counsel has been
6 appointed. In Anders v. California (1967) 386 US. 738, 87 S.Ct.
7 1396, 18 L.Ed.2d 493, the court determined this case revealed
8 two reviews of the record, each of a markedly, different charac-
9 ter. First comes review by the advocated, the defendant's
10 interested representative. His job is to idehtify the best issue
11 the partisan eye can spot. Then comes judicial review from a
12 disinterested judge, who asks two

13                         questions: Whether the lawyer really
14 did function as a commited advocate, and whether he misjudged
15 the legitimate appeal ability of any issue. In reviewing the
16 advocate's work, the court is responsible for assuring that
17 counsel has gone as far as advocacy will take him with the best
18 issues undiscounted. The court has repeatedly, described. (See
19 Smith v. Robbins (2000) 528 US 259, 120 S.Ct. 746;The task of an
20 appellate court in terms of this dual responsibility. "First,[the
21 court] must satisfy itself that the attorney has provided the
22 client with a diligent and thorough search of the record
23
24                 for any arguable claim that might support the client's
25 appeal. Second, it must determine whether counsel has correctly
26 concluded that the appeal is frivolous'." Penson v. Ohio 488 US.
27 75, 109 S.Ct.346, 102 L.Ed.2d 300(quoting McCoy, 486 US. at 442,
28 108 S.Ct. 1895

1 | THE UNITED STATES CONSTITUTION

2

3 | Recognizes an adversary system as the proper
4 | method of determining guilt..."). See also,e.g., Penson, supra,
5 | at, 109 S.Ct. 346 ("A criminal appellant is entitled to a single
6 | minded advocacy...") (See Smith v. Robbins (2000) supra, [528 US
7 | 297] Strickland v. Washington (1984) 466 US 668, 685, 104 S.Ct.
8 | 2052, 80 L.Ed.2d 674. The Sixth Amendment recognizes the right
9 | to the assistance of counsel because it envisions counsel's
10 | playing a role that is critical to the ability of the adversarial
11 | system to reach just results

12 | United States v. Cronic (1984) 466 US. 648,656,
13 | 104 S.Ct. 2039, 80 L.Ed.2d 657; Thus the adversarial process is
14 | protected by the Sixth Amendment requires that the accused have
15 | counsel acting in the role of an advocate, quoting Anders, supra
16 | at 743, 87 S.Ct.1396; In this case, Appellate counsel Ross thomas
17 | was less than advocate and incompetant in presenting the issues
18 | now raised before this court today.The court has held that when
19 | Appellate counsel ignors an issue clearly stronger than those
20 | presented,the

21 | presumption of effective assistance of counsel be overcome
22 | Mr. Thomas, should have filed

23 | (1) INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ON
DONALD THOMAS BERGERSON FOR VIOLATION OF
24 | PETITIONER DAVIS'S SIXTH AMENDMENT RIGHT TO
A FAIR AND IMPARTIAL TRIAL
25

26 | (2) ABUSE OF DISCRETION BY PRESIDING JUSTICE
ALLAN P. CARTER
27

28

1 | DEFENDANT HAS A CONSTITUTIONAL RIGHT TO
HAVE APPELLATE COUNSEL RAISE ALL CRUCIAL
2 | ASSIGNMENTS OF ERROR WHICH ARGUABLY MIGHT
RESULT IN A REVERSAL ESPECIALLY A STRUCTURAL
3 | ERROR

4

5      In this case it was incumbent upon Ross Thomas, to raise

6 the issue of "abuse of Discretion" on the trial justice Alan p.

7 Carter,when the record reflects that prior to denying petitioner

8 Davis's p.c. 995 motion to dismiss, he pronounced judgment on

9 the motion "in excess of Federal jurisdictional law" Justice

10 Carter, stated:

11

12      THE COURT:" I saw them, yeah. Now, I'm looking at two cases

13 the Cal.App.2nd case is People v. Langlois (1963). It's at 220 cal

14 App.2d 831, page 834; People v. McGaughran (1961 case, 197 Cal.

15 App.2d 6 at page 17. I sort of agree with Mr. Bergerson that there

16 doesn't appear to be a lot of law in this area. But these two

17 cases stand for the proposition, which I

18                          think is probably still a correct

19 statement of the law in cases involving a victim's recantation,

20 our appellate courts have cautioned repeatedly' that a witness's

21 offer to retract sworn testimony should be viewed with suspicion

22 and given little credence" (See Exhibit (E) RT 14 169 ) The

23 victim Sean Wydermyer, The prosecution's star witness in this case

24 met with petitioner Davis's trial attorney Donald Thomas Bergerson

25 on May 13, 200 for a "discovery" matter, that concerned of

26 relevant information regarding the case.

27

28      Mr. Wydermyer, there by, swore under oath, that petiti-

1 oner Davis might not have been the person that shot him. (see
2 Exhibit (B)
3
4 THE COURT: Sir, I'm looking at your declaration. Among other
5 things, you say that "I have determined that I may have been
6 mistaken in saying and later testifying that Mr. Davis shot me
7 Is that how you feel?
8
9 THE WITNESS: Yeah, because you know--
10 THE COURT: You don't know if you were mistaken, but you
11 may have been mistaken; is that it?
12 THE WITNESS: Yeah.
13
14 THE COURT: Did you want to ask any more questions?
15 MR. BERGERSON: Sure.
16
 Q : Let's assume that you were testifying at a hearing before
17
18 a finder of fact, like a judge at a preliminary hearing or a jury
19 okay?
20 , A :Yeah.
21 Q : And I'm going to pretend to be the prosecutor and I'm
22 going to ask you after you have descibed how you got shot, you
23 see this man over here, and I'm pointing to Mr. Davis. Do you see
24 him?
25 A: Yes.
26 Q: Is this the man who shot you?
27 A: I can't--I can't say that because I was looking down a
28 barrel, not at a face or any clothes.

1     Q : This man was in the house; is that correct?

2        A : Yeah, but I can't say he's the one who did it.

3

4  (See Exhibit (B) RT 147-148) The prosecution, on cross, further
5  examined the witness Sean Wydermyer,and Declared for the record
6  that petitioner Davis was not the person who shot him. (see
7  Exhibit (B)

8

9        THE PROSECUTION ON, CROSS:

10       Q : And you testified at a preliminary hearing a number of
11  months after this, apd at that point you identified the defendent
12  as the person who shot you right?

13

14    ,    A : Yeah.

15       Q : But now two years later you are saying you are not
16  sure, right?

17       A : Yeah, because I look--I'm looking at the big picture
18  I can't--
19       Q : Sure.
20    ...  A : I can't say that it was him or not. I really didn't
21  look at his face. I just went by who I seen went in the bathroom.

22

23       Q : But you're not saying that it wasn't the defendant ,
24  right?

25       A : I'm not saying that it is either.

26       Q : And nobody threatened you--

27       A : No.

28       .   ·   Q : --to say this, right?

1    A : Nope.

2    Q : And after you got shot, did the two People you saw in
3  the house, the defendant and somebody else, actually run out?

4    A : I know that the People ran out the house, but all I
5  seen was a couple of heads go by the window when I got up.

6    Q : And the person--Tyree, is that it?--he was gone after
7  these People fled, right?

8    A : Yeah. I heard the footsteps go out the door, and then
9  when I looked, when I tried to make my way outside, I seen a
10  couple of heads run by the window.;

11  ( .

12                      REDIRECT

13  Q MR. BERGERSON : Do you have an explanation as to what it is
14  that you were thinking at the time you told Detective Wentz "No
15  I don't want to change anything in my statement"?

16                  A.: Yeah, I do. I'm not going to chang what I was
17  saying as far as what I seen and as far as when I got there, but
18  it's a different point of view. I can't say that someone did
19  something when I didn't see him, see his face, clothes, nothing.
20  I was just looking at a weapon. That's all I was looking at, and
21  it was close enough for it to be the only thing. It was closer
22  than this mike in my face right now for me to be looking at, so

23

24  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIMS
    DO HAVE MERIT IN A FEDERAL HABEAS APPLICATION
25  WHERE PETITIONER HAS ESTABLISHED CAUSE

26

27                  ("[A]ppellate counsel has no constitutional obli-

28  gation to raise every nonfrivolous issue requested by the

OURT PAPER
   TT OF CALIFORNIA

1  defendant'.) The Sixth Amendment right to the effective
2  assistance of counsel encompasses the right to effective
3  assistance of appellate counsel. (See Evitts v. Lucey, 469 U.S
4  396 (1985): See also Smith v. Robbins, 528 U.S. 259, 285-86
5  (2000). claims of ineffective assistance of appellate counsel
6  are reviewed according to the Strickland standard. Robbins, 528
7  U.S. at 285; Keeney, 882 F.2d at 1433. Thus, Petitioner must
8  show that his appellate counsel's performance fell below an
9  objective standard of reasonableness and that " there is a rea-
10  sonableness and that " there is a reasonable probability that,
11  but for counsel's unprofessional errors, [Petitioner] would have
12  prevailed on appeal'

13        Keeney, 882 F.2d at 1434. Each of the claims petit-
14  ioner Davis contends should have been raised by appellate
15  counsel Ross Thomas. (See Exhibit (A). Each claim now raised
16  before this court has federal constitutional merit. Petitioner
17  alleges that his

18        appointed counsel Ross Thomas should have argued that :
19  (1) Trial counsel was ineffective in the various ways  discussed
20  above (A) Petitioner has a right to effective assistance of
21  counsel at pretrial pleading stages under both state and Federal
22  constitution (B) Facts and circumstances of improper investiga-
23  tion advice and negotiation. (c) Henderson/Bigman error failure
24  of counsel to inform petitioner Davis of the applicable specific
25  intent elements related to his prospective defenses (D) Petit-
26  ioner Davis's plea was involuntary as counsel improper use means
27  to convince petitioner Davis to accept the plea bargain. (E)
28  Petitioner Davis under constitutional standards has been

1 prejudiced by defense counsel's errors. (F) Petitioner Davis's
2 Plea of guilty should be vitiated pursuant to People v. Johnson
3 because petitioner Davis did not understand the possible Penal
4 consequences of the plea. (G) Petitoner Davis received
5 Ineffective Assistance of counsel, because defense counsel did
6 notadvise Petitioner Davis to withdraw the guilty plea when the
7 trial court did not approve the plea  (H) Petitioner Davis under
8 constitutional standards has been prejudiced by defense counsel'
9 errors. More importantly, the "abuse of discretion" by presiding
10 justice Allan P. Carter. (A) Denying defense counsel's motion
11 for continuance (B) denying the defense a Kelly-Frye Hearing
12 (C) Abuse of discretion and judicial misconduct denying peti-
13 tioner Davis's p.c. 1018 motion when Sean Wydermyer recanted his
14 testimony.

15

16    Choosing which issues to brief is a crucial component of
17 appellate strategy and it is up to appellate counsel to make that
18 (See Jones v. Barnes (1983) 463 US 745,754, 77 L.Ed.2d 987,995,
19 103 S.Ct.3308. A criminal defendant has no constitutional right.
20 to have appellate counsel raise every issue that defendant wishes
21 argued). The appellate courts regular inveigh against what they
22 see as unnecessary litigation of frivolous issues. (See e.g.,
23 People v. Craig (1991) 234 CA.3d 1066, 1068,286, and larding a
24 brief with hopeless claims can lead a reviewing court  to give
25 short shrift to other meritorious claims.

26                                      Nonetheless, appellate counsel has
27 the fundamental duty to raise every issue that has any likelihood
28 of sucess (either in the court of appeal or in a higher court

1 and that would benefit the client if successful. The courts have
2 engaged in a prolonged talmudic effort to define the precise
3 limit of this duty as a matter of a defendant's constitutional
4 rights. (See Jones v. Barnes, supra; In re Spears (1984) 157 CA.
5 3d 1203,1210;( Defendant has a constitutional right to have
6 appellate counsel raise all "crucial assignments of error, which
7 arguably might [result] in a reversal," as long as appellate .
8 counsel "believes" the issues to be meritorious"); People v.
9 Valenzuela (1985) 175 CA.3d 381,390,( appellate counsel's duty
10 includes raising inmeritorious issues that are nonetheless
11 "arguable" Regardless of how the constitutional minimum is define
12 the diligent appellate practitioner will not let the client loses
13 any opportunity to obtain a reversal or favorable modification of
14 the judgment. In this case Ross Thomas, failed to present
15 petitioner Davis's federal constitutional claims, and therefore,
16 the court must find appellate counsel incompetant in these
17 proceedings, and "Reverse"

18                the conviction and or allow Petitioner Davis,
19 to withdraw his plea, pursuant to P.C. 1018 (See Exhibit (B)

20

21

22

23

24

25

26

27

28

IV.

INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ON
DONALD THOMAS BERGERSON VIOLATION OF SIXTH
AMENDMENT UNITED STATES CONSTITUTION

1

2

3

4    STANDARD OF REVIEW

5

6        The Sixth Amendment guarantees criminal defendants

7  effective assistance of counsel under The United States

8  constitution. Strickland v. Washington (1984) 466 US. 668,687,

9  104 S.Ct. 2052, 80 L.Ed.2d 674, also People v. Pope (1979) 23 cal

10 3d 412 152 Cal.Rptr.732; The Sixth Amendment guarantees criminal

11 defendants the effective assistance of cousel. The right is

12 denied when a defense attorney's performance falls below an

13 objective standard of reasonableness and thereby, prejudices the

14 defense. (See Wiggins v. Smith (2003) 539 US, 510,521. 123 S.Ct.

15 2527, 156 L.Ed.2d 471; Strickland v. Washington (1984) 466 US 668

16 687, 104 S.Ct.2052, 80 L.Ed.2d 674;

17

18 A. PETITIONER DAVIS HAD A RIGHT TO EFFECTIVE
       ASSISTANCE OF COUNSEL AT PRETRIAL PLEADING
19     STAGES UNDER BOTH STATE AND FEDERAL CONSTITUTION

20

21       Ineffective Assistance of counsel in the investi-

22 gation of the facts, advice to petitioner Davis and plea nego-

23 tiations rendered petitioner's Davis's plea involuntary, because

24 the prosecution's star witness Sean Wydermyer, "recanted " his

25 allegations of petitioner Davis, being the person that shot him.

26 (See exhibit (D) Declaration of Sean Wydermyer.)

27                        On            a pretrial

28 hearing was held, (See Exhibit (B)(1) where by, trial defense

counsel Donald Thomas Bergerson argued before the court a
material fact with regard to a Kelly-Frye hearing, which the
court would hear Mr. Bergerson on the motion (See Exhibit (B)(11)
Mr. Bergerson, had a further issue of whether the gunshot residu
material was coming into evidence. He personally, made an objec-
tion to it on the grounds. The first was and he declared no fault
to the prosecution Mr. Highsmith. , but to his own avail, that
it was his lack of preparation that matters, not the District
Attorney's compliance with p.c. 1054.1 that is the constitutional
issue, and that Mr. Bergerson's was at fault for the lack of
preparation, and no fault by the prosecution. Mr. Bergerson ,
made the admission before the court he just didn't have the re-
port, including in his packet, or that it had

somehow sluffed away as he
went though it. (See Exhibit (C)(2) ) The essential nature of the
right to counsel in criminal cases has long been recognized by
the United States Supreme Court. Powell v. Alabama (1932) 283 US
245 Johnson v. Zerbst, (1938) 304 US, 458; Gideon v. Wainright
(1963) 372 US. 335. A criminal defendant is not only entitled to
counsel, but has an absolute right to "effective representation"
McMann v. Richardson (1977) 397 US. 759. The United states
Supreme Court set parameters for consideration of claims of
ineffectiveness of counsel in Strickland v. Washington (1984) 466
US. 668, reh.den. 467 US.1267. strickland, requires the assistance
of counsel fall below that reasonably expected of counsel and
there is resulting prejudice to the defendant. Relevant california
case law is in accord offering further defenition.

1 To render reasonably competent assistance an attorney in a

2 criminal case must perform certain basic duties. [Citation.]

3 Generally, the Sixth Amendment and article 1, section 15 require

4 counsel's diligence and active participation in the full and

5 active participation in the full and effective preparation of his

6 client's case [Citation.] <u>People v. Pope</u> (1979) 23 Cal.3d 412,42

7 Later, the California supreme Court expanded the standards for

8 ineffectiveness of counsel

9          [I]n cases in which a claim of <u>ineffective</u>
          <u>assistance of counsel</u> is based on acts or
10         omissions not amounting to <u>withdrawal</u> of a
          defense, a defendant may prove such
11         ineffectiveness if he establishes that his
          counsel failed to perform with reasonable
12         competence and that it is reasonably probable
          a determination more favorable to the
13         defendant would have resulted in the absense
          of counsel's failings. <u>People v. Fosselman</u>
14         (1983) 33 Cal.3d 572,584

15 Ineffectivess of counsel may occur at any crucial phase of the

16 proceedings. The pre-trial investigation and negotiation stage is

17 a critical phase of the trial. Competent counsel must investigat

18 and pursue possible plea agreements. <u>People v. Brown</u> (1986) 177

19 Cal.App.3d 537,548-549;

20       In the pre-trial proceedings in this case, Defense counsel

21 Donald Bergerson, was <u>incompetant</u> of preparing petitioner <u>Davis</u>'

22 <u>defenses</u>; because of personal <u>issues</u>, as well as a full <u>case load</u>

23 of other <u>clients</u> on his <u>assignment</u>. (See <u>Exhibit</u> (B)(2) defense

24 counsel motioned the court for a "<u>continuance</u>" to investigate

25 and prepare a defense for petitioner <u>Davis</u>, about the communica-

26 tion with the "cell phone" (See <u>Exhibit</u> (B)(1) Defense counsel

27 requested the court grant him a <u>continuance</u> to prepare; However,

28 the court denied doing so for the mere fact that counsel had

1 already been given several continuances. And the fact that the
2 case already two years old.

3

4 THE COURT: Okay."Well, Mr. Bergerson, I think , number
   one, your request is legally timely, but I
5 don't think it shows good cause for requested continuance. Obviously, your client
6 is entitled to effective assistance of
   counsel, and I'm convinced that based on my
7 experience with you in this case and some
   other cases that you have had in this court
8 that you've had ample opportunity to prepare
   in spite of the unfortunate circumstances
9 you have listed that has made it difficult
   for you to maintain a practice in orderly
10 fashion because of this disruption in
   apparently your personal, as well as your
11 professional life'.I point out this case is
   coming up on two years old, it's been
   continued a number of times. I think your
12 reason for the requested continuance, number,
   one, could be completely irrelevant. It
13 could be, and it's speculative at best. So
   I'm going to deny your motion".
14

15 On 11/2/06 a pre-trial hearing was held, where by, the court

16 accepted "jury trial motions from both the Deputy District

17 Attorney James Highsmith, on behalf of the People, and Donald

18 Bergerson, representing the Defendant Marquis Davis. (See Exhibit

19 (B)(1) RT 5-11' Mr. Bergerson, filed a "notice of motion and

20 motion to continue trial and trial was set in about three days

21 (See Exhibit (B)(11) RT 5-6 ) Mr. Bergerson, explained to the

22 court about some personal

23 issues dealing with his being evicted from his

24 place of residence (See Exhibit (B)(2) also he further notified

25 the court that another client had been the reason he was unable

26 to prepare petitioner Davis's pretrial pleadings sooner. (See

27 Exhibit (B)(2) RT 6-7 )

28

OURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

1   The court took judicial notice, as Mr. Bergerson continued
2   stating for the record, "Although, it is not a unusually
3   complicated one, it's a serious one, and it entails investigation
4   of several street sources to support the anticipated defense.
5   I had intended to conduct this investigation in September and
6   October, but for the foregoing reasons, I've not been able to do
7   so. Although, I do not anticipate that I will need more than two
8   weeks to do the investigation, a 11/6/ trial date is simply
9   incompatible with the undertaking it. even without the investiga
10   tion, the case still requires me to master these materials. I had
11   earlier prepared for trial
12         in the matter  and it will not take long for me
13   to get back up to speed. However, I have been working literally
14   nonstop on other cases. " with respect to the in limine hearings
15   I must confess that my recent request for a 402 hearing on cell
16   phone technology only occured to me recently. My research
17   indicates that my motion is a good one, but I will need more time
18   to litigate it". (See Exhibit (B)(3) RT 6 - 7
19
20           THE COURT: " okay, so you want a continuance?'
21           Mr. BERGERSON: "Yeah".
22           PROSECUTION : "I'm opposed' .
23           THE COURT: I'm opposed because, number one the
24   number of times this case has been continued, I'ts two years old
25   The second reason I'm opposed is because the cell phone records
26   we've all known about that this was going to be evidence for a
27   long, long time, but primarily, because if this case gets
28   continued, it's not going to be able to be continued to next week

1   (See Exhibit (B)(8) RT 11- 12 .) Defense counsel further

2   expressed his concerns before the court.

3

4       Mr.Bergerson: If I may. See, the problem I have is that I
                         know they say the fairgrounds tower,because
5                        that's what cellular phone records tend to
                         say, and I don't have a statement from this
6                        expert. I got a fax yesterday with the name
                         of this expert. I don't know who he is.
7                        there's no p.c. 1054.1 discovery to me as to
                         who the expert is and really what he's going
8                        to say or his vitae or his qualifications or
                         anything. And I actually, thought he was a
                         custodian of records for the cell phone
9                        carrier. This just more underscores what I
                         was saying which is again, with all due
10                       respect to Mr. Highsmith, I'm just not ready
                         because there are a couple of things now
11                       being thrown at me. Obviously, they will
                         inspire major tactical chioces in this case
12                       depending on how the outcome comes out, all
                         of this is nobody's fault except for whatever
13                       marked me that unit and caused me to lose a
                         month of time. I mean, this could probably
14                       all have been accomodated if we had been
                         doing this two or three weeks ago, and we
15                       just not, and it's nobody's fault. And I just
                         think Mr. Davis deserves a better defense
16                       than a lawyer who is harried at having done
                         this. I haven't even finished that Gilbreth,
17                       brief, and that's due tomorrow. And I got the
                         ultimate, you know, red notice from the court
18                       that it better be in, and I'm going to be up
                         all night doing it. (See Exhibit (B)(9)
19                       RT 26-27

20   Without question, petitioner Davis was deprived of effective

21   assistance of counsel,because this attorney was not prepared nor

22   was he able to focus completely, on pre-trial pleadings, as well

23   as, investigations/ and the defenses that were available,but for

24   Mr. Bergerson's inability to prepare the case initially. (See

25   Exhibit (B)(10) RT 26-27.)

26

27

28

## B FACTS AND CIRCUMSTANCES OF IMPROPER INVESTIGATION ADVICE AND NEGOTIATION

Petitioner Davis's constitutionally protected right to effective assistance of counsel at all stages of the case was violated. The facts of his case fit squarely within the parameter delineated by the California Supreme Court and other courts for finding such ineffectiveness, prejudice and relief. The following discussion establishes that petitioner Davis's trial counsel Donald Bergerson, failed to adequately, represent petitioner Davis during pre-trial investigations, the preliminary hearing and through plea negotiations. The record is unoccupied of any indications that counsel took any steps to investigate the the circumstances surrounding the shooting. Because when counsel did alert the court that he needed to investigate certain defense he requested that he be afforded a continuance. (See Exhibit (B) The court felt that Mr. Bergerson was already afforded enough continuances as the case was

going on 2 years old. (See Exhibit (B)(10) RT 28- 29 .)and the fact that Mr. Bergerson, had other clients on his case load that interfere with focusing exclusively, on petitioner Davis's case inefforts to prepare his case for trial. (See Exhibit (B)(9) RT 27 - 28 ).this without question deprived petitioner Davis, the equal protection of receiving effective assistance of counsel within the trial phase and penalty phase of this case. The evidence in this case establishes a very" reasonable probability...that a more favorable outcome would have been reached absent the deficient performance [of counsel]." (See People v. Karis (1989) 46 Cal.3d 612,657. had counsel

1 performed the minimal investigation, listed above, he could not
2 have nor should have advised petitiioner Davis to accept the plea
3 The appropriate remedy is to reverse the conviction by guilty
4 plea and allow Petitioner Davis, to plead not guilty to the
5 charges. On 5/24/07 Petitioner Davis's attorney Donald Bergerson
6 filed a new trial motion, raising "new evidence" where the
7 prosecution's star witness Sean Wydermyer, recanted his testimony
8 alledging petitioner Davis shot him (See Exhibit (D)(6) RT 141-
9 on 5/14/07 Petitioner Davis's attorney Donald Bergerson, met with
10 Sean Wydermyer, where by he swore under oath, via "affidavit"
11 that petitioner Daivs was not the person that shot him. (See
12 Exhibit (D)(8) RT 143-144.)

13       more importantly, Mr.Wydermyer's testimony of the p.c.
14 1018 hearing, revealed he could not "identify" petitioner Davis
15 as the person that shot him. (See Exhibit (D)(18)RT 160-161
16 Petitioner Davis there by, raised this issue via "writ of Habeas
17 corpus. (See EXHIBIT (B) also a supplemental brief raising
18 Ineffective Assistance of Counsel on Donald Bergerson. (See
19 EXHIBIT (B) In a simuliar case a petitioner sought "writ of
20 habeas corpus folllowing his conviction of first degree murder
21 and related charges and imposition of sentence of life. The
22 Supreme court Mosk j.
23       held that (1) Newly discovered and credible evidence which
24 undermied the entire case of the prosecution warranted habeas
25 corpus relief (2) "Identification" testimony was false evidence
26 which also warranted habeas corpus relief and (3) the record
27 amply supported referee's finding that petitioner was denied
28 constitutionally, adequate representation of counsel by his

1  attorney's failure to adequately, investigate the case and to
2  challenge "identification" procedures utilized by the police.
3  The court "granted" judgment of conviction, vacated the case
4  and remanded. As mentioned, the Referee found that petitioner
5  had sustained his burden of proving there is newly discovered
6  and credible evidence, which undermined the entire case of the
7  prosecution. If supported, such a finding warrants relief by
8  habeas corpus. In Re Lindly (1947) 29 Cal.2d. 709,723,724; The
9  Lara brothers were the only eyewitnesses to the crime who either
10 placed petitioner at the scene or implicated him as the gunman.
11 As such, they obviously, were the key prosecution's witnesses
12 after trial,however,the brothers expressly "recanted" their
13 testimony, both in writing and under oath at the habeas corpus
14 hearing. They confessed that their "identification" was
15 erroneous; Although, the court

16                    routinely, views " recantations " with
17 suspicion. In re Weber (1974) 11 Cal.3d 703,722, 114 Cal.Rptr.42
18 523; Because the question of credibility, is largely for the
19 referee, In re weber, also Wright (1978) 78 Cal.App.3d 788, 144
20 Cal.Rptr. 533; Petitioner, offers additional testimony, by Ms.
21 Couture, as well as, several other witnesses that tends to
22 exonerate him and implicate sanchez. It appears, however, that
23 this information either was known or could have been discovered
24 by diligent investigation before trial. It would therefore, not
25 qualify as "newly discovered" evidence for the purpose of a
26 motion for "new trial" People v. Williams (1962) 57 Cal.2d 263;
27 In re Branch (1969) 70 Cal.2d 200, 74 Cal.Rptr. 238. the court
28 considered similar evidence ground of habeas corpus relief. The

1  court being mindful of the convicted defendant ,the opportunity
2  to challenge his attorney's competence in failing to investigate
3  or present obviously, exculpatory evidence People v. Pope (1979)
4  23 cal.3d 412,425; Also People v. williams, supra. also Craig v.
5  Northcarolina (1987) 108 S.Ct.92, 484 US 887; In this case,
6  Donald Bergerson, was incompetent with preparing petitioner Davis
7  's case from the initial trial phase as well as, the penalty phase
8  (See Exhibit (B)(9) RT 27-28 .) The court determined that defense
9  counsel had enough continuances and was not worthy of further
10 delay. Despite Mr. Bergerson's explination as to working on other
11 client's cases, he without question failed to prepare petitioner
12 Davis's case and therefore must be found incompetant in his
13 representation of the trial phase and the penalty phases of this
14 case. ( See Exhibit (B)(10)RT 28  - 29  .)
15
16 UNITED STATES SUPREME COURT
17
18          In order to obtain Federal Habeas relief on
19 Ineffective Assistance claims, rejected on the merits by a state
20 court, the petitioner must convince the Federal court the state
21 applied Strickland incorrectly, Strickland v. washington (1984)
22 466 US. 668,688, 693-94, 104 S.Ct.2052, 80 L.Ed.2d 674; Rather
23 the petitioner must show the state court applied Strickland to
24 the facts of his case in an objectively, unreasonable manner.
25 28 U.S.C.A. § 2254;
26          Furthermore, under the AEDPA, in order to obtain
27 Federal habeas relief on an ineffective assistance  claim reject
28 on the merits by a state court, the petitioner must do more than

1 | convince the Federal court the state court applied Strickland
2 | incorrectly —the petitioner must show the state court applied
3 | Strickland, to the facts of his case in an objectively
4 | unreasonable manner. Bell v. Cone, 535 US. at 699, 122 SCt.at
5 |
6 | UNDER AEDPA
7 |
8 | A Federal court may grant habeas relief if a state court'
9 | s adjudication;
10 |

11,12 | (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determine by the Supreme court of the United States; or

13,14,15 | (2) resulted in a decision that was based on an unrea- sonable determination of the facts in light of the evidence presented in the state court proceeding. 28 USCA § 2254(d)

16 |

17 | The record unequivocally, substantiates, petitioner Davis's

18 | attorney Donald Bergerson, failed to prepare his defenses as .

19 | according to the disputed facts of the case. The right to

20 | counsel, under The United States Constitution Article VI of the

21 | California Constitution Article I, § 15, includes the right to

22 | adequately, prepare a defense.

23 | People v. Maddox (1967) 67 C2d.647,652,

24 | including the right to prepare and argue motions and objections

25 | before, during and after trial Cooper v. Superior Court (1961)

26 | 55 C2d 291,302, see also People v. Sarazzawski (1945) 27 C2d 7,

27 | 17, 161; At the pretrial hearing held 11/2/06 Mr. Bergerson

28 | at the begining of the proceedings requested the court allow

1    a continuance to conduct further investigation. (See Exhibit(B)
2    Mr. Bergerson informed the court that he was being evicted, and
3    from his home, and the fact that he was working on another
4    client's case as to the reason's why the continuance needed to
5    be granted. Mr. Bergerson further alerted the court that
6    petitioner Davis's case was a serious one that required investi
7    gation of several street sources to support the anticipated
8    defense. He further informed the court that he was working non-
9    stop on other cases, as to reasons why the "continuance" was
10   needed. (See Exhibit (B) Mr. Bergerson, further informed the
11   court that he was diligent and thorough, but the whole issue
12   just occurred to him, and he did not wish to deny petitioner
13   Davis effective assistance merely because a good idea arrived
14   in his mind as of late,

15            but he needed the continuance to conduct further
16   investigation. (See Exhibit (B)(5)  RT 11-12 .) The court asked
17   what was the prosecution's views  on it, and the prosecution was
18   opposed to the court granting another continuance to the
19   defense, because a number of continuances  had already been
20   granted to the defense and the fact that the case was already
21   two years old. (See Exhibit (B) (5) RT 11-12 ) The court denied
22   Mr. Bergerson motion for continuance for the following:

23

24            THE COURT: Okay. Well, Mr. Bergeerson, I think,
                         number one, your request is legally
25                       timely, but I don't think it shows good
                         cause for requesting continuance.obvi-
26                       ously, your client is entitled to
                         effective assistance of counsel, and I'm
27                       convinced that based on my experience
                         with you in this case and some other
28                       cases that you have had ample opportu-
                         nity to prepare in spite of the

1    unfortunate circumstances you have listed that
     has made it difficult for you to maintain a
2    practice in an orderly fashion because of this
     disruption in apparently your personal,as well
3    as your professional life. I point out this case
     is coming up on two years old. It's been continued
4    a number of times. I think your reasons for the
     requested continuance, number one could be completely
5    irrelevant. It could be, and it's speculative at best
     So I'm going to deny your request for continuance.
6

7  because of Mr.Bergerson, untimely, preparation of mr. Davis's

8  defenses, and investigation of certain evidence, petitioner

9  Davis, had no other alternative, but to accept the plea offer,

10 as a result of the incompetance of Donald Bergerson, and his

11 inability, to prepare petitioner Davis's case in a timely

12 matter.

13

14   NINTH CIRCUIT

15

16      The Court of Appeals reviews de novo denial of petition

17 for writ of habeas corpus, where a Defendant is entitled to

18 effective assistance of counsel to protect the fundamental right

19 to a fair trial. The court will review de novo, the district

20 court's denial of a petition for a writ of habeas corpus, (See

21 LAMBERT V. Blodgett,(9TH Cir.2004) 593 F.3d 943,964; and the

22 District court's grant of summary judgment Davis v. Woodford

23 (9TH Cir.2004) 384 F.3d 628,638; "Factual findings and credibi-

24 lity determinations made by

25              .  the district court in the context of granting

26 or denying the petition are reviewed by the court for "clear

27 error" (See Lambert v. Blodgett (9TH Cir.2004) 393 F.3d at 964

28 The district court's application of the Antiterrorism and

1  EFFECTIVE Death Penalty Act of 1996 ("AEDPA"), as well as it's
2  conclusion that the standards set forth in AEDPA are satisfied,
3  is a mixed question of law and fact, which the court also can
4  review de novo. Id.at 965. Therefore, for the above stated
5  reasons, the court must find defense counsel Donald Bergerson
6  incompetant and reverse the plea colloquy conviction,and allow
7  petitioner Davis to withdraw his plea, and enter a plea of not
8  guilty. Pursuant to Penal Code Section 1018.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28                                    58.

C
## *HENDERSON/BIGMAN* ERROR--FAILURE OF COUNSEL TO INFORM PETITIONER Davis OF THE APPLICABLE SPECIFIC INTENT ELEMENTS RELATED TO HIS PROSPECTIVE DEFENSES

Petitioner Davis plea of guilty was involuntary and accepted in violation of

constitutional due process because he was not apprised, by his appointed counsel of the

nature of the charges against him. Counsel did not discuss the elements of the charged

crimes with Petitioner Davis At the time he entered his plea, counsel did not inform

Petitioner Davis that to be guilty of Attempted murder

in violation of 664/187 (A) Petitione Davis had to "act with the knowledge

of the primary actor's criminal purpose" and that Petitioner Davis had to have the intent

to encourage or facilitate that purpose. *People v. Mendoza* (1998) 959 P.2d 735; 77 Cal.

Rptr.2d 428.

A plea may stand only where the accused comprehended the nature of the charges

to which he pleads. *Henderson v. Morgan*(1976) 426 U.S. 637, 645-647, 96 S.Ct. 2253,

2257-2259, 49 L.Ed.2d 108; *Smith v. Agreed* (1941) 312 U.S. 329, 334, 61 S.Ct. 572,

574, 85 L.Ed. 859. Understanding the nature of a criminal charge necessarily involves

understanding the legal elements of the crime that the prosecution must provide to obtain a conviction. *Henderson v. Morgan*, (1976) 426 U.S. at 645-647. In particular, a plea of guilty to a charge is constitutionally voluntary only when the defendant understands the specific intent elements of the crime of conviction. *Id* at 645-647. If the record fails to establish a knowing and voluntary admission, then the plea is involuntary and the judgment of conviction was entered without the due process of law. *Id.*

As in *Henderson,* which involved a second-degree murder plea, Petitioner
ı Davis case did not proceed to trial; the conviction is based on a plea. In addition, this case is similar to *Henderson*, as Petitioner ı Davis counsel stipulated to the requisite intent; but he did not explain to Petitioner Davis that his plea would be an admission of that fact; and Petitione, Davis made no factual statement or admission necessarily implying that he had such intent. (Exhibit B

The Court in *Henderson* maintained that, regardless of the wisdom of defense counsel's advice to plead guilty or the strength of the prosecution's evidence, an unintelligent and unknowing plea cannot support a judgment of guilt. *Id* at 644-645. In the case at bar counsel's advice to plead guilty was not based on any evidence nor was it based on the strength of the state's case. Therefore Petitioner Davis's waiver of his sixth amendment right to trial was not an intelligent and knowing waiver.

1.

## D. PETITIONER'B Davis 'S PLEA WAS INVOLUNTARY, AS COUNSEL USED IMPROPER MEANS TO CONVINCE PETITIONER Γ Davis TO ACCEPT THE PLEA BARGAIN.

A defendant's plea is not voluntary where counsel uses improper means to convince the defendant to accept a plea bargain. Under such circumstances, any plea is the product of the defendant's overborne will. *People v. Rivera* (1987) 196 Cal.App.3d 924,926-927.

The court in *People v. McGarvy*, held the defendant's plea was not voluntary in a homicide case. (1943) 61 Cal.App.2d 557, 559-565. The defendant pleaded guilty to a manslaughter charge after consulting with an attorney who was acting on the behalf of the state. The defendant's attorney spoke with him for approximately thirty minutes at the request of the prosecutor, and not pursuant to the formal appointment of the court. It was only, after defense counsel spoke with the defendant that he pled to the agreed charge. No investigation had been done; counsel apparently relied upon the representations of the prosecutor. Counsel for the defendant was not a vigorous advocate for him, but rather acted as agents of others whose interests were adverse to him.

The case at bar is similar in that defense counsel stated to Petitioner Davis, that because of his inability to obtain a continuance, due to his personal external problems as well as, him having a full case load of clients that he was responsible for petitioner Davis's lack of preparation in defending the charges held against him (See Exhibit (B)(1) also (C)(5)

61.

Furthermore, Defense counsel allowed Petitioner Davis to enter his plea without adequate knowledge of his defenses, the availability of exculpatory evidence, or the actual and accurate potential penal consequences. In fact, defense counsel encouraged Petitioner Davis to accept the plea without vital information; his acceptance was under duress and threats of inaccurate penal consequences as well as no description of the defense case available to him. (Id at ¶¶4,7.)

Counsel must act vigorously on behalf of his client. He may not properly act to advance his or her own interests, or the interests of a third party, to the detriment of his client. *People v. Corona* (1978) 80 Cal.App.3d 648, 705. Counsel's use of intimidation induced Petitioner Davis to enter his pleas and clearly establishes a conflict between the best interest of the client and counsel's interest in rapidly disposing of the case. Therefore, because of defense counsel's actions, Petitioner Davis plea was involuntary due to counsel's actions. (See Exhibit (B)(3) also (C)(5)

**E.** **Petitioner Davis plea of guilty should be vitiated pursuant to.**
**_People v. Johnson,_ Because Petitioner Davis did not understand the**
**possible Penal consequences of the plea.**

Petitioner Davis must be permitted to challenge his plea of guilty through a petition

for writ of habeas corpus. If a criminal defendant is prejudiced by his attorney's errors,

he must be given the opportunity to withdraw his plea. *People v. Johnson* (1995) 36 Cal.

App. 4th 1351, 1355.

In *Johnson,* a criminal defendant was permitted to withdraw his no-contest plea

because it was entered only because of a misunderstanding of the fundamental facts

surrounding the defendant's case. The defendant accepted a plea bargain of 20 years in

prison when two of his attorneys erroneously informed him that he faced a potential of 38

years of incarceration if found guilty at trial. In fact, Mr. Johnson's attorneys had over-

calculated his potential maximum sentence by 11 years so that his true maximum

sentence was 27 years, not 38 years. Thus, under the plea-bargained that Johnson

accepted, he saved at most 7 years, not 18 years as his attorneys represented. Johnson

declared in his writ of habeas corpus that had he been correctly advised of his maximum

potential sentence of 27 years, he would never have accepted the plea bargain. (pet

affidavit)

In permitting Johnson to withdraw his no-contest plea, the court stated: "Where a

defendant has been denied the effective assistance of counsel in entering a plea of guilty,

he is entitled to reversal and an opportunity to withdraw his plea if he so desires." *People*

*v. Johnson*, supra, 36 Cal. App. 4th at 1356, citing, *People v. McCary* (1985) 166 Cal.

App.; 3d 1, 7.) "To be valid, guilty pleas must be based upon a defendant's full awareness of the relevant circumstances and the likely consequences of his action." *People v. Johnson*, supra, 36 Cal.App. 4th at p. 1356, citing *People v. Hunt* (1985) 174 Cal.App.3d 95, 104.)

The facts in the present case are similar to those of *Johnson*. Petitioner Davis as did Johnson, only entered his plea through a misunderstanding of the possible penal consequences of his case. Petitione Davis because of his counsel's failure to explain the elements of the charged crimes and the available defenses, was not fully aware of "the relevant circumstances" to which he was entering his plea. *People v. Johnson*, 36 Cal.App.4th 1351,1354-1356. A defendant may withdraw a plea because of a "mistake, ignorance or inadvertence or any other factor overreaching defendant's free and clear judgment. *Id* at 1357

In fact, Petitioner Davis case is similar to *Johnson*. The advice given as to the penal consequences Petitionei Davis faced if he did not accept the plea was in fact grossly overstated, inaccurately stated, and presented to Petitioner Davis by his own counsel in an overreaching manner bordering on extortion. Petitioner Davis counsel advised him, that he should take the sentence because it would be in his best interest

h.

If

Petitioner Davis understood the true consequences of accepting such a plea, he would never have accepted the plea agreement. Counsel's misleading statements and omissions were prejudicial and adversely affected Petitioner: Davis 'ability to knowingly, intelligently, and voluntarily decide to enter a plea" of guilty. 36 Cal.App.4th 1351 at 1351. Because Petitioner Davis entered his plea under mistake and ignorance, it was ineffective representation of counsel and requires withdrawal of his plea. *Id.*

Petitioner Davis arguments with respect to *Henderson/E* error and the failure of defense counsel to advise Petitioner Davis of his potential defenses, including an intoxication defense as to the specific intent elements of aiding and abetting, apply equally to error under the *Johnson* decision as discussed above.

F· Petitioner Davis Received Ineffective Assistance of Counsel Because, Defense Counsel did Not Advise Petitioner Davis to Withdraw The Guilty Plea When the Trial Court Did Not Approve the Plea.

Petitioner Davis Trial Counsel did not advise Petitioner Davis that the trial judge's approval of the plea was not binding and that the trial judge, upon further reconsideration, had the discretion to revoke his approval of the plea. Counsel further erred in failing to advise Petitioner Davis of his right to withdrawal his plea upon the judge's revocation of approval of the plea. Trial Counsel's failure to advise Petitioner Davis of his right under California law directly prejudiced Petitioner Davis

The California Supreme Court has held that under California Penal Code § 1192.5 (1) a plea's approval is not binding, (2) the court may... withdraw its approval in the light

of further consideration of the matter, and (3) in such case the defendant shall be permitted to withdraw his plea if he desires to do so.'" *People v. Cruz* (1988) 44 Cal. 3d 1247, 752 P.2d 439; *In Re Lunceford*, (1987) 191 Cal. App. 3d 180, 236 Cal. Rptr. 274; Cal. Penal Code § 1192.5.

In the case at bar, trial counsel did not (1) advise Petitioner Davis of his right to withdrawal his plea if the Court did not approve the plea agreement and (2) trial counsel further erred by not advising Petitioner, Davis that the trial judge could in fact withdrawal his approval of the plea agreement. Additionally counsel failed to advise Petitioner Davis that he had the right to withdrawal the plea after disapproval by the judge. Reasonable counsel would have advised Petitioner Davis that the trial judge may not approve or may withdrawal his approval and further advise Petitioner. Davis of his right to withdrawal his plea.

Defense counsel's actions were clearly prejudicial to Petitioner Davis If Petitioner Davis was in fact aware of and understood his rights under California Penal Code § 1192.5, he would have withdrawn his plea and chosen to proceed with trial. The sentence received as a result of the plea is equal to the sentence which Petitioner ,Davis would have received if convicted by a jury for Attempted Murder with the use of a firearm with the use of a firearm enhancement charge. Petitioner Davis had nothing to lose by going to trial and this is evidences that Petitioner Davis did not understand his rights nor was he made aware of his rights under Cal Penal Code § 1192.5. Why would an individual plea to a sentence equal to that which he may receive if convicted by a jury.

### G. Petitioner Davis Under Constitutional Standards, Has Been Prejudiced By Defense Counsel's Errors.

The California Supreme Court has held that in order to obtain relief for ineffective assistance of counsel, the burden is on the Petitioner Davis to establish that "counsel failed to act in a manner expected of reasonably competent attorneys acting as diligent ,advocates... [and] that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." *People v. Pope* (1979) 23 Cal.3d 412, 425..

The United States Supreme Court has similarly held that a petitioner alleging ineffective assistance of counsel must show that counsel's performance was deficient and resulted in prejudice. *Strickland v. Washington* (1984) 466 U.S. 668,687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Under *Strickland*, the petitioner must comply with a two part test; (1) the defendant must identify each of the acts or omissions that demonstrate that trial counsel committed errors so serious that petitioner's sixth amendment rights were not afforded to them and (2) even if there was deficient representation the Petitioner must show that it is reasonably probable that the lawyer's deficiency negatively affected the outcome of the proceedings. *Id.*

In *Hill v. Lockhart*, the United States Supreme Court held that *Strickland* "applies to challenges to guilty pleas based on ineffective assistance of counsel." Furthermore, the Court held that in order to satisfy the prejudice requirement, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have plead guilty and would have insisted on going to trial." (1985) 474 U.S. 52, 58-59, 106 S.Ct. 366, 369, 88 L.Ed.2d 203. Moreover, where trial counsel fails to advise of a potential defense, showing prejudice will depend largely on whether the defense is likely to have prevailed

habeas corpus brought pursuant to subdivision (b).

(d)     Nothing in this section shall be construed as limiting the grounds for which a writ of habeas corpus may be prosecuted or as precluding the use of any remedies."

Ordinarily, the purpose of a "writ of habeas corpus" is to procedure one's discharge from custody alleged to be illegal. *Make v. Cameron,* (1966) 364 F.2d 657, 124 U.D. 963, 15 L.Ed.2d 100. The basic purpose of a writ of habeas corpus is to enable those unlawfully incarcerated to obtain their freedom. 28 U.S.C. 2241-2255, *Johnson v. Avery,* (1979) 393 U.S. 483.

A writ of habeas corpus is the appropriate proceeding to assert a claim of ineffective assistance of counsel. *People v. Pope,* (1979) 23 Cal.3d 412. "Where the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus. In habeas corpus proceedings, there is an opportunity in evidentiary hearing to have trial counsel fully describe his or her reasons for acting or failing to act in the manner . complained of." *(People v. Pope,* (1979) 23 Cal.3d 412; See Cal Penal Code Section 1483, 1484; e.g. *In Re Williams,* (1969) 1 Cal.3d 168.

### ABUSE OF DISCRETION BY PRESIDING JUSTICE ALLAN P. CARTER

Standard of Review

'Any justice of the peace, mayor, municipal or police judge, probate or common pleas judge within the county with whom the affidavit is filed charging a violation of any of the provisions of this act, when the offense is alleged to have been committed in the county in which such mayor, justice of the peace or judge( See Tumey v. State of Ohio (1927) 47 S.Ct.437, 237 US. 510 may be sitting shall have final jurisdiction to try such cases upon such affidavits without a jury, unless imprisonment is a part to the penalty, but error may be prosecuted to the judgment of such mayor, justice of the peace, or judge as herein provided. Tumey v. State of Ohio (1927) 47 S.Ct.437, 237 US 510. The appellate review in respect to evidence is such that the judgment can only be set aside by the reviewing court on the ground that it is so

clearly unsupported by the weight of the evidence as to indicate some misapprehension or mistake or bias on the part of the trial court or a willful disregard of duties. Tumey v. State of Ohio (1927) 47 S.Ct.437, 237 US 510;(See Exhibit (D)(4) where by, Trial justice Allan P. Carter, abused his discretion relying on non-controling authority, with recanted testimony.

OFFICERS ACTING IN JUDICIAL OR QUASI JUDICIAL CAPACITY ARE DISQUALIFIED BY INTEREST IN CONTROVERSY

The officers acting in a judicial or quasi judicial

capacity are _disqualified_ by their _interest_ in the _controversy_

to be decided is of course the general rule. Dimes v. Grand

Junction Canal, 3 H L.C. 759; quoting Tumey v. State of Ohio

(1927) 47 S.Ct.437, 237 US 510; The Trial court relied on Peoplev.
Langlois (1963) 220 Cal.App2d.831;Also People v. McGaughran (1967
197 Cal.App.2d 6 at p.g. 7; To justify it's ruling denying
Petitioner Davis motion to withdraw plea, when the prosecution's
star witness Sean Widermyer, "recanted" his testimony. The
court further ignored the fact that Widermyer, could not "identify'
Davis because the gun was in his face. (See Exhibit (D)(24)
the trial court's ruling was erroneous, because it wasn't controling law.

As set forth in appellant's opening brief, several months after the entry

of appellant's plea of guilty but prior to sentencing, Sean Widermyer came

forward on his own and advised appellant's trial counsel that he may have

been wrong when he identified appellant as the man who shot him on

December 13, 2004. (CT 233-237.) Based on this information, appellant

moved to withdraw his plea on May 14, 2007. (CT 229-237.) An evidentiary

hearing was subsequently held on May 24, 2007. (CT 272.) At that hearing,

Widermyer affirmed his earlier written declaration that he may have been

mistaken when identifying appellant as the man who shot him. (CT 236-237;

RT 150.) He testified that he could not say that appellant was that person

because he did not see the shooter's face. (RT 150, 160.) His said his

attention at the time was entirely focused on the assailant's handgun. (RT

158.) Widermyer also assured the court that he had not recanted his earlier

70.

identification because he had been threatened. (*Ibid.*)

Appellant establishes in his opening brief that the trial court abused its discretion when it refused to permit him to withdraw his guilty plea. In answer to this, respondent offers an opposing view. He asserts that the trial court did not err, arguing, in part, that "[o]verestimating the strength of the prosecutor's case is not good cause for the withdrawal of a guilty plea. [Citation omitted.]" (RB 6-7.) This claim is without merit.

Respondent fails to adequately acknowledge that affirmance of the trial court's ruling will result in a serious injustice. On his own volition, Sean Widermyer offered the court compelling evidence of appellant's innocence. Consequently, this is not a case, as claimed by respondent, where the defendant overestimated the strength of the prosecution's case against him. Moroever, an affirmance runs afoul of the fundamental policy that justice must prevail. It is well-established that a motion to withdraw a plea "should not be denied in any case where it is in the least evident that the ends of justice would be subserved by permitting the defendant to plead not guilty instead. . . ." (*People v. Dena* (1972) 25 Cal.App.3d 1001, 1012, quoting *People v. McGarvy* (1943) 61 Cal.App.2d 557, 564.) The case at hand is just such a case.

Accordingly, for these reasons and those set forth in the opening brief,

71.

Several months after the entry of appellant's plea of guilty but prior to sentencing, Sean Widermyer came forth on his own and advised appellant's trial counsel that he may have been wrong when he identified of appellant as the man who shot him on December 13, 2004. (CT 233-237.) Based on this information, appellant moved to withdraw his plea on May 14, 2007. (CT 229-237.) An evidentiary hearing was subsequently held on May 24, 2007. (CT 272.) At that hearing, Widermyer affirmed his earlier written declaration that he may have been mistaken when identifying appellant as the man who shot him. (CT 236-237; RT 150.) He testified that he could not say that appellant was that person because he did not see the shooter's face. (RT 150, 160.) His attention at the time was entirely focused on the assailant's handgun. (RT 158.) Widermyer also assured the court that he had not recanted his earlier identification because he had been threatened. (*Ibid.*) Upon hearing this testimony and counsel's arguments, the court denied the motion to withdraw

914, 917.) To withdraw a guilty plea, the defendant must show good cause by clear and convincing evidence. (*People v. Fairbank* (1997) 16 Cal. 4th 1223, 1254; *In re Vargas* (2000) 83 Cal.App.4th 1125, 1142.) In other words, the burden is on defendant to present clear and convincing evidence the ends of justice would be subserved by permitting a change of plea to not guilty. (*People v. Sandoval* (2006) 140 Cal.App.4th 111, 123.) The trial court's decision whether to accept a plea withdrawal is discretionary. (*People v. Superior Court (Giron)* (1974) 11 Cal.3d 793, 796; *People v. Sandoval, supra,* 140 Cal.App.4th at p. 123.) Therefore, the ruling will not be disturbed on appeal absent a clear showing of an abuse of discretion. (*People v. Superior Court, supra,* 11 Cal.3d at p. 796; *People v. Blomdahl* (1993) 16 Cal.App.4th 1242, 1247.)

Overlaying these requirements is the fundamental policy that justice must prevail. A motion to withdraw a plea "should not be denied in any case where it is in the least evident that the ends of justice would be subserved by permitting the defendant to plead not guilty instead. . . ." (*People v. Dena* (1972) 25 Cal.App.3d 1001, 1012, quoting *People v. McGarvy* (1943) 61 Cal.App.2d 557, 564.) Similarly, Penal Code section 1018 must be "liberally construed . . . to promote justice." (Pen. Code § 1018; see also *People v. Miranda* (2004) 123 Cal.App.4th 1124, 1129.) Moreover, "[t]he law seeks no

74.

unfair advantage over a defendant. . . ." (*People v. Schwarz* (1927) 201 Cal. 309, 315.)

Without question a serious injustice will occur if this Court affirms the denial of appellant's motion to withdraw his plea. Without question, Widermyer's recantation bears directly on the most fundamental issue – appellant's innocence. Concededly, "[g]uilty pleas resulting from a bargain should not be set aside lightly and finality of proceedings should be encouraged." (*People v. Hunt* (1985) 174 Cal. App. 3d 95, 103; see also *People v. Weaver* (2004) 118 Cal.App.4th 131, 146.) However, in light of Widermyer's recantation, affirmance of the denial of the motion to withdraw the plea would amount to nothing less than the impermissible elevation of procedure over justice.

For these reasons, the judgment of conviction must be reversed and cause remanded to permit appellant to withdraw his plea of guilty.

//

//

.75.

## VIII. CONCLUSION

For the reasons stated, this court should find as follows:

1. Petitioner Davis was deprived of his right to due process on a number of grounds during the entry of his plea;

2. Petitioner Davis was deprived due process in violation of his right to enter into knowing and intelligent plea in the trial court and thus, an Order to Show Cause should be issued;

3. Petitioner Davis was deprived of effective assistance of counsel to which he was entitled to when he entered his guilty plea;

4. That this court should take judicial notice of the record in the case of *People v.* Davis Solano County Superior Court case number VCR1767 which is 44 referred to herein to clarify and amplify various allegations in accordance with (Cal Evid. Code Sections 452(b)(1) and 459) ;

5. Issue a Writ of Habeas Corpus or Order to Show Cause to the Attorney General of California to inquire into the lawfulness of Petitioner Davis conviction;

6. If needed, order that an Evidentiary Hearing be convened;

7. After full consideration of this matter, set aside the conviction of Petitioner Davis and order a new trial, or other appropriate relief;

8. Reverse judgment with directions to allow Petitioner to withdrawal his admission of violation of 'Cal. p.c. 664/187 and enter a new plea to that charge and insure that Petitioner will receive credit for time served in the event he ultimately is sentenced to a term of incarceration following his withdrawal of his guilty plea.

9.  Grant Petitioner Davis whatever further relief is appropriate in the

interest of justice.

Accordingly, this court should issue the Great Writ of Habeas Corpus ordering

Petitioner Davisfreed from the effect of his unconstitutional confinement.

DATED: 1/26/10 , 2002

Respectfully submitted,

pro se

# EXHIBIT COVER PAGE

| A |
|---|

EXHIBIT

Description of this Exhibit: SUPREME COURT OF CALIFORNIA OPINION

Number of pages to this Exhibit: \_\_\_\_1\_\_\_\_ pages.

JURISDICTION: (Check only one)

| | Municipal Court |
| | Superior Court |
| | Applellate Court |
| | State Supreme Court |
| X | United States District Court |
| | State Circuit Court |
| | United States Supreme Court |
| | Grand Jury |

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

MARQUIS MATTHEW DAVIS, Defendant and Appellant.

The petition for review is denied.

George, C.J., was absent and did not participate.

SUPREME COURT
FILED

JAN 2 8 2009

Frederick K. Ohlrich Clerk

_____
Deputy

CORRIGAN

_____
Acting Chief Justice

EXHIBIT (F)(1)

# EXHIBIT COVER PAGE

B

EXHIBIT

Description of this Exhibit:   LETTER OF APPELLATE COUNSEL

ROSS THOMAS, ON OF 6/13/08

Number of pages to this Exhibit: _____1._____ pages.

JURISDICTION:  (Check only one)

| | Municipal Court |
|---|---|
| x | Superior Court |
| | Appellate Court |
| X | State Supreme Court |
| x | United States District Court |
| | State Circuit Court |
| | United States Supreme Court |
| | Grand Jury |

JANICE WELLBORN
Attorney at Law
4104 24th Street, No. 411
San Francisco, California 94114
(415) 627-4052

June 13, 2008

Marquis M. Davis
F-79213
Corcoran State Prison
Post Office Box 3461
3A04-114L
Corcoran, California 93212

Dear Mr. Davis,

Enclosed are copies of the Attorney General's respondent's brief and our reply brief. I believe
both are self-explanatory.

With the filing of these documents, the briefing phase of the appellate process comes to an end.
Now we wait for the issuance of the Court of Appeal's decision. Unfortunately, there is no way
of knowing when that will occur. However, I suspect it will issue in about 4 to 6 months from
now. I will inform you of any developments.

If you have any question, please contact me.

Very truly yours,

ROSS THOMAS
Attorney at Law

# EXHIBIT COVER PAGE

| C |
| --- |

EXHIBIT

Description of this Exhibit: PRETRIAL HEARING OF 11/6/06 CASE NO. VCR176744

Number of pages to this Exhibit: 29. pages.

JURISDICTION: (Check only one)

| | Municipal Court |
| --- | --- |
| X | Superior Court |
| | Applellate Court |
| X | State Supreme Court |
| X | United States District Court |
| | State Circuit Court |
| | United States Supreme Court |
| | Grand Jury |

| | |
|---|---|
| 1 | THURSDAY, NOVEMBER 2, 2006 |
| 2 | -oOo- |
| 3 | The before-entitled matter came on regularly |
| 4 | this day for JURY TRIAL MOTIONS in the Superior Court |
| 5 | of California, County of Solano, before HONORABLE ALLAN |
| 6 | P. CARTER, Judge Presiding. |
| 7 | The PEOPLE OF THE STATE OF CALIFORNIA were |
| 8 | represented by JAMES HIGHSMITH, Deputy District |
| 9 | Attorney. |
| 10 | The Defendant, MARQUIS DAVIS, was present |
| 11 | and represented by DONALD BERGERSON, Attorney at |
| 12 | Law. |
| 13 | JANICE DEL RIO, Official Court Reporter, was |
| 14 | present and acting. |
| 15 | The following proceedings were had and taken, |
| 16 | to wit: |
| 17 | -oOo- |
| 18 | (Defendant entered courtroom.) |
| 19 | MR. BERGERSON: Your Honor, in this case, I |
| 20 | need to be asking for a continuance. |
| 21 | THE COURT: Hang on a minute. |
| 22 | MR. BERGERSON: I have a declaration, and I |
| 23 | can -- |
| 24 | THE COURT: You want to file something? |
| 25 | MR. BERGERSON: Yes, I would, but you know, |
| 26 | it's two days in advance of the trial here, so it's |
| 27 | timely, but I'll tell you why, so you don't have to |
| 28 | read all six pages. |

| | |
|---|---|
| 1 | MR. HIGHSMITH: Can I have one? |
| 2 | THE COURT: So that's what you want to deal |
| 3 | with at this time; is that it? Is that the first order |
| 4 | of business you want to deal with? |
| 5 | MR. BERGERSON: I think that would be |
| 6 | appropriate. |
| 7 | THE COURT: Notice of motion and motion to |
| 8 | continue trial, and trial is set in about three days. |
| 9 | MR. BERGERSON: Correct. And the gist of |
| 10 | what I'm saying in there that really matters is that |
| 11 | I've tried as hard as I can to get this thing together, |
| 12 | but I had a disaster happen to me professionally in |
| 13 | September, which I intimated to the Court, but I don't |
| 14 | think the Court is fully cognizant of what happened. |
| 15 | I have a live/work space, and I was just |
| 16 | evicted summarily with no notice by the county of San |
| 17 | Francisco for a code violation. And, you know, it was |
| 18 | marketed to me by a real estate company. I didn't see |
| 19 | it coming, and they basically said, "You get out now, |
| 20 | you can get out in a month," or something like that. |
| 21 | And I just spent the whole of September essentially |
| 22 | relocating my office. I have described it to people as |
| 23 | the movie "Apollo 13," but in my scenario both the |
| 24 | space capsule and the LEM blow up at the same time. It |
| 25 | was just awful. And I'm just -- you know, I've been |
| 26 | doing a lot of things, including the Gilbreth appeal |
| 27 | that we just discussed, and I'm not quite ready on this |
| 28 | one. |

```
 1              THE COURT:  Okay.  I'm looking at page 3.
 2   "This leaves the Davis case.  Although it is not an
 3   unusually complicated one, it's a serious one, and it
 4   entails investigation of several street sources to
 5   support the anticipated defense.  I had intended to
 6   conduct this investigation in September and October,
 7   but for the foregoing reasons, I've not been able to do
 8   so.  Although I do not anticipate that I will need more
 9   than two weeks to do the investigation, a November 6th
10   trial date is simply incompatible with my undertaking
11   it.  Even without the investigation, the case still
12   requires me to master these materials.  I had earlier
13   prepared for trial in the matter, and it will not take
14   long for me to get back up to speed.  However, I have
15   been working literally nonstop on other cases.
16              "With respect to the in limine hearings, I
17   must confess that my recent request for a 402 hearing
18   on cell phone technology only occurred to me recently.
19   My research indicates that my motion is a good one, but
20   I will need more time to litigate it.
21              "I am aware that in the past few days
22   Mr. Highsmith has responded to that request by citing
23   transcripts in two cases in which the Courts, in
24   essence, said that such a hearing was not required
25   under the Kelly rule because it was not a new
26   technology."
27              This would be the two, one out of Moelk's
28   court and one out of Garrett's court?
```

1    "This is of key importance in this case
2    because Davis, the defendant, has claimed in the past
3    not to have been at the house in Vallejo which this
4    shooting occurred, but instead claims he was in
5    Fairfield.  A glance at tower locations in the Solano
6    County area on a web site shows that there are a number
7    of towers between Vallejo and Fairfield, each with
8    overlapping footprints or else the network would drop
9    calls as one drives along Highway 80, so they have to
10   overlap" -- that's probably true -- "and, hence, each
11   of which might have been the real tower in this case.
12   Assuming that the real tower in this case had a
13   footprint that covered, for example, American Canyon
14   and parts of Vallejo and Fairfield, Davis's, the
15   defendant's, cell phone carrier could document him as
16   being in Vallejo when, in fact, he was in Fairfield
17   because his tower was in American Canyon."

18         "Mr. Casey has informed me that he probably
19   could be available to testify within the next few
20   weeks.  He's already been making inquiries of local
21   cell carriers as to their geotopographic mapping
22   abilities."

23         MR. BERGERSON:  That's a word I made up, by
24   the way.

25         THE COURT:  "As the Court knows, I am
26   diligent and thorough, but this whole issue just
27   occurred to me.  I do not wish to deny Mr. Davis
28   effective assistance merely because a good idea arrived

| 1 | in my mind at a late date. Accordingly, I'm requesting |
|---|---|
| 2 | a continuance for further investigation." |
| 3 | Okay. So you want a continuance, but you |
| 4 | don't want a continuance for more than a couple of |
| 5 | weeks; is that it? |
| 6 | MR. BERGERSON: Well, I talked to Mr. Davis |
| 7 | and I can probably amend that to, you know, I'd rather |
| 8 | not, but if the Court can't accommodate us, then we'll |
| 9 | accommodate the Court. |
| 10 | THE COURT: Okay. So you want a continuance? |
| 11 | MR. BERGERSON: Yeah. |
| 12 | THE COURT: Okay. What is the D.A.'s view? |
| 13 | MR. HIGHSMITH: I'm opposed. |
| 14 | THE COURT: Tell me why. |
| 15 | MR. HIGHSMITH: I'm opposed because, number |
| 16 | one, the number of times this case has been continued. |
| 17 | It's two years old. The second reason I'm opposed is |
| 18 | because the cell phone records we've all known about |
| 19 | that this was going to be evidence for a long, long |
| 20 | time, but primarily because if this case gets |
| 21 | continued, it's not going to be able to be continued to |
| 22 | next week, because I've got witnesses that are |
| 23 | unavailable next week, and that's one of the main |
| 24 | reasons why -- |
| 25 | THE COURT: Well, one second, sir. I just -- |
| 26 | I'm looking for your trial management packet here, if I |
| 27 | can find it, because I'm interested in which witnesses |
| 28 | you are going to have a problem with if I grant this |

```
1    residue analysis?
2              MS. KAUFFMAN:  I'm not prepared to represent
3    to the Court one way or the other.
4              THE COURT:  You don't remember?
5              MS. KAUFFMAN:  No, I don't.
6              THE COURT:  You probably weren't prepared to
7    be asked questions about this case, were you?
8              MS. KAUFFMAN:  No.
9              THE COURT:  Would you like me to stop?
10             MS. KAUFFMAN:  Yes.
11             MR. BERGERSON:  Judge, I don't want --
12             MR. HIGHSMITH:  I wasn't actually finished
13   with my presentation.
14             THE COURT:  You go ahead, Mr. Highsmith.
15             MR. HIGHSMITH:  I basically had received this
16   motion to continue, although Mr. Bergerson did tell me
17   he was going to be filing this motion.  He told me this
18   morning or I think it was this morning.  He also hinted
19   that he might be doing it earlier.
20             I don't agree with his analysis on cell
21   phones, and I've already filed a brief, and I've also
22   filed several transcripts or portions of transcripts in
23   which in two -- at least in two departments, it has
24   been ruled that pursuant to Kelly-Frye, this is not new
25   technology, nor do we need to have a 402 hearing.
26             Actually, in the transcript presented by
27   Ms. Jensen, who happens to be the daughter of Judge
28   Jensen, retired, she says something I think is -- just
```

```
 1   a second -- I want to quote her.  In any case, this is
 2   not like the DNA hearings that we used to have where
 3   there was a raging dispute as to --
 4               THE COURT:  We are not asking -- we are not
 5   talking about Kelly-Frye here.  Right now, he's asking
 6   for a continuance basically --
 7               MR. HIGHSMITH:  But that's one of the
 8   reasons.
 9               THE COURT:  For a number of reasons, not the
10   least of which he's got some expert that may provide
11   impeaching, exculpatory and, with all due respect,
12   confusing testimony that could assist the defense.
13               In any event, when is that fellow available?
14               MR. BERGERSON:  Judge, he said he was going
15   to call me yesterday with his availability and with his
16   research into the local carriers, and he didn't, and I
17   called today and I've not received a call back, so --
18               THE COURT:  Here is one reason I'm asking.
19               MR. BERGERSON:  Yeah.
20               THE COURT:  Is that I'm looking at next
21   week's calendar, and if we -- if I deny this motion and
22   we proceed on Monday, we'll start picking a jury.
23   We're only going to be here two days next week because
24   it's a short week because Veteran's Day is a holiday.
25   So we are only going to be here Monday and Tuesday.
26   Then we are coming back the following week, in which
27   case, I can give you three full days and probably wrap
28   up then, but, see, that's two weeks off.  That gives
```

```
1    determine whether something is long distance or not.
2    We use it in determining bills that are sent out.  It's
3    not new technology.  It's something that's been used
4    since the '80s, and it's not a raging -- there's no
5    raging dispute here among people.  It's only a raging
6    dispute when a defense attorney in a criminal case
7    makes it one or tries to make it one.
8              MR. BERGERSON:  Judge --
9              THE COURT:  Yes, sir, Mr. Bergerson, go
10   ahead.
11             MR. BERGERSON:  If I may.  See, the problem I
12   have is that I know they say the Fairgrounds tower,
13   because that's what cellular phone records tend to say,
14   and I don't have a statement from this expert.  I got a
15   fax yesterday with the name of this expert.  I don't
16   know who he is.  There's no 1054.1 discovery to me as
17   to who the expert is and really what he's going to say
18   or his vitae or his qualifications or anything.  And I
19   actually thought he was a custodian of records for the
20   cell phone carrier.
21             This just more underscores what I was saying
22   which is, again, with all due respect to Mr. Highsmith,
23   I'm just not ready because there are a couple of things
24   now being thrown at me.  Obviously, they will inspire
25   major tactical choices in this case depending on how
26   the outcome comes out, all of this is nobody's fault
27   except for whoever marketed me that unit and caused me
28   to lose a month of time.  I mean, this could probably
```

EXHIBIT (B)(8)                                              26

1   all have been accommodated if we had been doing this
2   two or three weeks ago, and we are just not, and it's
3   nobody's fault. And I just think Mr. Davis deserves a
4   better defense than a lawyer who is harried at having
5   done this. I haven't even finished that Gilbreth
6   brief, and that's due tomorrow. And I got the
7   ultimate, you know, red notice from the Court that it
8   better be in, and I'm going to be up all night doing
9   it.

10              MR. HIGHSMITH: There are two issues then.
11  One is that we still have the issue of the Kelly-Frye
12  hearing, and, secondly, whether or not there is going
13  to be a motion granted for a continuance, and if so, to
14  what date?

15              As the Court knows, I'm retiring in the
16  middle of December and if it goes to a certain date,
17  this case is going to have to be reassigned. I mean,
18  I'm not going to, frankly, come back for this case, and
19  if there's a Kelly-Frye hearing, that really makes a
20  huge difference, because then we can forget about
21  having a trial next week, and also the defendant has
22  not waived time.

23              MR. BERGERSON: Well, he'll waive time.
24              MR. HIGHSMITH: I'm just suggesting that --
25              THE COURT: Yeah, I show -- I think he
26  withdrew his time waiver.
27              MR. HIGHSMITH: He's got a pro rata.
28              THE COURT: Up to the 13th.



```
 1              MR. HIGHSMITH:  Right.
 2              THE COURT:  Okay.  Anything else, Mr.
 3   Bergerson, you want to say on your request for a
 4   continuance?
 5              MR. BERGERSON:  No.
 6              THE COURT:  How about you, sir?
 7              MR. HIGHSMITH:  No.
 8              THE COURT:  You want to submit it?
 9              MR. BERGERSON:  Yes.
10              MR. HIGHSMITH:  Yes.
11              THE COURT:  Okay.  Well, Mr. Bergerson, I
12   think, number one, your request is legally timely, but
13   I don't think it shows good cause for requested
14   continuance.  Obviously, your client is entitled to
15   effective assistance of counsel, and I'm convinced that
16   based on my experience with you in this case and some
17   other cases that you have had in this court, that
18   you've had ample opportunity to prepare in spite of the
19   unfortunate circumstances you have listed that has made
20   it difficult for you to maintain a practice in an
21   orderly fashion because of this disruption in
22   apparently your personal, as well as your professional
23   life.
24              I point out this case is coming up on two
25   years old.  It's been continued a number of times.  I
26   think your reason for the requested continuance, number
27   one, could be completely irrelevant.  It could be, and
28   it's speculative at best.  So I'm going to deny your
```

```
1    request for continuance.
2                I'm going to confirm the trial date of
3    November 6th at 8:30.
4                Now, with reference to the Kelly-Frye issue,
5    I'm going to take five minutes, and we'll come back and
6    we'll have your hearing.  Okay.
7                MR. HIGHSMITH:  Thank you.
8                MR. BERGERSON:  What are we having a hearing
9    on?
10               THE COURT:  To determine whether or not I'm
11   going to allow you a Kelly-Frye hearing.
12               MR. HIGHSMITH:  Thank you, your Honor.
13               THE COURT:  Be right back.
14               (Recess.)
15               THE COURT:  All right.  We are back on the
16   record.  We'll get Mr. Davis back out here.
17               (Defendant entered courtroom.)
18               THE COURT:  Okay.  I'm just looking for your
19   motion.
20               MR. BERGERSON:  You know what is going to
21   happen is that over the weekend, Judge -- I hate to do
22   this to you and I'm hoping we can schedule around it --
23   I'm going to have to be coming in with a couple of
24   other in limine motions now that I got this stuff on
25   the GSR, because I just talked to Detective Mustard,
26   and it's my understanding that the arrest of Mr. Davis
27   occurred with respect to a call of shots fired.
28               THE COURT:  Okay.
```

EXHIBIT (B)(11)

29

```
 1              MR. BERGERSON:  And that, you know, that's
 2   probably the source of the GSR, because we've all been
 3   around this stuff.  And my feeling is that I want to
 4   move in limine to exclude the GSR on relevancy and 352
 5   and 1101(b) grounds.
 6              THE COURT:  Yeah?
 7              MR. BERGERSON:  And, you know, I have to --
 8   but now I have to write it up because I didn't know
 9   about it.
10              THE COURT:  Okay.
11              MR. BERGERSON:  And I think that we have to
12   have a hearing on that.
13              THE COURT:  Okay.
14              MR. HIGHSMITH:  That's fine.
15              MR. BERGERSON:  Or we can get a stipulation
16   that it just isn't relevant to this case.
17              THE COURT:  He's not going to stipulate to
18   that.
19              Okay.  Here is what I want to deal with now.
20   'Here is the motion I was looking for, and this is Mr.
21   'Bergerson has filed a motion in limine to bar expert
22   testimony on cell tower positioning and objection to
23   business records purporting to show cell tower
24   locations.  So the issue is whether or not a Kelly-Frye
25   hearing is necessary, and that's why we're here today
26   to determine whether or not I'm going to grant the
27   request for the hearing.
28              And then Mr. Highsmith has filed opposition
```

1 | associated with those records was proximate to that
2 | particular tower as opposed to other towers when he
3 | made a cellular telephone call.

4 | I mean, yeah, of course, cell calls go into
5 | towers, but my expert says that the tower that's
6 | selected is selected simply because there is evidence
7 | that the cell phone may be within the overlapping
8 | footprint area of one of several towers, and that
9 | essentially the company would select, for example, its
10 | own tower, rather than a tower that's used by another
11 | company or owned by another company that conveys into
12 | the system, or that it will select the tower that's
13 | emitting the strongest signal in the general area, even
14 | though there might be a tower emitting a weaker signal
15 | that actually is the tower used because the individual
16 | is closer to the other tower. That's what my expert in
17 | Texas was trying to explain to me, and I don't purport
18 | to be an expert, but I think there is controversy about
19 | this.

20 | In other words, you don't have -- what you
21 | have is a very superficial layering in these bills, and
22 | you are essentially having a guy reading hearsay into
23 | the record without any showing that the hearsay means
24 | anything, other than that the phone company has decided
25 | to go and put these alphanumeric listings on some sort
26 | of records it keeps.

27 | THE COURT: Okay. Is the matter going to be
28 | submitted?

38

| | |
|---|---|
| 1 | MR. BERGERSON: I guess, because I don't have |
| 2 | anything more at this time because the Court has denied |
| 3 | me my motion to continue to get the expert. |
| 4 | THE COURT: Okay. So is it submitted, Mr. |
| 5 | Bergerson? |
| 6 | MR. BERGERSON: Yes. |
| 7 | THE COURT: Is it submitted? |
| 8 | MR. HIGHSMITH: Yes. |
| 9 | THE COURT: Based on your comments most |
| 10 | recently made, Mr. Bergerson, I just don't think they |
| 11 | support having a Kelly-Frye hearing. They certainly |
| 12 | would go to the relevance of evidence. It would go to |
| 13 | the admissibility of the evidence, and it may go to the |
| 14 | impeachment of the evidence. But let me just read a |
| 15 | couple of things into the record, the matter having |
| 16 | been submitted. |
| 17 | "In applying the Kelly standard, it's |
| 18 | important to distinguish between expert testimony and |
| 19 | scientific evidence. The former is not subject to the |
| 20 | special admissibility of Kelly, which applies to cases |
| 21 | involving novel devices or procedures. The Kelly test |
| 22 | is intended to forestall the jury's uncritical |
| 23 | acceptance of scientific evidence or technology that is |
| 24 | so foreign to everyday experience as to be unusually |
| 25 | difficult for a layperson to evaluate. In most other |
| 26 | instances, the jurors are permitted to rely on their |
| 27 | own common sense and good judgment in evaluating the |
| 28 | weight of the evidence presented to them." |

```
 1    established to have gained general acceptance in the
 2    particular field in which it belongs. In determining
 3    whether there has been general acceptance, the goal is
 4    not to decide the actual reliability of this technique,
 5    this new technique, but simply to determine whether the
 6    technique is generally accepted in the relative --
 7    relevant, excuse me, scientific community.
 8              And I don't think you have sufficient legal
 9    basis for the hearing, so I'm going to deny the request
10    for the Kelly-Frye hearing.
11              MR. BERGERSON: I appreciate the Court's
12    reasoning.
13              THE COURT: You are interrupting me because
14    I'm not finished, Mr. Bergerson.
15              MR. BERGERSON: I apologize.
16              THE COURT: So with reference to the 402
17    hearing, which sort of follows on its heels, I am not
18    going to make a ruling on that now. I'm not going to
19    deny it. I may deny it, but you may be entitled to a
20    402 hearing regarding, you know, foundational
21    requirements regarding somebody coming in and
22    testifying, but I'm denying the Kelly hearing.
23              MR. BERGERSON: I understand where the Court
24    is going. I appreciate the Court's reasoning. Just to
25    correct my part of the record, I kept referring to the
26    second prong of Kelly. I really meant the third prong,
27    and the Court is right. And that is what I'm asking
28    for. The Court hasn't addressed that in its ruling.
```

EXHIBIT (B)(15)                                                    41

```
 1          What I question is how we know that this
 2   information is in any way accurate without him having
 3   somebody explain that it's accurate, and it's not the
 4   person that says --
 5          THE COURT:  Isn't that why you are bringing
 6   somebody in from Texas?
 7          MR. HIGHSMITH:  Exactly.  Not from Texas, but
 8   from San Francisco.
 9          THE COURT:  He's got somebody from Texas.
10          MR. HIGHSMITH:  Texas is the custodian from
11   Dallas, and the RF engineer is from San Francisco, and
12   he's going to testify exactly to answer his questions
13   before the jury would be to explain how this works.
14          THE COURT:  Okay.
15          MR. BERGERSON:  I'd have fewer questions if I
16   had a statement from this expert.
17          THE COURT:  Well, you know, your client is
18   entitled to a fair trial and not a perfect one, and
19   basically what you are asking is that we have two
20   trials on this issue, you know, sort of two shots at
21   the person.  And that's one reason, you know, a
22   preliminary hearing is not supposed to be a discovery
23   hearing.
24          MR. BERGERSON:  Right.
25          THE COURT:  Oftentimes, it turns into one,
26   but it's not supposed to be, and I don't recall any of
27   this, but if I picked up a transcript from the prelim
28   right now, I'm sure there's probably no testimony
```

```
 1   regarding cell phone use, anybody from Texas, none of
 2   that stuff.

 3              MR. HIGHSMITH:  Actually, there was.

 4              THE COURT:  So this isn't a civil matter, you
 5   are not entitled to a deposition.

 6              MR. BERGERSON:  I got that.  I mean, the last
 7   time we had Detective Mustard, I think it was also
 8   testified in the Hughes trial, I mean, he was just
 9   doing time stamping, and that I accept.  That's a whole
10   different issue.

11              THE COURT:  He has a certain amount of
12   expertise in a limited area.

13              MR. BERGERSON:  No, I don't -- Judge, any
14   person who is, you know, in the third grade -- and I'm
15   not demeaning Detective Mustard -- but anybody who is
16   in the third grade can read these numbers.  They are
17   not hard to read.  They are Arabic numbers.

18              MR. HIGHSMITH:  Well, it does require some
19   knowledge as to what these numbers mean.

20              MR. BERGERSON:  But what I'm saying is the
21   knowledge of what the numbers mean is correlate to some
22   sort of key, a crib sheet, you know -- what is the word
23   that I'm looking for -- but it just correlates to some
24   sort of gliff that's been generated by the cell phone
25   company.  But why is that being generated?  How do we
26   know that this stuff actually means anything?  And to
27   say that people use radios all the time is begging not
28   answering the question.  That's what my problem is.
```

1 | And I think that before the jury is prejudiced by
2 | having this stuff come in and then being stricken on so
3 | crucial an issue as to where the defendant was at the
4 | time of the shooting, I think we have to have a hearing
5 | outside the jury's presence. I mean, if it's not on
6 | the morning, fine, but it should be before this guy
7 | testifies and we have to unring a bell.

8 | MR. HIGHSMITH: There's not going to be any
9 | bells unrung until I've laid a foundation. That's why
10 | we have experienced lawyers like Mr. Bergerson and I.
11 | He will object, and the objection will either be
12 | sustained or denied, if I haven't laid a proper
13 | foundation. That's why I have these witnesses lined
14 | up.

15 | MR. BERGERSON: I don't have a vitae on the
16 | guy. I don't have any statements from him. I don't
17 | know who he is.

18 | MR. HIGHSMITH: I haven't talked to him in
19 | detail yet. I intend to talk to him tomorrow
20 | afternoon.

21 | MR. BERGERSON: I at least did my best to try
22 | and explain what it is that I knew from a telephone
23 | conversation with my expert.

24 | MR. HIGHSMITH: One thing I did do is I had
25 | Officer Mustard and he, in a timely fashion, provided
26 | us with this incredible report, and it explains
27 | everything that Mr. Bergerson wanted to know and what
28 | it is that we are going to elicit at trial.

1    THE COURT: I'm sorry, you have provided Mr.
2    Bergerson with this information?
3    MR. HIGHSMITH: A report as to what all these
4    things mean in these records.
5    THE COURT: When did you give that to Mr.
6    Bergerson?
7    MR. HIGHSMITH: I gave it to him today,
8    because I wanted -- it was mostly for my use. It's
9    nothing new in here, but it's for my use, so I'll
10    understand what it means, because I've never been
11    through a hearing like this. But I know what's
12    involved now, after having somewhat prepared for it
13    this week in what little time I've had.
14    MR. BERGERSON: This is a list of antennas.
15    And as I say, my question is, how do you know that this
16    antenna, which I don't deny exists -- I mean, I
17    probably could drive out to them.
18    THE COURT: Here is what I'm going to do.
19    I'm not going to rule on the 402 request, because it
20    may be appropriate and, you know, I don't want to --
21    the easiest thing for me to do would be to deny it,
22    frankly, but I want to do the right thing, of course,
23    and I want to make sure both sides get a fair trial.
24    And I may deny it. I don't know. But I'm not going to
25    force Mr. Highsmith to bring in his people early on
26    Monday morning to accommodate, I guess, Mr. Bergerson.
27    So what I will say is that prior to these
28    people testifying, whether it's Mustard or the fellow

| | |
|---|---|
| 1 | we get there, but we might not get there, because I |
| 2 | might 1118 him because he can't prove my client was at |
| 3 | the scene because he doesn't get his cell phone stuff |
| 4 | in. And, see, that -- because we have to prove that |
| 5 | beyond a reasonable doubt, that's the test of an 1118. |
| 6 | THE COURT: That's fine. I'll deal with that |
| 7 | when it occurs, but the trial is set to begin on |
| 8 | Monday, and we are going to start picking a jury on |
| 9 | Monday. |
| 10 | Now, there's a motion here by the defense. |
| 11 | Motion to require the prosecution to refer to itself as |
| 12 | the State or the Government rather than the People. |
| 13 | MR. BERGERSON: Mr. Russo and I attend the |
| 14 | same seminars. |
| 15 | THE COURT: I understand. |
| 16 | MR. HIGHSMITH: I think it says on the |
| 17 | caption, People of the State of California versus |
| 18 | Marquis Davis. That's who we are. That's who I |
| 19 | represent, and I think I should be able to refer to |
| 20 | myself and -- |
| 21 | THE COURT: Okay: Do you have anything other |
| 22 | than what is in your pleadings to support your |
| 23 | position? |
| 24 | MR. BERGERSON: Constitution of the United |
| 25 | States, by George. No, nothing. |
| 26 | MR. HIGHSMITH: It says, "We the People." |
| 27 | MR. BERGERSON: Nothing, Judge. |
| 28 | THE COURT: Submitted? |

```
 1                    MR. BERGERSON:  Yes.
 2              THE COURT:  Okay.  Your request is denied.
 3              Now, here is a notice of motion to amend the
 4    Information.  What is that all about, Mr. Highsmith?
 5              MR. HIGHSMITH:  I filed that because, in my
 6    research, I realized -- I should have known this and I
 7    did know at one time and I forgot -- that assault with
 8    a firearm is not a lesser included of attempted murder.
 9    So I thought that it would be prudent of me to add a
10    count to allege assault with a firearm along with the
11    other --
12              THE COURT:  In the alternative, is that it?
13              MR. HIGHSMITH:  Well, no, it's not -- it's
14    just --
15              THE COURT:  Well, it is in the alternative.
16              MR. HIGHSMITH:  It's not.
17              THE COURT:  It's not?
18              MR. HIGHSMITH:  No.  You can't punish him for
19    both, but they can certainly find him guilty of both.
20    This is a lesser related offense, and therefore, as you
21    know, it's not going to be part of -- it's not going to
22    be a lesser included of attempted murder.  So I thought
23    I would want to have the jury to have that option in
24    case for some reason they didn't feel that the
25    defendant is guilty of attempted murder.
26              MR. BERGERSON:  Gee, Judge, you know, see
27    here I am in this difficult position because, see, I
28    can kind of like the same outcome, if I were to ask for
```

54

1    THE COURT: Well, is it relevant to whether
2    this defendant fired the gun on the 16th, or is it
3    relevant that he fired the gun on the 13th?

4    MR. HIGHSMITH: On the 13th. And I'm not
5    offering any evidence that he was arrested regarding
6    shots fired. I'm not offering that. I'm not even
7    having any evidence of that. I'm just going to have
8    evidence that he was in custody on such and such a day.

9    THE COURT: So Mr. Bergerson, you want me to
10   exclude any reference to the results of the gunshot
11   residue test that was done shortly after your client's
12   arrest on the 16th?

13   MR. BERGERSON: I do, Your Honor. And unless
14   the Court is prepared to do it, I had two other reasons
15   that I wanted to articulate for the record.

16   THE COURT: Why don't you start over. Give
17   me one, two, three.

18   MR. BERGERSON: Okay. One, I'm now just
19   becoming aware of the circumstances of Mr. Davis'
20   arrest, and I as yet actually have no discovery on the
21   gunshot residue evidence.

22   I received from Mr. Highsmith when we first
23   heard about this on Thursday, the summary GSR report, a
24   one-paragraph report that says that GSR evidence was
25   found on the defendant. I went through my file, and
26   what I found in my file is evidence that there was a
27   gunshot residue swab collected. I was aware of that,
28   but I assumed it wasn't tested because why would it

EXHIBIT (C)(1)                                    74

```
 1    have been tested?  There was no material connection
 2    between Mr. Davis's arrest and the --
 3             THE COURT:  Is there some expert's report
 4    floating around out there that would have been
 5    generated at or near the time of your client's arrest?
 6             MR. BERGERSON:  Well, that's the second
 7    problem in the discovery.
 8             THE COURT:  Let me ask Mr. Highsmith.  Do you
 9    have -- forget the summary that Mr. Bergerson just
10    referred to.  Do you have a report that says "I'm a GSR
11    expert, and on January 5th of '05 at the request of the
12    Vallejo Police Department, I examined a couple of bags
13    that had been placed on the hands of Mr. Davis"?
14             MR. HIGHSMITH:  Yes.
15             THE COURT:  You have a report like that?
16             MR. HIGHSMITH:  Yes, I do.
17             THE COURT:  When did you provide that to the
18    defense, whether it was Mr. Bergerson or the other
19    lawyer, Ms. Kauffman?  Do you know?
20             Are you saying you never got that report?
21             MR. BERGERSON:  I'm -- I'm now actually in a
22    state of wonderment, because I've asked Mr. Highsmith
23    if he had the report.  And by that, I mean, what I
24    ordinarily get in GSR cases, you know, the pictures of
25    the things that look like cannon balls that they take
26    off the people.  And Mr. Highsmith told me not five
27    minutes ago that no, he didn't have that.
28             THE COURT:  Well, he just says he has it, and
```

EXHIBIT (C)(2)                                               75

|    |                                                                            |
|----|----------------------------------------------------------------------------|
| 1  | is relevance. There is no relevance to the charge at                       |
| 2  | bar that is derived from the fact that three calendar                      |
| 3  | days later, exactly 72 hours minus an hour, Mr. Davis                      |
| 4  | is found to be having handled a gun within, depending                      |
| 5  | on the checks that you use, the last 20 minutes or the                     |
| 6  | last hour. That's just irrelevant to the charge at                         |
| 7  | bar. I mean, unless the prosecution wants to speculate                     |
| 8  | that the shooting --                                                       |
| 9  | THE COURT: You know, I tend to sort of agree                               |
| 10 | with both of you on this, because it is relevant,                          |
| 11 | because it sends to show that he has handled a fired                       |
| 12 | firearm within three days after somebody is shot and                       |
| 13 | says your client shot him. So the fact that he's got                       |
| 14 | GSR residue, gunshot residue, on his hands is some                         |
| 15 | evidence that he may have handled a fired gun within                       |
| 16 | three days.                                                                |
| 17 | MR. BERGERSON: Yes. But that is not                                        |
| 18 | relevant to the charge at bar. It's relevant to the                        |
| 19 | explanation which is implicit in this report which,                        |
| 20 | again, I am now belatedly receiving, although I have to                    |
| 21 | say that I did have oral reference to it last Thursday.                    |
| 22 | THE COURT: What explanation?                                               |
| 23 | MR. BERGERSON: Which is that the defendant                                 |
| 24 | was arrested at a shots fired scene. So now we are                         |
| 25 | stuck with the following. I have a cure that is worse                      |
| 26 | than the disease, in that in order to explain why the                      |
| 27 | defendant has gunshot residue on his hands, I have to                      |
| 28 | either admit that he was carrying around the gun that                      |

EXHIBIT (C)(3)                                                          80

```
 1    from opposing, because it does give the jury, in a case
 2    where I think we all agree the evidence is substantial
 3    against my client, an option of finding a lesser
 4    offense that carries no possibility of life
 5    imprisonment, whereas the principle charge carries a
 6    possibility of life imprisonment, both in the charge
 7    itself and in the enhancement, which will necessarily
 8    follow from it.

 9              So, therefore, I almost cannot, as a
10    competent lawyer, object to the amendment to the
11    Information. However, the fact that the Information is
12    being amended substantially increases the likelihood
13    that the prosecution is going to obtain a conviction of
14    some sort in this case. And since 245 is not a
15    lightweight crime, it's a conviction for something
16    that's serious. With the great bodily injury, ten year
17    weapons enhancement and the four years for 245, that's
18    a total of -- I'm terrible at math -- 17 years.

19              MR. HIGHSMITH:  I didn't figure it out.
20              MR. BERGERSON:  --'17 years I think that
21    Mr. Davis could be serving as a result of a compromised
22    verdict which is more likely to be reached as a result
23    of this Amended Information.  And I think the sole and
24    exclusive remedy that the Court has is to grant the
25    motion to amend the Information, because number one, I
26    can't oppose it and, number two, I think that there
27    really is a compromise verdict possibility here.  But
28    because the compromise verdict substantially increases
```

EXHIBIT (C)(4)

```
 1   the prosecution's chances of victory, and because I was
 2   not preparing my case around the calculation of those
 3   chances, that the Court follow the United States
 4   Supreme Court decision in Holloway versus Arkansas,
 5   Chandler verse Freytag and a number of other cases that
 6   are directly on point, and grant me my continuance, so
 7   I can think about what is now happening to Mr. Davis.
 8   And that is clear U.S. Supreme Court law, when the
 9   prosecution amends at the last minute to increase its
10   chances of victory, the defense is allowed a
11   , continuance.
12          MR. HIGHSMITH:  If he's objecting, I'll
13   withdraw this thing.  We'll just go on the attempted
14   murder.  I feel really confident about this case.  I'll
15   withdraw it.
16          THE COURT:  Okay.
17          MR. HIGHSMITH:  That's fine.
18          THE COURT:  It's been withdrawn.  Very good.
19          MR. HIGHSMITH:  Thank you.
20          MR. BERGERSON:  Well, see, now, that puts me
21   in a difficult position, whereby just going and
22   articulating Mr. Davis's constitutional right to have a
23   prepared lawyer --
24          THE COURT:  Sir, with all due respect, you
25   are beginning to talk out of both sides of your mouth.
26          MR. BERGERSON:  No, no --
27          THE COURT:  Yes, you are.
28          MR. BERGERSON:  But that's what happens when
```

EXHIBIT (C)(5)                                                84

```
 1   the prosecution gives you a sandbagging motion at the
 2   last minute.
 3              THE COURT:  He's withdrawn his request.
 4              MR. BERGERSON:  I'm not opposed to the
 5   amendment.  We are going to get the attempted voluntary
 6   manslaughter instructions anyway.
 7              THE COURT:  Well, let me ask Mr. Highsmith.
 8   Let's assume that you have withdrawn your request to
 9   amend the Information, and you proceed on Count 1,
10   which is an attempted willful, deliberate, premeditated
11   murder as an attempt.  What lessers do you think that
12   the Court is going to have to give?
13              MR. HIGHSMITH:  At this point, nothing.  I've
14   heard nothing about self-defense.  I've heard no
15   opening statement.  I've heard nothing about
16   self-defense.  Until I hear the defendant take the
17   stand or Tyree Covin take the stand and stay that the
18   victim pulled a gun out and this guy acted in
19   self-defense or thought --
20              THE COURT:  Let's assume there's some
21   evidence that the defendant here was placed in a
22   position where he had an honest, but unreasonable
23   belief in the need to exercise his right to
24   self-defense.  Wouldn't he be entitled to an attempted
25   voluntary manslaughter instruction?
26              MR. HIGHSMITH:  Yes, he would, but not until
27   I hear some evidence of it.
28              THE COURT:  Okay.  And if there's some
```

EXHIBIT (C)(6)                                               85

```
 1   evidence of self-defense, that could be a complete
 2   defense.
 3           MR. HIGHSMITH:  And, of course, if that
 4   happens, all of this discussion we are having now is
 5   kind of moot, irrelevant.
 6           THE COURT:  Are there any necessarily lesser
 7   includeds, like a 245?
 8           MR. HIGHSMITH:  No.  These are lesser
 9   relateds.  And that's why I filed this thing, because I
10   thought, you know, I really ought to have something
11   besides attempted murder, because maybe for some odd
12   reason, the jury is going to think that the defendant
13   accidentally fired off six rounds or maybe they are
14   going to think that he didn't really intend to kill him
15   when he shot him multiple times in the stomach.  And
16   that's why I wanted this.  And I think Mr. Bergerson,
17   if I were in his shoes, and I'm not, I would certainly
18   want it, because it is a compromise verdict, and like
19   he says, it's better serving 15 years than it is 40 to
20   life.
21           MR. BERGERSON:  I do want it.  I do want it.
22           MR. HIGHSMITH:  Fine.  Then I'll file it.
23           THE COURT:  Well, I'm glad we had this
24   conversation.
25           MR. BERGERSON:  I'm just raising a
26   constitutional issue.
27           MR. HIGHSMITH:  Why don't I just file it?
28           MR. BERGERSON:  That's fine.  I was just
```

EXHIBIT (C)(7)

```
1   raising a constitutional issue.
2              THE COURT:  You would prefer it; is that
3   true?
4              MR. BERGERSON:  Yes.  But I would have
5   preferred it to have been timely filed, and that I get
6   to present --
7              THE COURT:  I'm denying your continuance.  If
8   you want it filed, then bring it on up here.
9              (Document handed to the Court.)
10             MR. HIGHSMITH:  I think I gave you a copy,
11  right?
12             MR. BERGERSON:  Well, it's a 245, right?
13             MR. HIGHSMITH:  Yeah.
14             THE COURT:  Let's take a look at our -- well,
15  first of all, Mr. Bergerson, do you have a copy of the
16  Amended Information?
17             MR. BERGERSON:  I believe I do.  Hold on.
18             MR. HIGHSMITH:  I think I gave you mine.
19             MR. BERGERSON:  I mean, I know I do.
20             ' MR. HIGHSMITH:  I gave you the pink one.
21             ' MR. BERGERSON:  No, I have a fax.
22             MR. HIGHSMITH:  Here.  This is yours.
23             MR. BERGERSON:  Now I have two copies of it.
24             THE COURT:  Would you please enter a plea to
25  Count 2 and perhaps the enhancements?
26             MR. BERGERSON:  Okay.  With respect to the
27  Amended Information, formal instruction, arraignments
28  are waived.  The irregularities already objected to are
```

EXHIBIT (C)(8)                                          87

```
 1    not, but otherwise all other irregularities are waived,
 2    and the plea would be not guilty as to both counts.
 3              THE COURT: And deny all the enhancements?
 4              MR. BERGERSON: Yes.
 5              THE COURT: Mr. Highsmith, would you please
 6    look at your Amended Information, because I want to see
 7    if this is the language you want me to give this jury.
 8    So it's alleged December 13th of '04, the defendant
 9    committed a felony, attempted, willful, deliberate
10    premeditated murder, attempted 664/187. The defendant
11    did unlawfully with malice aforethought attempt to
12    murder a human being. You want that, right?
13              MR. HIGHSMITH: Yes.
14              THE COURT: Okay. Lines 20 and 21 should not
15    be given, true?
16              MR. HIGHSMITH: That's right.
17              MR. BERGERSON: This is on page 1?
18              THE COURT: I'm still looking at page 1.
19              MR. HIGHSMITH: Yes. That should not be
20    given.
21              THE COURT: Okay.
22              MR. HIGHSMITH: 22 and --
23              THE COURT: You wanted 22 and 23, though,
24    right?
25              MR. HIGHSMITH: Yes.
26              THE COURT: And --
27              MR. BERGERSON: Isn't there a case, by the
28    way, that says that you are not supposed to have a jury
```

EVEDIT (C)(9)

# EXHIBIT COVER PAGE

| D |
|---|

EXHIBIT

Description of this Exhibit: PETITIONER DAVIS'S MOTION TO

WITHDRAW PLEA OF GUILTY PURSUANT TO P.C. 1018 DUE TO
SEAN WYDERMYER "RECANTED" TESTIMONY ON 5/24/07

Number of pages to this Exhibit: __29.__ __ pages.

JURISDICTION: (Check only one)

| | Municipal Court |
|---|---|
| X | Superior Court |
| | Appellate Court |
| X | State Supreme-Court |
| X. | United States District Court |
| | State Circuit Court |
| | United States Supreme Court |
| | Grand Jury |

```
 1                      AFTERNOON SESSION
 2                          -o0o-
 3              (Continuing proceedings re Jury Voir
 4              Dire held and reported, but not
 5              transcribed.)
 6              (PROSPECTIVE JURY PANEL NOT PRESENT.)
 7              MR. HIGHSMITH:  Your Honor --
 8              THE COURT:  Yes.
 9              MR. HIGHSMITH:  -- can I say one thing?
10              THE COURT:  Yeah.
11              MR. HIGHSMITH:  This offer is not on the
12       table at five o'clock tonight.  And, in fact, it's not
13       on the table when the jury is sworn in.  Once the jury
14       is sworn in, it's not on the table.
15              THE COURT:  Whoa, whoa, whoa, whoa, whoa.
16       What is the problem?  Wait a minute.
17              MR. BERGERSON:  Maybe we should --
18              MR. HIGHSMITH:  As soon as the jury is sworn
19       in, the offer is off the table.
20              MR. BERGERSON:  Here's the situation.
21       There's an offer in the case.  I'll just be candid with
22       this, what the hell, on the record.  There has never
23       been an offer previous to today in this case that's in
24       any way reasonable.  When I spoke with Mr. Highsmith,
25       we were talking 35 to 40 year kind of offers.  The
26       mandatory minimum penalty in this case if Mr. Davis
27       falls on all allegations is, I guess, 40 years to life.
28              THE COURT:  Okay.
```

EXHIBIT (C)(10)                                               113



```
 1 │ we are here today because Mr. Bergerson has filed a
 2 │ motion to withdraw a previously entered plea of guilty,
 3 │ and I have read that and then there's a response from
 4 │ the D.A. which was prepared by Mr. Mullins and
 5 │ basically in opposition, right?  Okay.  So that's why
 6 │ we are here.
 7 │         MR. BERGERSON:  You didn't get the other two
 8 │ documents?
 9 │         THE COURT:  What?  No.
10 │         MR. BERGERSON:  Okay.
11 │         THE COURT:  I got your motion, and there's a
12 │ couple of exhibits.
13 │         MR. KAUFFMAN:  There were two motions.  I
14 │ received them May 24th.
15 │         THE COURT:  Today is May 24th.
16 │         MR. BERGERSON:  Yeah.  No, I mailed them.  I
17 │ got the response on Friday, and then I mailed out on
18 │ Monday or whenever it was, Tuesday, a reply which you
19 │ might want to glance it.
20 │         THE COURT:  Never seen it.
21 │         MR. KAUFFMAN:  There was a response and there
22 │ was a motion to continue.
23 │         MR. BERGERSON:  There was a motion to
24 │ continue, but that's been taken care of, I think,
25 │ because my -- there was an allegation that I probably
26 │ shouldn't have any future contact with this victim
27 │ witness.  And that's not a problem anymore.  It would
28 │ have presented a problem my serving him, but Officer
```

```
 1                    MR. BERGERSON:  Yes.
 2                    THE COURT:  Really?
 3                    MR. BERGERSON:  Yes.
 4                    MR. KAUFFMAN:  Mr. Mullins cited Watts.
 5                    MR. BERGERSON:  And I considered it.
 6    Obviously, I didn't cite it in my initial memorandum.
 7                    MR. KAUFFMAN:  In fact, if I may interrupt,
 8    Mr. Bergerson at page 2, line 19, actually says "Watts"
 9    and he means "Davis."
10                    THE COURT:  Oh.
11                    MR. KAUFFMAN:  Because it was referred to a
12    number of times.
13                    THE COURT:  Well, I found it on something on
14    my computer, and it's a withdrawal of a previously
15    entered plea of guilty or no contest --
16                    MR. KAUFFMAN:  Right.
17                    THE COURT:  -- under a situation where the
18    defendant allegedly over-estimated the D.A.'s case.
19                    MR. KAUFFMAN:  Right.
20                    THE COURT:  And Watts stands for the
21    proposition that a mistake of fact regarding the
22    strength of the prosecution's case is not good cause
23    for withdrawing a guilty plea.
24                    MR. BERGERSON:  Yeah, yeah.  And here is what
25    I said in my reply memorandum.  This is at page 2 --
26    I'm sorry, the document, the response memorandum, page
27    2 starting at line 10.  I need to get new bifocals,
28    Judge.
```



1    Watts' claim is very different from that at
2    bar.  Here the State's case consisted primarily of
3    Wydermyer's statements that Davis shot him, but
4    Mr. Wydermyer has now recanted.  This is not,
5    therefore, a motion in which the defendant seeks to
6    withdraw his plea because the defendant was
7    subjectively mistaken about the strength of the State's
8    evidence.  It is, rather, a case in which the chief
9    statement, the victim has recanted, a case in which the
10   evidence has objectively shifted in Mr. Davis's favor.
11   And they really are different.  Watts goes and doesn't
12   realize that at some future point the person he thought
13   was going to testify against him, he actually doesn't
14   mention it at the trial of a co-defendant.  That means
15   that he subjectively misvalued his own case.  This is a
16   case in which there's essentially new evidence that
17   could not have been discovered in the exercise of
18   diligence.  Specifically, that on reflection, Mr.
19   Wydermyer has decided that Mr. Davis may very well not
20   be the person who shot him.
21            And this is fortunate that this has developed
22   during a period of time where it's not too late for a
23   fair trial to be had for a possibly innocent man.  What
24   I was going to say in connection with the Court's
25   observation, this probably is not a typical
26   circumstance.  Usually, a person is sentenced about 30
27   days from date of their plea, and you have to imagine
28   that a prosecution witness would objectively recant and

1    then come forward during that period for the issue we
2    have here even to arise.  And I think that's actually a
3    fairly unlikely scenario.

4            Second of all, in order to get an appellate
5    decision that says that the person has a right to
6    withdraw his plea at that juncture, you'd have to.
7    assume that the judge who heard that claim decided it
8    wrongly, because it would only be the defendant who
9    would appeal.  For all I know, this has happened before
10   but it was resolved favorably to the defendant in the
11   trial court.

12            So it seems to me that the absence of
13   specific case authority shouldn't be a bar to our
14   prevailing on the motion here in that this is both a
15   rare set of circumstances, and that judicial error is
16   probably even rarer.

17           THE COURT:  Okay.

18           MR. BERGERSON:  And I did site these federal

19   cases.

20           THE COURT:  I saw them, yeah.

21           Now, I'm looking at two cases, the

22   Cal.App.2nd case is People versus Langlois,

23   L-a-n-g-l-o-i-s, 1963.  It's at 220 Cal.App.2d 831,

24   page 834; People versus McGaughran,

25   M-c-G-a-u-g-h-r-a-n, 1961 case, 197 Cal.App.2d 6 at

26   page 17.  I sort of agree with Mr. Bergerson that there

27   doesn't appear to be a lot of law in this area.  But

28   these two cases stand for the proposition, which I

| 1 | MR. BERGERSON: Your Honor, if I can say it |
| 2 | fairly, I pretty much clubbed him over the head with |
| 3 | the 43 year to life top, and I think the Court kind of, |
| 4 | you know, said, "Listen to Mr. Bergerson, he's a good |
| 5 | lawyer." There was very nice other things that you |
| 6 | said. |
| 7 | THE COURT: Why didn't you enter the plea |
| 8 | pursuant to People versus West? |
| 9 | MR. BERGERSON: Pardon me? It was -- a West |
| 10 | plea is a plea bargain. You mean an offered plea? |
| 11 | THE COURT: A West plea is you are not |
| 12 | admitting guilt. What you are doing is you are |
| 13 | accepting a plea bargain to avoid a more serious |
| 14 | consequence. |
| 15 | MR. BERGERSON: I think that that was |
| 16 | relatively clear from the discussions we had that are |
| 17 | not necessarily important. I could characterize it |
| 18 | fairly as an offered plea. Mr. Davis was saying at all |
| 19 | times that he was -- |
| 20 | THE COURT: What do you want to do today? |
| 21 | MR. BERGERSON: Well, if the Court wants to |
| 22 | hear from Mr. Wydermyer, that may be appropriate. |
| 23 | THE COURT: Okay. That's fine. I'd be happy |
| 24 | to hear from him. Why not? |
| 25 | MR. KAUFFMAN: Can I just say a couple of |
| 26 | things -- |
| 27 | THE COURT: Yes. |
| 28 | MR. KAUFFMAN: -- along the lines of what |

```
 1  your pleading here and you say that a well-recognized
 2  ground for permitting a defendant to withdraw a guilty
 3  plea is the recantation of the prosecution's
 4  complaining witness.  There is absolutely no support
 5  for this position.
 6             MR. BERGERSON:  You know, I think that -- I
 7  would imagine that based on what he says, if the Court
 8  feels that there is -- you know, it's good cause, fair
 9  and just, whatever the standard is.
10             THE COURT:  Well, the standard is by clear
11  and convincing evidence.  So let's get him in here.
12  Let's get him in here.
13             MR. BERGERSON:  Can I show him my copy of it?
14             THE COURT:  I don't want you to do anything
15  right now.
16             Okay.  Mr. Wydermyer?
17             THE WITNESS:  Yes.
18             THE COURT:  Thank you for waiting, sir.  Head
19  over this way.  We are going to get you sworn.
20             Raise your right hand, please face our clerk.
21             THE CLERK:  Do you swear the testimony you
22  are about to give will be the truth, the whole truth
23  and nothing but the truth, so help you God?
24             THE WITNESS:  Yes.
25             THE COURT:  Okay.  Come on up here, please.
26  Have a seat.
27                       SEAN WYDERMYER
28  called as a witness on behalf of the defense, having
```

```
 1    been duly sworn, was examined and testified as follows:
 2              THE COURT:  Sir, would you please state your
 3    name for the record and spell your last name.
 4              THE WITNESS:  Sean Wydermyer,
 5    W-y-d-e-r-m-y-e-r.
 6              THE COURT:  Okay.  I'm Judge Carter.  I don't
 7    know if we met before.  Remember testifying -- it would
 8    be about two years ago at a preliminary hearing in
 9    front of a different judge, probably same room?
10              THE WITNESS:  Um-hmm.
11              THE COURT:  Do you remember that?
12              THE WITNESS:  Um-hmm.
13              THE COURT:  Have you since that time read a
14    transcript of your comments or testimony at that
15    hearing?
16              THE WITNESS:  Yes.
17              THE COURT:  Who gave you a copy of that?
18              THE WITNESS:  Detective Wentz or Mustard.
19              THE COURT:  Okay.  Mustard or Wentz, one of
20    those --
21              THE WITNESS:  Yeah.
22              THE COURT:  -- Vallejo police officers.
23              Okay.  Now, I'm looking at what is called,
24    can you see this, it says declaration of Sean
25    Wydermyer?
26              THE WITNESS:  Um-hmm.
27              THE COURT:  I, Sean Wydermyer, declare as
28    follows, and there's a page full of stuff there and
```

EXHIBit(D)(7)                                                        142

```
 1   then a second page and then a signature, right?
 2             THE WITNESS: Yep.
 3             THE COURT: Is that you?
 4             THE WITNESS: Yeah.
 5             THE COURT: Did you read this document before
 6   you signed it?
 7             THE WITNESS: Yes, sir.
 8             THE COURT: Okay. And did you ever get a
 9   copy of it? Anybody give you a copy of it?
10             THE WITNESS: Yeah. I have a copy.
11             THE COURT: Okay. All right. These lawyers
12   are going to ask you a few questions about this, okay?
13             THE WITNESS: Okay.
14             THE COURT: So we know what we are taking
15   about, right?
16             THE WITNESS: Yes.
17             THE COURT: Very well.
18             Mr. Bergerson, go ahead.
19                   DIRECT EXAMINATION
20        Q    MR. BERGERSON: Good afternoon,
21   Mr. Wydermyer.
22        A    Good afternoon.
23        Q    Do you recognize me?
24        A    Yes.
25        Q    We met and talked one time; is that correct?
26        A    (Nods head.)
27        Q    14th of May, remember that?
28        A    Yes.
```

```
1          Q    And where was that?

2          A    At -- it was a -- it was a Starbucks.

3               THE COURT:  Was it here in town?

4               MR. BERGERSON:  It starts with Jack.

5               THE WITNESS:  Oh, Jack in the Box.  That was

6     the first location we were supposed to meet at.

7               THE COURT:  Was it in Vallejo?

8               THE WITNESS:  No.  It was in Richmond.

9               THE COURT:  So you are in Richmond at Jack in

10    the Box somewhere?

11              THE WITNESS:  Yeah.

12              THE COURT:  Nighttime?  Daytime?

13              THE WITNESS:  Daytime.

14         Q    MR. BERGERSON:  Now, before I met you there,

15    I had talked to you a couple times on the phone?

16         A    Yeah.

17         Q    Some of those conversations, is it fair to

18    say, were just for me to arrange the circumstances of

19    our meeting, correct?

20         A    Yes.

21         Q    Okay.  And in that respect, do you remember I

22    was late for the meeting?

23         A    Yes.

24         Q    And as a result of that, I gave you $20 and

25    told you to buy lunch?

26         A    Lunch.

27         Q    You didn't sign the declaration because I

28    gave you $20, did you?
```

```
 1        A    No.

 2        Q    Nobody threatened you in any way to get you

 3   to sign the declaration, did they?

 4        A    No.

 5        Q    Anybody make you any promises of money or any

 6   other kind of benefit?

 7        A    Nope.

 8        Q    Did you sign the declaration because it was

 9   true?

10        A    Yes.

11        Q    Okay.  Was it you who first contacted me

12   about this case or was it I who contacted you?

13        A    I contacted you.

14        Q    What made you contact me about this case?

15        A    Just having time to think stuff over, you

16   know.  I can't assume, you know, just because one

17   person went in, there wasn't another person there,

18   especially when I didn't go in for a thorough search.

19   I didn't look through the tub or nothing, you know.  I

20   can't assume, I can't even say that he did it when I

21   didn't look at his face, you know, clothes, you know.

22        Q    We are talking about December 4th, 2004,

23   correct?

24        A    Yeah.

25        Q    You were shot and very badly wounded; is that

26   fair?

27        A    Yeah.

28        Q    You had previously that day arranged to do a
```

1    transaction with a person you know by the nickname of
2    "Pluck"; is that correct?
3         A    Yes.
4         Q    And that person "Pluck" is this person here,
5    Mr. Davis, correct?
6         A    Yeah.
7         Q    But when you got to the location, something
8    happened?  You got shot?
9         A    Yeah.
10        Q    Okay.
11             THE COURT:  Sir, I'm looking at your
12   declaration.  Among other things, you say that "I have
13   determined that I may have been mistaken in saying and
14   later testifying that Mr. Davis shot me."
15             Is that how you feel?
16             THE WITNESS:  Yeah, because you know --
17             THE COURT:  You don't know if you were
18   mistaken, but you may have been mistaken; is that it?
19             THE WITNESS:  Yeah.
20             ' THE COURT:  Did you want to ask any more
21   questions?
22             MR. BERGERSON:  Sure.
23        Q    Let's assume that you were testifying at a
24   hearing before a finder of fact, like a judge at a
25   preliminary hearing or a jury, okay?
26        A    Yeah.
27        Q    And I'm going to pretend to be the prosecutor
28   and I'm going to ask you after you have described how

```
 1   you got shot, you see this man over here, and I'm
 2   pointing to Mr. Davis. Do you see him?
 3        A    Yes.
 4        Q    Is this the man who shot you?
 5        A    I can't -- I can't say that because I was
 6   looking down a barrel, not at a face or any clothes.
 7        Q    This man was in the house; is that correct?
 8        A    Yeah, but I can't say he's the one who did
 9   it.
10             MR. BERGERSON:  Well, I have no questions at
11   this time, Judge.
12             THE COURT:  Okay.  Mr. Kauffman, questions?
13             MR. KAUFFMAN:  Thank you.
14                    CROSS-EXAMINATION
15        Q    MR. KAUFFMAN:  Good afternoon, sir.
16        A    How you doing?
17        Q    We've never met, right?
18        A    No.
19        Q    I've never talked to you?
20        A    (Shakes head.)
21        Q    Looking at your transcript of what happened
22   at the prelim, do you remember testifying that the
23   person who shot you just before that maybe just walked
24   into a bathroom?
25        A    Yeah.
26        Q    Okay.  And the person who walked into the
27   bathroom just before you got shot was the defendant,
28   right, Mr. Davis, right?
```

EXHIBIT (D)(12)                                                147

|     |     |                                                      |
| --- | --- | ---------------------------------------------------- |
| 1   | A   | Yes.                                                 |
| 2   | Q   | So you know that and you are sure of that,           |
| 3   | right? |                                                    |
| 4   | A   | Yes.                                                 |
| 5   | Q   | Did you ever see anybody in the house go into        |
| 6   | that bathroom? |                                             |
| 7   | A   | No, but I can't say there wasn't no one              |
| 8   | already in there. I didn't thoroughly search anything. |          |
| 9   | Q   | Right. Because you didn't go in there and,           |
| 10  | like, as you said, look in the tub and that sort of  |      |
| 11  | thing? |                                                    |
| 12  | A   | Right.                                               |
| 13  | Q   | And there was another person in the house            |
| 14  | other than the defendant, Mr. Davis, right? |                |
| 15  | A   | Yeah.                                                |
| 16  | Q   | What was his name?                                   |
| 17  | A   | I can't remember his name.                           |
| 18  | Q   | Where was that person when you are getting           |
| 19  | shot at? |                                                  |
| 20  | A   | Sitting in the front.                                |
| 21  | Q   | So it definitely wasn't that person who shot         |
| 22  | you, right? |                                                 |
| 23  | A   | No.                                                  |
| 24  | Q   | And you, a number of times, did identify the         |
| 25  | defendant as the person who shot you, right? I think |      |
| 26  | the day this happened, you identified him? |                 |
| 27  | A   | Yeah.                                                |
| 28  | Q   | To Detective Wentz here; is that right?              |

148

1   A   Yeah.

2   Q   And, again, maybe a day or two later,

3   Detective Wentz showed you a photo lineup, and you

4   identified the defendant then, right?

5   A   Yeah.

6   Q   And there was some kind of dying declaration

7   done --

8           MR. BERGERSON:  Excuse me --

9   Q   MR. KAUFFMAN:  -- by the defendant at that

10  point, right?

11          MR. BERGERSON:  Your Honor, it's not a dying

12  declaration, whatever it is.

13          MR. KAUFFMAN:  Well, that's what they called

14  it.

15          THE COURT:  Well, yeah.  That's what they

16  called it.  It sort of calls for a legal conclusion.

17          You were hospitalized, and you knew you were

18  in pretty bad shape, right?

19          THE WITNESS:  Yeah.

20          THE COURT:  And you made a couple of

21  statements, maybe to the doctors and certainly to the

22  police officers.

23          THE WITNESS:  Yeah, that's how all the names

24  and stuff popped up.

25          THE COURT:  Right.

26  Q   MR. KAUFFMAN:  And just to be clear, you

27  identified the defendant by a nickname called Pluck,

28  right?

EXHIBIT (D)(14)                                          149

```
 1        A    Yes.

 2        Q    And you don't know anybody else you call that

 3   name, right?

 4        A    No.

 5        Q    And you testified at a preliminary hearing a

 6   number of months after this, and at that point you

 7   identified the defendant as the person who shot you,

 8   right?

 9        A    Yeah.

10        Q    But now two years later you are saying you

11   are not sure, right?

12        A    Yeah, because I look -- I'm looking at the

13   big picture.  I can't --

14        Q    Sure.

15        A    I can't say that it was him or not.  I really

16   didn't look at his face.  I just went by who I seen

17   went in the bathroom.

18        Q    But you're not saying that it wasn't the

19   defendant, right?

20        A    I'm not saying that it is either.

21        Q    And nobody threatened you --

22        A    No.

23        Q    -- to say this, right?

24        A    Nope.

25        Q    And after you got shot, did the two people

26   you saw in the house, the defendant and somebody else,

27   actually run out?

28        A    I know that the people ran out the house, but
```

```
 1   all I seen was a couple of heads go by the window when
 2   I got up.
 3        Q    And the person -- Tyree, is that it? -- he
 4   was gone after these people fled, right?
 5        A    Yeah.  I heard the footsteps go out the door,
 6   and then when I looked, when I tried to make my way
 7   outside, I seen a couple of heads run by the window.
 8        Q    A couple.  You mean two by a couple?
 9        A    Yeah, but I only looked in one direction.
10   There was two windows I could have looked out of, and I
11   chose to look to my right.
12        Q    So you only saw two people leaving, right?
13        A    I only seen two people pass the window.
14        Q    Okay.  Pass the window.  Two heads pass the
15   window?
16        A    Yeah.
17        Q    There was never like a third person you saw
18   leave the house?
19        A    I didn't look for a third person.  I just saw
20   the two heads.
21             THE COURT:  He's just asking, did you see a
22   third person?
23             THE WITNESS:  No.
24             THE COURT:  Did you hear a third person?
25             THE WITNESS:  I don't recall.
26        Q    MR. KAUFFMAN:  You got shot and that made a
27   pretty loud noise, right?
28        A    Yeah.  It wasn't -- it wasn't really all that
```

```
1          A     I'm terrible with days.
2                THE COURT:  About three weeks ago?
3                THE WITNESS:  Yeah.
4          Q     MR. KAUFFMAN:  So sometime between then and
5    now, you've now signed this declaration and that's
6    different from what you told Detective Wentz, right?
7          A     It's not different.  It's actually giving a
8    different perspective on it.
9                MR. KAUFFMAN:  Thank you.  Nothing further.
10               THE COURT:  Mr. Bergerson, any questions?
11               MR. BERGERSON:  Sure.
12                    REDIRECT EXAMINATION
13         Q     MR. BERGERSON:  Let me just get the sequence
14   of what you saw at that house on the 4th of December.
15   Is it your testimony that you saw Pluck for the last
16   time, knowing him to be Pluck, when he went into the
17   bathroom?  Is that what you are saying?
18         A     Yes.
19         Q     And then you just saw a gun being fired?
20         A     Yes.
21         Q     That's all you focused on?
22         A     Yes.
23         Q     With respect to the conversation you had on
24   the phone with Detective Wentz, do you remember that
25   line for line, or do you just --
26         A     No.  I don't remember it line for line.
27         Q     Okay.
28         A     I have a terrible memory especially after the
```

```
 1                THE COURT:  Go ahead.  Take your time.
 2        Q    MR. BERGERSON:  Do you have an explanation,
 3   yes or no, as to --
 4                THE COURT:  You can't limit his answer to yes
 5   or no.
 6        Q    MR. BERGERSON:  Do you --
 7                THE COURT:  He can expand on his answer if he
 8   wants.
 9        Q    MR. BERGERSON:  Do you have an explanation as
10   to what it is that you were thinking at the time you
11   told Detective Wentz "No, I don't want to change
12   anything in my statement"?
13        A    Yeah, I do.  I'm not going to change what I
14   was saying as far as what I seen and as far as when I
15   got there, but it's a different point of view.  I can't
16   say that someone did something when I didn't see him,
17   see his face, clothes, nothing.  I was just looking at
18   a weapon.  That's all I was looking at, and it was
19   close enough for it to be the only thing.  It was
20   closer than this mike in my face right now for me to be
21   looking at, so --
22                MR. BERGERSON:  Okay.  I have no further
23   questions.
24                THE COURT:  Anything else, Mr. Kauffman?
25                MR. KAUFFMAN:  Just to clarify.
26                     RECROSS-EXAMINATION
27        Q    MR. KAUFFMAN:  You knew the defendant, what,
28   eight months to a year prior to when the shooting
```

```
 1    happened?
 2           A    Yeah.
 3           Q    You had known him for a while?
 4           A    Maybe longer, yeah.
 5           Q    You knew him well enough to arrange this deal
 6    with him, right?
 7           A    Yeah.
 8                MR. KAUFFMAN:  Thank you.  Nothing further.
 9                THE COURT:  Mr. Bergerson, anything else?
10                    FURTHER REDIRECT EXAMINATION
11           Q    MR. BERGERSON:  Was it your belief at the
12    time that the shooting took place that there was a
13    person who had targeted you for some sort of
14    retaliatory hit over a drug deal?
15                MR. KAUFFMAN:  Objection, leading.
16                THE COURT:  Sustained.
17           Q    MR. BERGERSON:  Okay.  Did you believe that
18    you were in danger from somebody even before you got
19    shot?
20           A    I've heard a few things, but it was from more
21    than one character, just over some jealousy stuff.
22           Q    Did any of those things involve Mr. Davis?
23           A    No.
24           Q    Mr. Davis had a good relationship with you
25    until that time?
26           A    Yeah.  That was -- that's another reason that
27    had me thinking, no motive, no reason.
28                MR. KAUFFMAN:  Okay.  All right.  Well, I
```

1    have no further questions.
2              THE COURT: Anything else, sir?
3              MR. KAUFFMAN: No thank you.
4              THE COURT: Okay. Thank you for coming down.
5    Step down. You are free to go. All right?
6              THE WITNESS: All right.
7              THE COURT: Thank you.
8              Did you want to call another witness?
9              MR. BERGERSON: I don't want to call another
10   witness.
11             THE COURT: Do you want to call any witness?
12             MR. KAUFFMAN: I don't think it's necessary.
13             THE COURT: Okay. I think I'll hear from Mr.
14   Bergerson. He has the burden of proof here.
15             MR. BERGERSON: Well, a couple of things.
16   First of all, I think when the Court considers this
17   motion, it should expand the scope of it in two small
18   respects. One is that unanticipated by me, there was a
19   statement by Mr. Wydermyer that basically his general
20   memory is bad, and I think that that may be
21   significant, because, you know, in general,
22   Mr. Wydermyer seems to be a person who might not have
23   been that impressive as a prosection witness in the
24   first place, given the manner in which he claims to
25   have identified Mr. Davis in the first place.
26             I say all this because I want to make sure
27   that the Court understands what we are dealing with is
28   a real person's life and the implications of granting

```
 1    or not granting this motion. I tend to think that
 2    Mr. Davis got a fairly good disposition in this case,
 3    if the evidence against him --
 4              THE COURT: Go ahead.
 5              MR. BERGERSON: -- if the evidence against
 6    him is regarded as objectively strong. I must say as a
 7    practitioner of some years of experience, I don't
 8    regard the evidence at this point as being nearly as
 9    strong as I would have believed it objectively to be,
10    based on Mr. Wydermyer's previous statements as
11    unexplained by his objective new statement today.
12              We have here, fortunately, an opportunity to
13    correct something that could have been an injustice,
14    which is the conviction by plea under the face -- in
15    the face of potentially catastrophic consequences of
16    Mr. Davis simply because he had reason to believe that
17    he could be convicted of a certain testimony of
18    Mr. Wydermyer. We now know that testimony is not
19    certain.
20              This is not the same thing as Watts, where
21    the defendant just over-estimated the strength of the
22    prosecution case. This is an objective new development
23    that could not have been foreseeable or discovered in
24    due diligence at the time of the trial.
25              Apparently Mr. Wydermyer decided, having
26    heard that Mr. Davis pleaded guilty, that having
27    thought about it, he couldn't abide in his own
28    conscious Mr. Davis going to prison for however long
```

1  and however comparatively less it would have been than
2  had he been convicted and decided to come forward and
3  prevent the prison term from happening at all.  And I
4  think the Court should respect this victim's testimony
5  and give the defendant a shot at a fair trial.

6          THE COURT:  Mr. Kauffman, what is the D.A.'s
7  view?

8          MR. KAUFFMAN:  I think even if you do believe
9  what Mr. Wydermyer says here today, it's still an
10  extremely strong circumstantial case.  You know, the
11  defendant goes into this bathroom, and moments later,
12  someone returns out and starts firing.  Mr. Bergerson,
13  before that hearing, tried to suggest it was this other
14  person in the house, but as the victim clearly said,
15  there's another person sitting on the couch and never
16  had anything do with this.

17          THE COURT:  I have a question for you.  Was
18  the cigarette butt with this other person's DNA on it
19  located inside the house, and if so, where?

20          MR. KAUFFMAN:  It was located inside the
21  house, but I don't --

22          THE COURT:  Was it in the bathroom?

23          MR. BERGERSON:  I think it was.

24          MR. KAUFFMAN:  I know the defendant's
25  cigarette butt was in the bathroom, but I think it's
26  clear from what the witness said today --

27          THE COURT:  At the time somebody went in
28  there and came out shooting --

EXHIBIT (D)(22)                                    164

```
 1 |              MR. KAUFFMAN:  Right.
 2 |              THE COURT:  -- the second person --
 3 |              MR. KAUFFMAN:  -- is somewhere on the couch,
 4 | luxuriating, had nothing to do with it.  So that hasn't
 5 | changed.  So what we have to believe is there is some
 6 | hidden third person there who no one ever sees leave
 7 | because the victim sees only these two people leaving
 8 | from this house.
 9 |              So I think this is exactly like Watts.  You
10 | know, this objective/subjective distinction that
11 | Mr. Bergerson tries to make, I think is one that makes
12 | no difference in this situation, even if it's true,
13 | which I don't think it is.  I think it's remarkably
14 | close to Watts, if not on all fours with it.
15 |              I think what you have is just a person who
16 | has known the defendant for a long time, reflected on
17 | this and is sort of regretting the situation.  He
18 | thinks he was responsible.  I think that the abundance
19 | of his statement implicating the defendant would be
20 | fatal to the defendant at any trial, and I don't think
21 | this is a situation where the defendant should be
22 | allowed to withdraw his plea simply because this may
23 | have changed.
24 |              THE COURT:  Okay.
25 |              MR. BERGERSON:  Judge, first of all, on the
26 | legal standard, I don't have to prove by clear and
27 | convincing evidence that this testimony establishes the
28 | right of Mr. Davis during a trial.  I just have to
```

```
 1   prove that it establishes good cause for withdrawing
 2   the plea and that the evidence is substantial.  In
 3   other words, that there's a sufficient quantity of it
 4   to allow the Court to make whatever inferences we seek
 5   to draw from it.
 6              I think that there's a hundred percent
 7   certainty from this evidence that Mr. Wydermyer has
 8   changed the key aspect of his story, and that's the
 9   identification of Mr. Davis.  In that respect, this is
10   a hundred percent opposite from the circumstance we saw
11   presented in Watts.  In Watts, there was a failure on
12   the part of the testifying witness to even mention
13   Mr. Watts, which led -- in the trial of the
14   co-defendant, which led Mr. Watts to allege that he
15   over-estimated the strength of the State's case.
16              Here, there's an explicit denial by
17   Mr. Wydermyer that he can identify Mr. Davis as the
18   person who shot him.  It's just a different set of
19   circumstances.  The Court can rule according to its own
20   interpretation of the law, but that law should not be
21   dictated by Watts, which really involves different
22   circumstances than those presented at bar.
23              I don't have with me, by the way, the DNA
24   report on the case.  My recollection is that there were
25   three cigarettes butts found in the bathroom:  One from
26   Mr. Davis, one from Mr. Covin and one unidentified, but
27   I don't want to say that as a court officer, because
28   it's been almost a year -- well, six months at least
```

```
 1   since I've looked at the police report.  If Detective
 2   Wentz, who is looking through it has the report, that
 3   might help me refresh my recollection, and I would make
 4   an offer of proof to the Court, because I think that
 5   that may be -- it could be important.  It might not.
 6            MR. KAUFFMAN:  I just want to point out one
 7   thing.
 8            THE COURT:  What?
 9            MR. KAUFFMAN:  Mr. Wydermyer didn't get up
10   there and say it wasn't the defendant who shot him.  He
11   says he's now not sure.  Mr. Bergerson is making it
12   sound like that's what he did.
13            THE COURT:  Well, he's arguing his case.
14            MR. BERGERSON:  I don't think I said that.  I
15   said that he couldn't identify him with a hundred
16   percent certainty.  He basically said "I was looking at
17   a gun," which probably is true.
18            THE COURT:  We are all familiar with the
19   concept of weapon focus, and the identification experts
20   will say identification is questionable because of the
21   cross-racial nature, which doesn't apply here, or
22   weapon focus, and that apparently has been shown, that
23   people that get guns or knives pointed at them will
24   look at that gun or knife and not the height, weight,
25   appearance of the perpetrator.
26            In any event, do the two of you want to
27   submit it?
28            MR. BERGERSON:  I just want to make one more
```

| 1 | comment. |
| 2 | THE COURT: Okay. |
| 3 | MR. BERGERSON: I agree with Mr. Kauffman |
| 4 | that this is a highly plausible circumstantial case. I |
| 5 | think that's the reason that Mr. Wydermyer made the |
| 6 | identification of Mr. Davis, which he now thinks may be |
| 7 | mistaken, and because Mr. Davis was in the house, |
| 8 | because he was dealing with him, because there was a |
| 9 | drug deal that was going on, so he assumed it was |
| 10 | Mr. Davis. But now we have explicit testimony that he |
| 11 | was focusing on the weapon, he can't say with a hundred |
| 12 | percent certainty that it was Mr. Davis. I think that |
| 13 | any competent lawyer capable of fogging a mirror could |
| 14 | go and argue to a reasonable doubt to a jury that this |
| 15 | identification that was made at the preliminary hearing |
| 16 | was not accurate and could argue that the individual |
| 17 | before the jury, Mr. Davis, is not guilty. |
| 18 | So I think that there is good and sufficient |
| 19 | cause for Mr. Davis to proceed to trial if he so |
| 20 | chooses to do. I cannot irrigate to myself the task of |
| 21 | dictating to him that he must avoid a trial, simply |
| 22 | because the odds of him losing are significant, which |
| 23 | they still would be, but I think there might be a very |
| 24 | good claim for reasonable doubt, and because the |
| 25 | punishment would be drastic if he were convicted. |
| 26 | I think that in the interest of justice, |
| 27 | which is, after all, what Section 1018 is about, the |
| 28 | Court should allow him to proceed to trial and let him |

| 1 | withdraw his plea, and I would submit. |
| 2 | THE COURT: Submitted? |
| 3 | MR. BERGERSON: Submitted. |
| 4 | THE COURT: Okay. Well, Penal Code Section |
| 5 | 1058 authorizes motions to withdraw guilty pleas, |
| 6 | provides basically that a trial court may grant such a |
| 7 | motion for a good cause shown, and as a general rule, a |
| 8 | plea of guilty may be withdrawn for mistake, ignorance |
| 9 | or inadvertence or any other factor overreaching the |
| 10 | defendant's free and clear judgment, meaning at the |
| 11 | time he entered the plea. The defendant has the burden |
| 12 | of proving grounds for withdrawal of the guilty plea by |
| 13 | clear and convincing evidence, and I agree with |
| 14 | Mr. Bergerson that he's got to show good cause. And |
| 15 | he, of course, thinks he has. |
| 16 | I think the general rule, as I articulated in |
| 17 | these two cases from the '60s, is that cases involving |
| 18 | a victim's recantation, our appellate courts have |
| 19 | cautioned repeatedly that a witness's offer to retract |
| 20 | sworn testimony should be viewed with suspicion and |
| 21 | given little credence. |
| 22 | And I listened to this gentleman, and I think |
| 23 | that Mr. Wydermyer basically has a little bit of |
| 24 | buyer's remorse. After all, what he says is the same |
| 25 | in the declaration that Mr. Bergerson prepared and he |
| 26 | signed, he basically said the same thing here ten |
| 27 | minutes ago, that is, that he may have been mistaken in |
| 28 | saying and later testifying that the defendant, Mr. |

```
 1 | Davis, shot me.
 2 |                I don't think you've carried your burden of
 3 | proof. I think this defendant got what he asked for.
 4 | He got the benefit of his bargain. He got a case,
 5 | which could have resulted in over 40 years to life,
 6 | reduced to a case where he was going to receive 25
 7 | years.
 8 |                So your motion to withdraw his previously
 9 | entered plea is denied.
10 |                MR. BERGERSON: Thank you very much for
11 | considering it.
12 |                THE COURT: You're welcome. Is he ready to
13 | be sentenced?
14 |                MR. BERGERSON: Yes. No legal cause. I've
15 | looked at the probation report a long time ago. I
16 | don't remember anything particularly egregious about it
17 | that I would object to.
18 |                THE COURT: Do you want to submit it, Mr.
19 | Kauffman?
20 |                MR. KAUFFMAN: Yes.
21 |                THE COURT: Okay. Arraignment having been
22 | waived, no legal cause, it appears to me the interest
23 | of justice would not be served by granting the
24 | defendant probation, so I'm going to deny him
25 | probation.
26 |                The Court having denied probation, it's the
27 | judgment of this Court that the defendant be committed
28 | to the California Department of Corrections for the
```

# EXHIBIT COVER PAGE

| E |
|---|

EXHIBIT

Description of this Exhibit: DECLARATION OF SEAN WYDERMEYER
EXECUTED ON 5/14/07

Number of pages to this Exhibit: _____2.____ pages.

JURISDICTION: (Check only one)

| | Municipal Court |
|---|---|
| X | Superior Court |
| | Appellate Court |
| X | State Supreme Court |
| X | United States District Court |
| | State Circuit Court |
| | United States Supreme Court |
| | Grand Jury |

1

2                  DECLARATION OF SEAN WYDERMEYER

3

4        I, SEAN WYDERMEYER, declare as follows:

5        I was the complaining witness against Marquis Davis. I recall having

6   testified at his preliminary hearing that he shot me. I recall having made

7   previous statements consistent with my said testimony.

8        Several months ago, I learned that Davis had pleaded guilty to the charge

9   of having shot me. In thinking about the case both before and after I learned of

10  Davis' said plea, I have determined that I may have been mistaken in saying,

11  and later in testifying, that Davis shot me. I am now uncertain of the truth of

12  my statements in this regard. I myself have a doubt as to whether Davis shot

13  me. I would be prepared to testify to this doubt to any Court or any jury should

14  Davis be permitted to withdraw his plea and go to trial.

15       I am aware that if I sign this declaration, I will have to testify regarding

16  its contents at a hearing. I am further aware that if Davis is permitted to

17  withdraw his plea, I will have to testify at trial. I am aware that my statement

18  here is not consistent with my prior testimony at Davis' preliminary hearing

19  and that the prosecution might decide to say that I perjured myself either at

20  that hearing, or in making this statement and in testifying consistently with it

21  any any of the above-referenced prospective hearings. I nevertheless make this

22  statement of my own free will. No one has offered me any inducements to make

EXHIBIT (E)(1)                    8

1   this statement, or to testify in any fashion hereafter. I make this statement,

2   and proffer my future testimony exclusively because it is true.

3       I declare under penalty of perjury that this is true.

4       EXECUTED: Richmond, county of Contra Costa, state of California, this

5   May 14, 2007.

6

7                         SEAN WYDERMEYER

8 .

9                   PROOF OF SERVICE BY MAIL

10

11       I, DONALD THOMAS BERGERSON, declare that I am over 18 years old

12   and not a party hereto and that I mailed a true copy hereof to DISTRICT

13   ATTORNEY, attn. GEORGE WILLIAMSON, Chief Deputy, c/o branch office at

14   321 Tuolomne Ave., Vallejo, CA., 94590, on May 14, 2007.

15       EXECUTED: City and County of San Francisco, California, this May 14,

16 ' 2007.'

17

18                   DONALD THOMAS BERGERSON

# EXHIBIT COVER PAGE

| F |
| --- |

EXHIBIT

Number of pages to this Exhibit: ___1.___ pages. REASONS FOR STAY AND
ABEYANCE IS NEEDED,BECAUSE FEDERAL CLAIMS ARE NOW
PENDING BEFORE THE CALIFORNIA SUPREME COURT CASE NO.
S-178177

JURISDICTION: (Check only one)

|   | Municipal Court |
| --- | --- |
| X | Superior Court |
| X | Applellate Court |
|   | State Supreme Court |
| X | United States District Court |
|   | State Circuit Court |
|   | United States Supreme Court |
|   | Grand Jury |

Name: MARQUIS M. DAVIS

Address: CSP CORCORAN

PO. BOX 3461

CORCORAN      CA. 93212

CDC or ID Number: F-79213

ORIGINAL

RECEIVED

NOV 2 3 2009
SUPREME COURT OF CALIFORNIA

EN BANC      CLERK SUPREME COURT

(Court)

| MARQUIS M. DAVIS | PETITION FOR WRIT OF HABEAS CORPUS |
|---|---|
| Petitioner | S178177 |
| vs. | No. |
| | (To be supplied by the Clerk of the Court) |
| Respondent MAURICE JUNIOUS | Super Ct.no.VCR176744 |

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court; you only need to file the original unless local rules require additional copies Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and 4 copies of the petition and, if separately bound, 1 copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2007). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2009]

PETITION FOR WRIT OF HABEAS CORPUS

Page 1 of 6
Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov
American LegalNet, Inc.

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare the following:

I am over 18 years of age, and a party to the within action.

My address is:

MARQUIS M. DAVIS F-79213

CSP-CORCORAN   PO. BOX 3461

CORCORAN         CA. 93212

On 1/26/10 , I served a copy of the attached

First Amended Federal Writ of Habeas Corpus Petition

Pursuant to Fed R.Civ P.Rule 15

On the below-named persons by placing a true copy thereof
in envelope addressed as follows, with first class postage
thereon fully prepaid, and delivering the sealed envelopes,
according to the procedures prescribed for sending legal
mail, to the proper institutional official for deposit
in the United States mail at Corcoran, in the County of
Kings, California.

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF

CALIFORNIA 501 I STREET RM.4-400

SACRAMENTO OFFICE

SACRAMENTO        CA. 95814

ATTORNEY GENERAL'S OFFICE

EDMUND G. BROWN JR.

ATTN: DEPUTY AG. JAIME M. GANSON

1300 I STREET, SUITE 125 PO. BOX 94442550

SACRAMENTO        CA. 94442-2550

Executed under penalty of perjury this 26 day of
JANUARY  , 200 , at Corcoran, California.

Marquis Davis

DECLARANT